UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK by
ANDREW M. CUOMO, Attorney General of the State of
New York,

                                        Plaintiff,

                    *against,*

FIRST AMERICAN CORPORATION and FIRST
AMERICAN EAPPRAISEIT,

                                        Defendants.

**ECF Case**

Civ. Action No.:  07-10397 (LTS)
(HP)

**DECLARATION OF RICHARD
F. HANS IN SUPPORT OF
MOTION TO DISMISS
COMPLAINT**

Pursuant to 28 U.S.C. § 1746, **RICHARD F. HANS** hereby declares:

1.      I am a partner in the law firm of Thacher Proffitt & Wood LLP, attorneys for Defendants The First American Corporation and eAppraiseIT, LLC (collectively, "First American") in the above-entitled action, and am duly admitted to practice law in this Court.[1]

2.      Unless otherwise noted, I have personal knowledge of the facts and circumstances set forth herein.

3.      I submit this declaration for the sole purpose of introducing documents referenced in the accompanying Memorandum of Law of Defendants The First American Corporation and eAppraiseIT, LLC to Dismiss the Complaint, dated November 26, 2007.

4.      A true and correct copy of the Summons and Complaint filed by Andrew Cuomo, Attorney General for the State of New York against First American dated November 1, 2007, is attached hereto as Exhibit A.

5.      A true and correct copy of OTS Opinion P-2003-2 issued January 30, 2003, is attached hereto as Exhibit B.

---

[1]      The Complaint names First American Corporation and First American eAppraiseIT as defendants.  The proper legal names of these entities are The First American Corporation and eAppraiseIT, LLC.

6.      A true and correct copy of OTS Opinion P-2003-7 issued October 6, 2003, is attached hereto as Exhibit C.

7.      A true and correct copy of OTS Opinion P-2003-1 issued January 21, 2003, is attached hereto as Exhibit D.

8.      A true and correct copy of OTS Opinion P-2003-6 issued September 2, 2003, is attached hereto as Exhibit E.

9.      A true and correct copy of OTS Opinion P-2006-3 issued June 9, 2003, is attached hereto as Exhibit F.

10.     A true and correct copy of the Letter from Nicholas Dyer, Assistant Director of the OTS dated November 6, 2007, is attached hereto as Exhibit G.

11.     A true and correct copy of a transcription of the press conference held by Andrew Cuomo, Attorney General of the State of New York ("Attorney General") on November 7, 2007, is attached hereto as Exhibit H.

12.     A true and correct copy of the Attorney General's Press Release on November 1, 2007, is attached hereto as Exhibit I.

13.     A true and correct copy of the letter from James B. Lockhart III, Director of the Office of Federal Housing Enterprise Oversight, to the Attorney General dated November 8, 2007, is attached hereto as Exhibit J.

14.     A true and correct copy of the Independent Appraisal and Evaluation Functions issued by the Office of the Comptroller of Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision and National Credit Union Administration dated October 27, 2003 are attached hereto as Exhibit K.

15.    A true and correct copy of the *Statement of Tom Watson, OCC National Bank Examiner and Credit Risk Specialist*, appearing in The Federal Line, a publication of the Appraisal Institute, December 2003, is attached hereto as Exhibit L.

16.    I declare under penalty of perjury that the foregoing is true and correct.


_/s/ Richard Hans_____
RICHARD F. HANS

Executed on November 26, 2007

# EXHIBIT A

NEW YORK
COUNTY CLERK'S OFFICE

NOV - 1 2007

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK
by ANDREW M. CUOMO, Attorney General of
the State of New York,

                              Plaintiff,

                -against-

FIRST AMERICAN CORPORATION and
FIRST AMERICAN EAPPRAISEIT,

                         Defendants.

------------------------------------------------------------x

**SUMMONS**

Index No. 07/406796

**Plaintiff designates
New York County as the
place of trial**

TO THE ABOVE-NAMED DEFENDANTS:

        **YOU ARE HEREBY SUMMONED** to answer in this action and serve a copy of

your answer, or if the complaint is not served with the summons, to serve a notice of appearance

on the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of

the day of service. If this summons is not personally served upon you, or if this summons is

served upon you outside of the State of New York, then your answer or notice of appearance

must be served within thirty (30) days. In case of your failure to appear or answer, judgment will

be taken against you by default, for the relief demanded in the complaint.

Filed: November 1, 2007

Dated: New York, New York
       November 1, 2007

Andrew M. Cuomo
Attorney General of the State of New York
Attorney for Plaintiff
120 Broadway, 25th Floor
New York, New York 10271
(212) 416-6563

By
Christopher Mulvihill
Assistant Attorney General

NEW YORK
COUNTY CLERK'S OFFICE

NOV - 1 2007

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------x
                                       :

THE PEOPLE OF THE STATE OF NEW YORK    :
by ANDREW M. CUOMO, Attorney General of  :
the State of New York,                         :

                                 Plaintiff,       :      **COMPLAINT**

               -against-          :      Index No.  07/406796

FIRST AMERICAN CORPORATION and      :
FIRST AMERICAN EAPPRAISEIT,        :

                       Defendants.    :
----------------------------------------------------------x

    1.    This action is brought by Plaintiff, the People of the State of New York, by Andrew M. Cuomo, Attorney General of the State of New York ("Attorney General"), based upon the Attorney General's authority under Article 22-A of the General Business Law, Section 63(12) of the Executive Law, and the common law of the State of New York.

    2.    Plaintiff, complaining of the above-named defendants, alleges upon information and belief as follows.

### THE RELEVANT ENTITIES

    3.    First American Corporation ("First American") is, according to its 2006 annual report, "America's largest provider of business information." It earned $8.5 billion in revenues in 2006. First American operates in five primary business sectors: Title Insurance and Services, Specialty Insurance, Mortgage Information (including real estate appraisal services), Property Information, and Risk Mitigation and Business Services. It does business in New York both directly and through its subsidiaries.

Page 1 of 31

4.    First American provides real estate appraisal services to savings and loans, banks, and other lending professionals through its wholly owned subsidiary, First American eAppraiseIT ("eAppraiseIT"), an appraisal management company headquartered in California and Massachusetts. eAppraiseIT conducts business and appraises real estate in the state of New York.

5.    Washington Mutual, Inc. ("WaMu") is the country's largest savings and loan, with assets totaling $346 billion. In the first three quarters of 2007, WaMu originated $116 billion in residential mortgage loans. WaMu is eAppraiseIT's largest client.

## PRELIMINARY STATEMENT

6.    In this era of widespread mortgage loan defaults and home foreclosures, the independence and integrity of the real estate appraisers who determine the value of home loan collateral is of enormous importance. Real estate appraisals are intended to provide borrowers and lenders with an independent and accurate assessment of the value of a home. This ensures that a mortgage or home equity loan is not under-collateralized, which in turn protects borrowers from being over-extended financially and lenders and investors from loss of value in a foreclosure proceeding.

7.    First American recognizes and touts the central role it plays, through its appraisal management company eAppraiseIT, in protecting homeowners, business customers, and the entire financial market. As First American explains in its 2006 Annual Report:

> Appraisals are used to establish a property's market value; therefore, inaccurate or fraudulent appraisals damage the entire market and have negative economic effects that are far reaching. First American's third-party, unbiased valuations – including insured valuations – are a resource real estate and lending professionals can turn to for accuracy

that benefits not only the homeowner and lender, but our nation's economy.

*Value to Consumers*: Homeowners, who place a large investment in their property, can be particularly victimized by appraisal fraud. First American's warranted valuations, which are supported by our third-party perspective and backed by more than a century of integrity, virtually eliminate risk from this type of fraud.

*Value to our Business Customers*: Inaccurately appraised properties that make their way into lender portfolios increase the opportunity for foreclosures. Our national services provide our mortgage lender customers with a welcomed resource for unbiased appraisals that satisfy increased regulatory concerns, help to accurately determine value, and mitigate default risk.

8.    Despite these representations, First American and eAppraiseIT have abdicated their role in providing "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close. eAppraiseIT compromises its independence even while publicly touting that independence, and despite myriad warnings from its senior management team about the illegal collusion inherent in the compromises it is making. Instead of preserving its independence, which would have protected consumers and business customers alike, eAppraiseIT chose to protect only itself. And senior executives at First American, though warned by eAppraiseIT's senior management of its compromised independence, nonetheless directed eAppraiseIT to continue its wrongful conduct.

9.    This wrongful conduct constitutes a deceptive, fraudulent, and illegal business practice. It violates New York law as well as federal law and regulations.

## JURISDICTION

10.     The State of New York has an interest in the economic health and well-being of those who reside or transact business within its borders.  The State also has an interest in assuring the presence of an honest marketplace in which economic activity is conducted in a competitive manner, without fraud, deception, or collusion, for the benefit of marketplace participants.  The State also has an interest in upholding the rule of law generally.  The conduct of First American and eAppraiseIT injured these interests.

11.     Thus, the State of New York sues in its sovereign and quasi-sovereign capacities, as *parens patriae*, and pursuant to Executive Law § 63(12), General Business Law §§ 349 *et seq.* and New York common law.  The State sues to redress injury to the State, and to its general economy and residents, as well as on behalf of:  (1) persons who obtained mortgages, home equity loans, or refinanced their homes with WaMu and as to whose homes eAppraiseIT conducted the real estate appraisal; and (2) persons who bought WaMu loans secured by mortgages that were improperly appraised by defendants.  The State seeks disgorgement, restitution, damages including costs, and equitable relief with respect to defendants' fraudulent, deceptive, and otherwise unlawful conduct.

## FACTUAL ALLEGATIONS

### I.     The Real Estate Mortgage Industry

#### A.     Background

12.     Most people interested in purchasing or refinancing a home ("borrowers") seek a financial institution (a "lender") to lend them money on the most favorable repayment terms available.  Traditionally the lender, as part of agreeing to loan the funds, wanted to ensure that

the borrower was able to repay the loan and that the loan was adequately collateralized in case the borrower defaulted. The borrower and the lender had a common interest in accurately valuing the underlying collateral because both wanted to be sure the borrower was not paying too much for the property and would be able to meet the repayment terms, or that – in the event of default and foreclosure – the property value could support the loan.

13.     Today, the landscape of the mortgage industry is quite different from this traditional model. Rather than holding the mortgage loans, lenders now regularly sell these mortgages in the financial markets, either directly or to investment banks or Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are then pooled together, securitized, and sold to the general public as mortgage backed securities. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and aiding its stock price. Today, the vast majority of mortgage loans are sold to investment banks or GSEs, leaving the original lender holding far fewer mortgages in its portfolio.

14.     This reconfiguration of the way that mortgages are held has transformed the incentives in the industry. Specifically, it has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest in ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lenders' profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow

the loan to close, whether or not the appraisal accurately reflects the home value.

15.     Further jeopardizing the process, mortgage brokers and the lenders' loan production staff (also known as "loan origination staff") are almost always paid on commission. Thus, the income of these individuals depends on whether a loan closes and on the size of the loan. Accordingly, brokers and loan production staff have strong personal incentives to pressure appraisers to value a home at the maximum possible amount, so that loans will close and generate maximum commissions. For these reasons, mortgage brokers and lenders frequently subject real estate appraisers to intense pressure to change values in appraisal reports.

16.     The investment banks and GSEs also have an interest in inflating (or at least in not questioning) the value of the pooled loans. The values of these loans serve as a basis for the value of their securities. As such, the higher the value of the loans closed, the greater the value for which the securities are sold on the secondary market.

17.     Thus, the only parties under the current system who want an accurate appraisal are the borrowers and the investors in the asset-backed securities market. Neither of these parties, however, has any contact with, or control over, the appraisal process.

**B.     Federal and State Laws Require Appraisal Independence**

18.     Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent. The Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated into federal and New York law. See 12 C.F.R. § 34.44; 19 NYCRR § 1106.1. USPAP requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal

practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).

19.    Federal law sets independence standards for appraisers involved in federally-regulated transactions. See 12 U.S.C. §§ 3331 *et seq.* The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

20.    In 2005, federal regulators including the OTS [Office of Thrift Supervision] published "Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions." With regard to appraisal independence, the document provides:

> 3.    *Who should be considered the loan production staff for purposes of achieving appraiser independence? Could loan production staff select an appraiser?*
>
> *Answer:*    The loan production staff consists of those responsible for generating loan volume or approving loans, as well as their subordinates. This would include any employee whose compensation is based on loan volume. Employees responsible for the credit administration function or credit risk management are not considered loan production staff. **Loan production staff should not select appraisers.**

\* \* \*

5.   *When selecting residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provided the list is not under their control?*

*Answer:*   Yes, loan production staff may use a revolving, board-approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. **Staff responsible for the development and maintenance of the list should be independent of the loan production process. . . . Further, there should be periodic internal review of the appraiser selection process to ensure that appropriate procedures are being followed and that controls exist to ensure independence.** (Emphasis added).

21.   New York law incorporates USPAP and requires that a State-certified or State-licensed appraiser may not accept a fee for an appraisal assignment "that is contingent upon the appraiser reporting a predetermined estimate, analysis, or opinion or is contingent upon the opinion, conclusion or valuation reached, or upon the consequences resulting from the appraisal assignment." N.Y. Exec. Law § 160-y; 19 NYCRR § 1106.1.

## II.   Appraisal Management Companies Create the Appearance of Appraiser Independence

22.   In response to these rules and the threat of stricter federal enforcement, in Spring 2006, WaMu attempted to insulate itself by hiring two Appraisal Management Companies ("AMCs") – eAppraiseIT and its top competitor Lender's Service, Inc. ("LSI") – to oversee the appraisal process. These companies provide the appearance of a structural buffer between the banks and the appraisers that eliminates potential pressure or conflicts of interest. In theory, an AMC selects appraisers independently, serves as the appraisers' sole contact, and communicates the unbiased results to the lending institution. In this way, structurally, a lending institution

would be much less able to improperly influence an appraisal.

23.     eAppraiseIT publicly claims on its website that it provides just such a firewall between lenders and appraisers, and that "customers can be assured that Uniform Standards of Professional Appraisal Practice (USPAP) and Financial Institutions Reform Recovery and Enforcement Act (FIRREA) guidelines are followed and that each appraisal is audited for compliance."

**III.    First American and eAppraiseIT Violate Appraiser Independence Requirements by Permitting WaMu's Loan Origination Staff To Select Appraisers Who Provide Higher Appraised Values**

24.     Despite their claims of independence from their lender clients, First American and eAppraiseIT violate federal and state independence requirements with regard to appraisals performed for WaMu, and in doing so deceive borrowers and investors who rely on their proclaimed independence.

25.     WaMu retained eAppraiseIT in Spring 2006, after WaMu decided to close its internal appraisal office and terminate its staff appraisers. WaMu quickly became eAppraiseIT's largest client, providing nearly 30 percent of its business in New York. Over the course of the business relationship, eAppraiseIT conducted more than 260,000 appraisals for WaMu, receiving over $50 million from WaMu.

26.     Initially, eAppraiseIT employed a combination of in-house staff and third-party fee appraisers, including some "preferred appraisers" identified by WaMu, to conduct appraisals of residential property for WaMu. eAppraiseIT also hired approximately 50 former WaMu employees as staff appraisers and Appraisal Business Managers ("ABMs") and – at WaMu's request – gave the ABMs the authority to override and revise the values reached by third-party

appraisers. One-third of eAppraiseIT's staff appraisers are former WaMu employees, and all of the ABMs are former WaMu employees. eAppraiseIT's President advised the leadership of First American that "we have hired and on boarded many of Wamu's regional mangers and appraisers last week. They will be instrumental in our relational and operational success with the sales force."

27. Under contractual arrangements between WaMu and eAppraiseIT, WaMu can challenge an appraiser's conclusions by requesting a "reconsideration of value" ("ROV") when WaMu disagrees with an appraised home value set forth in an appraisal report. Practically speaking, this permits WaMu to ask eAppraiseIT to reconsider and raise the value assigned to a home. Throughout the business relationship, WaMu has frequently ordered ROVs from eAppraiseIT.

28. By email dated September 29, 2006, a WaMu executive wrote to eAppraiseIT's senior executives to define the responsibilities of eAppraiseIT's ABMs as to ROVs and value disputes:

> . . . the four appraisers/reviewers would be directly involved in escalations dealing with: ROVs, Valuation issues where the purchase price and appraised value differ with no reconciliations/justifications by the appraiser, Value cuts which we continue to receive from your third party reviewers (Wholesale), **proactively making a decision to override and correct the third party appraiser's value or reviewer's value cut**, when considered appropriate and supported . . . .

In this way, from the outset, WaMu sought to use eAppraiseIT to ensure that appraisals did not come in lower than WaMu wanted.

A.    **Summer - Fall 2006: WaMu is Dissatisfied with the Values
       Provided by eAppraiseIT's Independent Appraisers;
       First American and eAppraiseIT Try to Satisfy WaMu's Concerns**

29.    Almost immediately after WaMu retained eAppraiseIT to provide appraisals in early Summer 2006, WaMu's loan production staff began complaining that the appraisal values provided by eAppraiseIT's appraisers were too low. It was clear, and eAppraiseIT well understood, that WaMu's dissatisfaction was largely due to the fact that eAppraiseIT's staff and fee appraisers were not "hitting value," that is, were appraising homes at a value too low to permit loans to close.

30.    For example, on August 9, 2006, eAppraiseIT's President told WaMu executives that "We need to address the ROV issue . . . . Many lenders in today's environment . . . have no ROV issue. The value is the value. I don't know if WAMU production will go for that . . . . The Wamu internal staff we are speaking with admonish us to be certain we solve the ROV issue quickly or we will all be in for some pretty rough seas."

31.    A week later, on August 15, 2006, eAppraiseIT's Executive Vice President advised eAppraiseIT's President that WaMu's loan officers would often pressure WaMu's internal appraisal field managers for an "extra few thousand," or "tell[] them specifically what they needed," or would "ask for several ROVs on the same property." eAppraiseIT's Executive Vice President explained that "[h]aving loan officers ask for a few thousand dollars because it is within the range is something we do not currently do for any client. . . . It is also direct pressure on the appraiser for a higher value without any additional information."

32.    Yet only a month later, on September 14, 2006, eAppraiseIT's Executive Vice President proposed a solution that appeared to capitulate to these demands for an "extra few

thousand": he wrote "it looks like our potential 'raise the value' policy by [an eAppraiseIT

manager's] group might help a lot on the small value changes. . . . [W]e are studying allowing

[the manager's] group a little flexibility to raise the value 5% with a cap of $50k if it is fully

justified."

33.      Complaints and pressure from WaMu's loan origination staff were not empty

threats.  On October 5, 2006, in response to "complaints from the WaMu production team –

particularly in Northern California," eAppraiseIT prepared a "WaMu Improvement

Implementation Plan."  The plan was unsuccessful, however.  By December 2006, WaMu had

reassigned all of its Northern California appraisal work to LSI.

34.      During this period, First American was seeking additional business from WaMu

in other areas.  But WaMu expressly conditioned giving any future business to First American on

success with eAppraiseIT.  By email dated September 27, 2006, a First American senior

executive advised other senior executives at First American and eAppraiseIT about a

conversation he had with the President of WaMu Mortgage about long-term business prospects.

The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the
> money we have on deposit there and our other current business
> relationships.  I told him we would like to expand those relationships.
> And in exact terms, we would like one half of their flood business,
> which they currently give 100% to [Corporation A] and their tax
> business is divided 3 ways among [3 corporations] and that we would
> like to take [Corporation A's] tax business.

According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working
> well he would welcome conversations about expanding our
> relationship including tax and flood.

Thus, First American knew that WaMu would provide it with new business only if the "appraisal issues" – including WaMu's complaints that eAppraiseIT's appraisers did not provide high enough values – were "resolved."

35.     By December 2, 2006, eAppraiseIT noted internally that ". . . we know [WaMu is] going to complain about the excessive number of low values because the majority of orders are not going to [WaMu's] preferred appraisers."

36.     On December 18, 2006, one eAppraiseIT executive told others that WaMu had advised him that its criticism was based on the fact that "values are coming in lower with EA [eAppraiseIT]" than with LSI, the competitor appraisal management company that WaMu had also retained to provide appraisals.  According to this executive, WaMu maintained that "They also see more Wamu preferred appraisers doing work for LSI and they think that is why they aren't having as many value issues with them. . . . The [WaMu] managers indicated that if the loan consultants had a choice they would prefer to use LSI over eAppraiseIT because they feel they will have less problem with the values."

**B.     Winter 2007:  First American and eAppraiseIT Agree to "Roll Over and Just Do It" and Accept WaMu's Corrupt Proven Appraiser List**

37.     In February 2007, WaMu directed eAppraiseIT to stop using its usual panels of staff and fee appraisers to perform WaMu appraisals.  Instead, WaMu's loan origination staff demanded that eAppraiseIT use a Proven Panel of appraisers selected by the loan origination staff, who were chosen because they provided high values.

38.     By email dated February 22, 2007, eAppraiseIT's President explained to senior executives at First American WaMu's motives for demanding the Proven Panel:

We had a joint call with Wamu and LSI today. The attached document outlines the new appraiser assigning process. In short, we will now assign all Wamu's work to Wamu's "Proven Appraisers" . . . . We will pay their appraisers whatever they demand. **Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value, negating a need for an ROV.** (Emphasis added).

39.    eAppraiseIT's senior management was well aware of the threats to appraiser independence inherent in allowing WaMu's loan production staff to select the appraisers on the Proven Panel based on whether the appraiser "came in on value," and raised these concerns with First American's senior management. eAppraiseIT executives warned of their "concern regarding the proven list" and "concerns about over-valued properties."

40.    These concerns were warranted. eAppraiseIT knew that WaMu's Proven Appraiser List would be composed of appraisers who had been hand-picked by the loan origination staff because they brought in high appraisal values. Indeed, when eAppraiseIT received email requests to add particular appraisers to the panel, the email chains often showed that the requests came directly from WaMu's loan origination staff. Further, a WaMu Vice President in the Appraisal Oversight group explained, in an email to eAppraiseIT about an ROV for a "low value," that "This is an example of the issue that has caused sales pushing for a 'proven appraiser' process."

41.    In February 2007, eAppraiseIT simply capitulated to WaMu's demands. In an email on February 22, 2007, eAppraiseIT's President told senior executives at First American "we have agreed to roll over and just do it." He explained that "we were willing to live with the change if they would back us up with the appraisers and tell them that simply because they are rated as Gold Preferred does not mean that they can grab all the fees. They agreed." In other

words, for the right price in fees, eAppraiseIT was willing to go along with the Proven Panel.

Indeed, eAppraiseIT's President suggested to WaMu

> that if this the case we should have Wamu write the introduction letters
> to their appraisers, set the stage and let us do our magic . . . . I assured
> her the noise from retail will stop . . . . She brought up the fact that
> Wamu knows this means little money to no money for EA and LSI and
> they will fix that in the near future. But for now they need to stop the
> noise or none of us will be around. I believe her.

    42.    eAppraiseIT agreed to the Proven Panel with full knowledge that WaMu's loan

production staff was selecting appraisers that would "hit value" and provide higher appraisals. In

an email dated March 1, 2007, eAppraiseIT's President told WaMu executives:

> Recently, we have been notified that Lending would like us to use
> more of their "Proven Appraisers" versus appraisers off our pre-
> selected appraiser panel. It seems the amount of Reconsideration of
> Value (ROV) requests associated with our appraisers far exceeds those
> initiated when a WaMu proven appraiser completes a file. Said
> differently, **Wamu proven appraisers bring the value in a greater
> majority of the time** with minimal involvement of the vendor, sales
> and Appraisal Oversight. **I am fine with that, of course, and will
> happily assign Wamu orders to Wamu proven appraisers instead
> of eAppraiseIT's approved panel appraiser whenever possible.**
> (Emphasis added).

With this email, eAppraiseIT's President "happily" agreed to compromise the company's

independence and violate the laws governing appraiser independence.

    43.    On March 5, 2007, WaMu confirmed the primary role of its loan origination staff

in picking appraisers in a follow-up email, in which it explained that the

> Proven Appraiser List is being created. This will replace the WaMu
> preferred list. **The initial list of names will be provided by lending**
> with a minimum of two appraisers per area/county. The list will then
> be reviewed and approved by the Appraisal Business Oversight Team
> and will be checked against our most recent ineligible list. Final list
> will be provided to VMC's [vendor management companies].

Majority of work must be assigned to the appraisers on the Proven
Appraiser List on a Priority Basis. (Emphasis added).

44.    eAppraiseIT knew that the "review and approval" role of WaMu's Appraisal

Oversight team described above was a fig leaf, because WaMu's Appraisal Oversight team

deferred to WaMu's loan production staff. For example, in March 2007, upon learning that

WaMu's loan production officers were pressuring eAppraiseIT to reach a predetermined value

for a particular appraisal, the Appraisal Oversight Vendor Relations Manager told eAppraiseIT to

"stop coming to me for approval" and to work the issue out with the lending staff. In other

words, WaMu's Appraisal Oversight group provided no oversight at all.

### C.    Spring 2007: First American and eAppraiseIT Knew That The Proven Appraiser List Was Illegal

45.    As it became increasingly apparent to eAppraiseIT that WaMu's loan production

staff was hand-picking the appraisers that eAppraiseIT was required to use based on the values

the appraisers provided, eAppraiseIT began to consider the legal implications of this

arrangement. eAppraiseIT's Executive Vice President analyzed the federal guidelines and

regulations on appraiser independence and selection of appraisers by loan production staff, and

advised eAppraiseIT's President that "Based on this, I think WAMU's new initiative is way over

the line. It is even possible that the current arrangement crosses the line." In response,

eAppraiseIT's President wrote: "Bingo!" and explained that since the federal government

enforced appraiser independence rules variably in different regions of the United States, and that

"it boils down to who has juice with whom at the regulatory level." In response, the Executive

Vice President warned "it may be that the OTS [federal Office of Thrift Supervision] is OK with

WAMU's current way (maybe) but the new way seems to be quite a stretch."

46.     On April 4, 2007, eAppraiseIT's Executive Vice President wrote an email to senior eAppraiseIT executives regarding eAppraiseIT's legal liability for using WaMu's Proven List. He explained that appraiser independence is initially

> the lender's responsibility since the OCC [Office of the Comptroller of the Currency]/OTS only pertain to lenders. **However, we as an AMC need to retain our independence from the lender or it will look like collusion. Imagine a simple mortgage broker saying he will give us the work if we use his "proven" appraiser. We say no. This is very similar to that except they are very big. . . .**
>
> So the push back to WAMU needs to be (assuming we want to do this some day), eAppraiseIT needs to choose the appraisers, not WAMU. Where it gets really clear that eAppraiseIT is NOT choosing is the proven idea because they always go first and MUST be selected unless there is a specific reason why not. **eAppraiseIT is clearly being directed who to select. The reasoning that there are fewer ROVs is bogus for many reasons including the most obvious – the proven appraisers bring in the values.**
>
> Fun, eh?? (Emphasis added).

47.     Yet, despite this clear articulation of what eAppraiseIT should do, by one of the company's most senior executives, eAppraiseIT did not "push back." It agreed to use the WaMu Proven Appraiser Panel, acceding to WaMu's demands for complete control over the Proven Panel and the reconsideration of value process.

48.     On April 17, 2007, eAppraiseIT's President wrote to senior executives at First American, describing the issues with WaMu as follows:

> In short, the issues are using their designated appraisers as mandated by the WaMu production force at 20% gross margin and bypassing our panel. **We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation.** (Emphasis added).

49.     In support of his conclusion that using the WaMu panel violated federal

regulations and USPAP, eAppraiseIT's President attached to his email a memorandum to WaMu that was prepared by eAppraiseIT's Executive Vice President. At the outset of the memorandum, eAppraiseIT summarized the guidelines regarding appraiser independence, stating:

> The various regulatory boards including OTS, OCC, FDIC and others prepared a list of frequently asked questions on Independent Appraisal and Evaluation Functions on March 21, 2005. These FAQs should be reviewed in conjunction with prior guidelines published in 1994 and 2003. I have included the 2005 FAQs at the end of this document. We assume that you are very familiar with these documents.
>
> We want to focus on appraiser independence. All three documents address and re-address this issue. In the section titled Independence of the Appraisal and Evaluation Function, the 1994 and 2003 document states, "Because the appraisal and evaluation process is an integral component of the credit underwriting process, it should be isolated from influence by the institutions's loan production process." This is reinforced in the Selecting Individuals to Perform Appraisals or Evaluations section from the 2003 document. It states that it is important to ensure that the program is safeguarded from internal influence and interference from an institution's loan production staff. Individuals independent from the loan production area should oversee the selection of appraisers and individuals providing evaluation services.

50.    eAppraiseIT's memorandum then applied the appraiser independence guidelines to the WaMu Proven Panel and concluded that:

> Based on our conversations we have had with the WAMU oversight as well as the questions and answers initiated by our competitor LSI, **it is our interpretation that the loan production staff has a great deal to do with selecting appraisers. The PAL [Proven Appraiser List] has been selected by the loan production staff and the continued use of these appraisers is being monitored by the loan production staff.** For example, on the LSI question #1 "Does WAMU want to be updated transactionally on every order we can not assign to a PAL?", WAMU's answer is "Yes, we need a short sentence in the message log so that we can monitor, – AND most important - lending can see why you didn't assign to a PAL service provider. Not using a PAL appraiser will be an issue so we need to ensure we've covered our

Page 18 of 31

bases as to why they're not utilized." **This appears to be directly in contradiction to the interagency guidelines unless you have a different interpretation.**

\* \* \*

This produces the following challenge – eAppraiseIT is operating under what appears to be a mandate from WAMU in utilizing PAL selected appraisers (and this selection is coming from the loan production staff). We are then asked to rep and warrant this work. We are concerned about this arrangement from a risk perspective . . . ." (Emphasis added).

51.     As demonstrated by this memorandum, First American and eAppraiseIT knew

that complying with the WaMu Proven Panel violated appraiser independence regulations.

However, eAppraiseIT did not stop conducting appraisals for WaMu using the tainted Proven

Panel. To the contrary, First American's Chief Operating Officer, who sits on First American's

Compliance Committee, testified under oath that his reaction to the April 17 email and the

attached memorandum was that "I don't recall anything unique about this email."

52.     Again, on April 17, 2007, eAppraiseIT's Executive Vice President wrote to

eAppraiseIT's President and Chief Operating Officer regarding eAppraiseIT's legal liability:

OTS and OCC only control lenders. However, there is the legal concern about collusion. For example, let's say it is discovered that a lender (loan officer at a lender) is being collusive with an appraiser that is on OUR (WAMU) panel. That is, our reps and warrants apply. Then we are liable I would say because we have gone along with it. . . .

In addition, I think it will tarnish our reputation in the appraisal community because we are allowing WAMU to pick appraisers based on their loan officers. It makes us look complicit. So [it] may not be actionable legally but would hurt our reputation. So those are two bad things off the cuff. There may be more if we think about it and use creative paranoia.

53.     On April 17, 2007, eAppraiseIT emailed its staff appraisers to explain why the

staff appraisers had been removed from the WaMu Proven List. In these messages,

eAppraiseIT's ABMs acknowledged that WaMu loan origination staff were now choosing the appraisers for their loans:

> I thought I [sic] pass on my thoughts regards the recent message that we all received for [sic] Peter last weekend. I will be glad to tell you what I know. I have been told that the lending folks at Wamu and [sic] were unhappy with the AMC's and felt they were not receiving a good level of appraisal work. They therefore decided to construct their own appraisal panel, now known as the wamu proven panel, and instructed the AMC's to utilize appraisers from this panel whenever possible. The end result is that if you are not on this proven panel it is very unlikely you will receive wamu work.

No independent appraiser could misread this message: if you want to do work for WaMu, you will have to satisfy the "lending folks at Wamu."

54.    Even beyond picking the Proven Panel, WaMu's loan officers at times also directly selected specific individual appraisers on the panel to conduct their appraisals. On April 19, 2007, eAppraiseIT's Chief Operating Officer wrote in an email to eAppraiseIT's President and Executive Vice President:

> Evidently, we do get calls/emails from the WaMu Oversight Group to select a specific appraiser for an order. Now, normally, this would not be a concern since the group is separate from [WaMu] lending. However, Vicky [at eAppraiseIT] is also receiving a copy of an email from the LC [WaMu Loan Consultants] to Oversight requesting the appraiser selection – then the subsequent email from Oversight directing the assignment change."

55.    By April 2007, WaMu had complete control over eAppraiseIT's appraiser panel. On April 26, 2007, eAppraiseIT's President wrote an email to senior management at First American regarding WaMu. In the email, eAppraiseIT's President discussed the Proven Panel and eAppraiseIT's reputational risk:

> Sales is the driving force behind the Proven Appraiser List (PAL)

which is questionable from regulatory perspective. We are required to use these appraisers at 80/20% fee splits. This is dilutive to our P&L. Even with the implementation of such, we are still finding that we are being questioned surrounding what appraiser was assigned the order. **We feel our reputation in the industry is being tarnished by the implementation of the Proven List since Production selects the appraiser.** (Emphasis Added).

56.    Yet First American and eAppraiseIT continued to comply with WaMu's demands and agreed to use the Proven Panel selected by WaMu loan production staff.

57.    On May 11, 2007, eAppraiseIT's Executive Vice President wrote to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel. They are selecting the appraisers and calling them 'proven' appraisers. These appraisers are being chosen by their sales force. First American eAppraiseIT (FA eAppraiseIT) is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using a Proven Panel because of the "low values" from eAppraiseIT's appraisers.

**D.    Spring 2007:  First American and eAppraiseIT Attempt to Stop Warranting WaMu's Appraisals Because They Know They Have Illegally Compromised Appraiser Independence**

58.    On April 26, 2007, eAppraiseIT informed WaMu that effective May 1, 2007, it would no longer "be warranting appraisals as performed by the Wamu selected Proven Appraiser List (PAL) appraiser on originations. . . . The new, verbal requirements to utilize Wamu's panelists falls outside the spirit and letter of our agreement as it relates to Warranties. . . ."

59.    This was a dramatic departure from eAppraiseIT's regular practices. On its website, eAppraiseIT claims that: "All of First American eAppraiseIT's traditional appraisal products come standard with one of the industry's strongest warranties. Our warranty coverage includes foreclosure loss incurred due to fraud or gross negligence. First American

eAppraiseIT's commitment to appraisal quality means our customers don't need to go through the lengthy and difficult process of filing a claim against our Errors and Omissions policy, in the event they suffer a loss due to appraisal error. Of course, the policy is there for that purpose, but our warranty presents a much simpler way to recover losses due to appraisal fraud or gross negligence."

60.    eAppraiseIT threatened to stop warranting WaMu appraisals because eAppraiseIT's management knew that it had compromised its appraiser independence by using the WaMu Proven Appraiser List. eAppraiseIT's Chief Appraiser has testified that the threat to stop warranting was based on the risks inherent with WaMu's choice of such a "limited" panel.

61.    eAppraiseIT's senior managers acknowledged these risks internally to one another. As eAppraiseIT's Executive Vice President explained in an email to other members of senior management while discussing a particular reconsideration of value: "The original appraiser was a WAMU proven appraiser coming in $750,000 higher than the eAppraiseIT review appraiser. This is a good example of why we currently have stopped rep and warrants and our concerns about over-valued properties."

62.    In response to the above email, eAppraiseIT's Chief Operating Officer wrote that "In addition to this example, we are also seeing what appears to be a higher incidence of Threshold Reviews [mandated for properties worth over $1 million] coming in with a lower value than the original appraisal. I think this supports our concern regarding the proven list."

63.    On April 30, 3007, eAppraiseIT's President wrote to his Chief Operating Officer, regarding the warranting of appraisals from WaMu's Proven Panel:

I have given serious thought to your suggestion on Friday regarding an

addendum to section B of the contract striking our quality control efforts and warranty coverage on appraisals performed by an appraiser off the Wamu Proven Appraiser List (PAL). Would you draft something that stipulates this? Again, this new requirement violates the spirit of our agreement where we agreed to aggressively QC and warrant appraisals as performed by our own panel. **Using Loan Officer's favorite appraiser is obviously something we will not stand behind from a quality and risk perspective.** (Emphasis added).

64.     Nevertheless, eAppraiseIT continued to perform appraisals for WaMu, and continued to tout its independence.

65.     The New York Attorney General issued a subpoena to First American on May 5, 2007.

66.     On May 15, 2007, eAppraiseIT's Chief Operating Officer in an email wrote to eAppraiseIT's President regarding WaMu's Appraisal Oversight group: "I think this proves the point that . . . Oversight continues to buckle when confronted with direct and unrelenting pressure from lending."

67.     Although eAppraiseIT repeatedly told First American that WaMu's loan origination staff illegally selected and controlled its Proven Appraiser List and that, in some instances, loan officers were directly selecting specific appraisers, First American instructed eAppraiseIT to continue the business relationship with WaMu. By email dated May 17, 2007, First American's Chief Operating Officer instructed eAppraiseIT's President and Executive Vice President to continue the relationship with WaMu and to "design a model that predominantly leverages their panel but doesn't violate our independence **which is probably easier said than done but there should be a way to figure it out.**" (Emphasis added).

68.     On May 29, 2007, eAppraiseIT's Executive Vice President summarized the

problems in the eAppraiseIT/WaMu business relationship in a letter to a senior executive at

WaMu as follows:

> In the first quarter of 2007, the sales group of WAMU began to insist
> they choose the appraisers mostly due to their concerns about 'low
> values.' eAppraiseIT encouraged WAMU to resist these pressures if
> possible. However, WAMU decided to go with what came to be called
> the "proven" list of appraisers recommended by sales. . . .
>
> The use of the "proven panel is challenging for eAppraiseIT in two
> ways: A. Financially – The proven panel is paid a minimal of 20%
> more than the eAppraiseIT panel. B. Risk Management – the
> possibility of collusion between the loan officers and appraisers is
> increased when eAppraiseIT does not control the selection. In
> addition, eAppraiseIT is concerned with any possible lender pressure
> or perception of lender pressure when the only way to get on the
> WAMU "proven" panel is through the loan officer.

69.    Despite this articulation of the "possibility of collusion," nothing changed

between the parties, except cosmetically, and they continued in this corrupt business relationship.

On June 7, 2007, a WaMu executive directed eAppraiseIT to change the name of the Proven List

for the following reasons: "Name change from "proven appraiser" and/or use of the moniker

"PAL" list is discontinued, under direction of the WaMu legal department. We are utilizing a

more generic term acceptable w/in regulatory guidelines and industry standards." The Proven

Appraiser Panel was renamed the "WaMu Select" panel, and eAppraiseIT accepted the name

change while doing nothing to solve the regulatory violations.

**IV.    First American and eAppraiseIT Permit WaMu's Loan Origination Staff
to Remove Appraisers From the Proven Appraiser Panel and to Improperly
Communicate Directly With eAppraiseIT Appraisal Business Managers**

70.    As discussed above, First American and eAppraiseIT permitted WaMu's loan

origination staff to select a Proven Appraiser List of appraisers and to control the Proven Panel.

In addition, First American and eAppraiseIT permitted WaMu's loan origination staff to remove appraisers from the Proven Panel on the grounds that such appraisers consistently valued properties lower than WaMu's desired target amount, had a high rate of reconsideration of value requests, or performed desk reviews that reduced another appraiser's value for a given property.

71.    In one specific example, in or about December 2006, a particular appraiser ("Appraiser A") was approved to be an appraiser on the Proven Panel. From January 25, 2007 through May 7, 2007, Appraiser A conducted five appraisals for eAppraiseIT with respect to WaMu properties. For each appraisal, WaMu requested a reconsideration of value. In each instance, Appraiser A refused to increase the value.

72.    Shortly thereafter, Appraiser A was removed from the Proven List and placed on the WaMu inactive list. He was then told by a WaMu sales assistant that he was removed from the panel because he did not increase values in response to these reconsiderations of value. This same WaMu sales assistant told Appraiser A that many appraisers who had previously been removed from WaMu's list of active appraisers for conducting fraudulent appraisals were being reinstated on WaMu's Proven List in order to help ensure that appraisals would come in at sufficiently high value to permit the loans to close.

73.    On May 30, 2007, Appraiser A wrote to eAppraiseIT regarding the WaMu Proven Panel. In the email, Appraiser A wrote that: "We continued to provide this high level of service when eAppraiseIT took over as appraisal management. With no explanation or warning, I was removed from the assignment rotation in mid April of this year. I respectfully ask to be reinstated as an active preferred appraiser."

74.    Following receipt of Appraiser A's email, on May 30, 2007, an eAppraiseIT

Appraisal Specialist wrote to eAppraiseIT's Executive Vice President, Chief Operating Officer

and Chief Appraiser:

> I was working with two good, solid long-time wonderful appraisers in
> NY and CT until right after the WaMu Proven Panel was formed.
> They were both removed very soon after for no apparent reason. **We
> were having value issues, however, I felt their work was very
> defendable and supportable, and kept copious notes on our
> dealings.** They have continued to keep in touch with me, in order to
> find out why they were removed from the panel. (Emphasis added).

75.    On May 31, 2007, eAppraiseIT's Chief Appraiser replied:

> First he was on the Master List so put on WAMU Proven and then as
> the list went around he was REMOVED. The probability that a loan
> officer requested him to be removed is pretty high I think because that
> is what they did with the Master List; they sent it out to Lending to
> choose.

76.    To date, Appraiser A remains off the Proven Panel.

77.    Another appraiser ("Appraiser B") conducted hundreds of appraisals for WaMu

loans through eAppraiseIT from January 2007 through April 2007. During this period, Appraiser

B received 102 Reconsideration of Value requests.

78.    On April 3, 2007, in an email Appraiser B wrote to eAppraiseIT the following:

> I WAS JUST MADE AWARE FROM ONE OF YOUR
> COMPETITORS (LSI) THAT I MAY BE ON A BLOCKED LIST
> FROM WAMU. THIS MAY HAVE SOMETHING TO DO WITH
> THIS APPRAISAL IN QUESTION FOR WHICH I THOUGHT WAS
> BEING TAKEN CARE OF AND IN PROCESS OF BEING
> RESOLVED. CAN SOMEONE HELP ME OUT HERE AS THIS IS
> IMPORTANT TO US TO KEEP THE RELATIONSHIP WITH
> WAMU THROUGH EAPPRAISEIT. WHAT IS GOING ON AND
> WHAT CAN I DO TO CLEAR THIS FILE UP????? (Capitals in
> original).

79.    A senior appraiser employed by Appraiser B argued to eAppraiseIT that he was

removed because WaMu did not like it when he reduced appraisal values after desk reviews. He wrote: "After reviewing appraisals over the past few months, many of which are fraudulent, with inflated unsupported values, it is disturbing that WaMu's focus and concern is misplaced with the review process."

80.     To date, Appraiser B is still on the WaMu removed list.

81.     Similarly, on April 17, 2007, a third appraiser ("Appraiser C") wrote to eAppraiseIT that:

> This is the second Wamu Appraisal quality assurance issue I have received from Wamu in the past 2 months. Both as a result of an appraisal I completed that did not come in to their predetermined value for a "valued" Wamu client. **I was pressured for 2 weeks to change both my value and the conditions of my appraisal report . . . both of which were violations of USPAP, FANNIE MAE and the Supplemental Standards I am required to observe and am bound by my license to complete.** Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed that did not reach a pre-determined value. I feel that Wamu is in process of "blacklisting" me as an approved Wamu appraiser by going after each appraisal I complete and looking for violations." (Emphasis added).

82.     Appraiser C wrote this email after having been pressured and harassed to increase values on two appraisals, after WaMu had requested ROVs and she had declined to increase the values. Shortly after her refusal to increase these values, she received two "Unacceptable Appraisal Notifications" from WaMu. After having been harassed and targeted with "unacceptable" strikes, she withdrew from WaMu's panel in order to avoid being removed against her will.

83.     Senior executives at eAppraiseIT acknowledged that WaMu was targeting their appraisers. On May 23, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's

Executive Vice President that " It was disturbing to find out from [WaMu] that we receive three times the number of strike letters as LSI – and we're getting less volume. This indicates to me that they have targeted our "non-proven" appraisers – and are somewhat biased against EA in their work."

84.    Further, eAppraiseIT permitted loan officers at WaMu to communicate directly with eAppraiseIT's ABMs and Appraisal Specialists by telephone and email, to discuss appraisal values. Indeed, eAppraiseIT permitted loan officers at WaMu to pressure eAppraiseIT ABMs and Appraisal Specialists about appraisal values even after an initial appraiser has considered a value reconsideration request and refused to change the value.

85.    eAppraiseIT permitted these improper practices because WaMu is a large client that demanded the right to have these contacts. And eAppraiseIT's ABMs had the authority to change a final appraisal value only because WaMu had demanded, in September, 2006, that ABMs be permitted to "proactively mak[e] a decision to override and correct the third party appraiser's value or reviewer's value cut."

86.    Further, email exchanges between WaMu and eAppraiseIT show that WaMu repeatedly pushed eAppraiseIT's ABMs to increase appraised values so that loans could close. For example, in one exchange with an eAppraiseIT review appraiser, a WaMu loan officer wrote that "Basically, if we don't get at least the appraised value of $3,650,000 . . . we lose the deal." (Ellipses in original). Earlier that day, this loan officer told eAppraiseIT that "if we don't have a definitive $$ appraised value then the borrower will go to another lender with a higher appraised value of $4mm. Please . . . at least . . . keep this value at the original appraised value of $3,650,000." (Ellipses in original).

87.     On May 23, 2007, eAppraiseIT's Chief Appraiser described these comments as "a clear picture of Lender Pressure on behalf of WaMu."

88.     eAppraiseIT received other communications from WaMu in which WaMu attempted to influence the appraised values of specific properties.  For example, on May 24, 2007, eAppraiseIT's Chief Operating Officer wrote to eAppraiseIT's President that: "We have received in the past, and now most recently with the Sag Harbor event (which incidentally just happens to be a New York property), communications where it could be viewed that EA did experience some level of influence to increase a value beyond that which we concluded in our own analysis was not supported."

89.     eAppraiseIT's internal appraisal log entries indicate that its Review Appraisers and ABMs increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close.  For the period of November 2006 to May 2007, there were 8 desk reviews performed by ABMs and 1 desk review performed by the Appraisal Specialist relating to properties in New York, all of which were for WaMu.  The appraised values were increased in each of the 9 desk reviews completed, as follows:  from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000.

90.     This level of contact between WaMu's loan production staff and eAppraiseIT's ABMs is prohibited by USPAP's independence requirements and by state and federal law.

## FIRST CAUSE OF ACTION
(Fraudulent or Illegal Business Practices – Executive Law § 63(12))

91.     The acts and practices alleged herein constitute conduct proscribed by § 63(12) of

the Executive Law, in that defendants engaged in repeated fraudulent or illegal acts or otherwise

demonstrated persistent fraud or illegality in the carrying on, conducting on transaction or a

business.

## SECOND CAUSE OF ACTION
(Deceptive Acts or Practices – General Business Law § 349)

92.     The acts and practices alleged herein constitute conduct proscribed by § 349 of the

General Business Law, in that defendants engaged in repeated deceptive acts or practices in the

conduct of its business.

## THIRD CAUSE OF ACTION
(Unjust Enrichment)

93.     By engaging in the acts and conduct described above, defendants unjustly

enriched themselves by receiving payment for independent, accurate, and legal appraisals, but

failing to provide such appraisals.


WHEREFORE, plaintiff demands judgment against the defendants as follows:

A.     Enjoining and restraining First American and eAppraiseIT, their affiliates,

assignees, subsidiaries, successors and transferees, their officers, directors, partners, agents and

employees, and all other persons acting or claiming to act on their behalf or in concert with them,

from engaging in any conduct, conspiracy, contract, agreement, arrangement or combination, and

from adopting or following any practice, plan, program, scheme, artifice or device similar to, or

having a purpose and effect similar to, the conduct complained of above.

      B.      Directing that First American and eAppraiseIT, pursuant to Article 22-A of the

General Business Law, § 63(12) of the Executive Law and the common law of the State of New

York, disgorge all profits obtained, including fees collected, and pay all restitution, and damages

caused, directly or indirectly by the fraudulent and deceptive acts complained of herein;

      C.      Directing that First American and eAppraiseIT pay plaintiff's costs, including

attorneys' fees as provided by law;

      D.      Directing such other equitable relief as may be necessary to redress First

American and eAppraiseIT's violations of New York law; and

      E.      Granting such other and further relief as may be just and proper.

Dated:      New York, New York
             November 1, 2007

                                   ANDREW M. CUOMO
                                   Attorney General of the State of New York
                                   *Attorney for Plaintiff*
                                   120 Broadway, 25th Floor
                                   New York, New York 10271
                                   (212) 416-6053

                  By:                               
                                   Nicole Gueron
                                   Deputy Chief Trial Counsel

Of Counsel:
Christopher Mulvihill
Assistant Attorney General

Page 31 of 31

# EXHIBIT B

**Preemption of New York Predatory Lending Law**

**Summary Conclusion:** Federal law preempts application of various provisions of the New York Predatory Lending Law to federal savings associations and their operating subsidiaries.

**Date:** January 30, 2003

**Subjects:** Home Owners' Loan Act/Savings Association Powers

P-2003-2

# P-2003-2



**Office of Thrift Supervision**
Department of the Treasury                                              *Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6251

January 30, 2003

[

        ]

Re:    Preemption of New York Predatory Lending Law

Dear [          ]:

This responds to your recent letter on behalf of
("Association"), a federal savings association.
In your letter, you ask the Office of Thrift Supervision ("OTS") to confirm that federal
law preempts the application to the Association of the recently enacted New York
Predatory Lending Law ("NY law").[1]  We conclude that NY law provisions purporting to
regulate the terms of credit, loan-related fees, disclosure and advertising, and mortgage
origination, refinancing, and servicing are preempted by federal law from applying to
federal savings associations.[2]

**Background**

The NY law imposes requirements on "high-cost home loans," including such
loans made by federal savings associations.[3]  High-cost home loans are subject to certain
requirements on the terms of credit, loan-related fees, disclosure and advertising, and

---

[1] The NY law is codified as N.Y. Banking Law § 6-l, N.Y. Gen. Bus. Law § 771-a, and N.Y. Real Prop. Acts. Law
§ 1302. The NY law takes effect April 2003.

[2] The same conclusion would apply to preemption for federal savings association operating subsidiaries. OTS has
consistently indicated that state laws purporting to regulate the activities of a federal savings association's operating
subsidiary are preempted by federal law to the same extent such laws are preempted for the federal savings
association itself. *See* 12 C.F.R. § 559.3(n)(1) (2002); OTS Op. Chief Counsel (January 21, 2003); OTS Op. Chief
Counsel (July 26, 1999) (and authorities cited therein).

[3] A "high-cost home loan" is a mortgage loan (including a home equity loan, but excluding a reverse mortgage) to a
natural person secured by a one- to four-family owner-occupied principal dwelling located in New York, where the
principal amount does not exceed the lesser of $300,000 (or the Fannie Mae conforming loan limit which is
$322,700 for 2003 for a single-family dwelling), and which exceeds specified annual percentage rate or point/fee
thresholds. N.Y. Banking Law § 6-l(1)(d)-(h). The NY law purports to apply to federal savings associations. N.Y.
Banking Law §§ 6-l(1)(i) and 590(1)(e).

2

mortgage origination, refinancing, and servicing. Requirements concerning the terms of credit and loan-related fees include prohibiting call provisions, balloon payments, negative amortization, default interest rates, modification or deferral fees, and single premium insurance financing, as well as limiting advance payments and the financing of points and fees.[4] Requirements concerning disclosure and advertising include mandating a disclosure at application concerning financial counseling, a pre-closing disclosure which, among other things, warns about possible foreclosure and home loss in the event of default and encourages shopping and credit counseling, and a legend on the mortgage instrument identifying the loan as high-cost, as well as prohibiting the encouragement of default.[5] Requirements concerning mortgage origination, refinancing, and servicing include limiting the circumstances in which a refinancing may occur, prohibiting lending without regard to repayment ability, prohibiting the payment of referral fees to mortgage brokers, restricting payments to home improvement contractors from loan proceeds, and mandating reporting of payment history to a consumer credit bureau.[6]

The NY law also contains a multifaceted compliance scheme. The NY law grants authorization to the NY Attorney General, the NY Superintendent of Banks, or any party to a high-cost home loan to enforce the law through litigation.[7] Remedies available include actual and statutory damages, attorneys' fees, injunctive and declaratory relief, for intentional violations voiding of loan agreements and borrower recoupment of payments made, and rescission of the loan transaction without time limitation.[8] Further, the NY law uses state foreclosure law as an additional tool to compel compliance with the predatory lending law. The NY law makes a violation of the predatory lending law a foreclosure defense and requires a lender to affirmatively prove compliance with the NY law as a prerequisite to obtain the entry of judgment in a foreclosure action.[9]

**Discussion**

The NY law provisions discussed above, which purport to regulate the terms of credit, loan-related fees, disclosure and advertising, and mortgage origination, refinancing, and servicing are preempted by federal law from applying to federal savings

---

[4] N.Y. Banking Law § 6-l(2)(a)-(f), (h), (m), and (q).

[5] N.Y. Banking Law §§ 6-l(2)(l)(i)-(ii) and (o) and 6-l(2-a)(a).

[6] N.Y. Banking Law §§ 6-l(2)(i)-(k), (n), and (p) and 6-l(2-a)(b).

[7] N.Y. Banking Law § 6-l(5)-(6).

[8] N.Y. Banking Law § 6-l(7)-(12).

[9] N.Y. Real Prop. Acts. Law § 1302.

3

associations.[10]  In enacting the Home Owners' Loan Act ("HOLA"),[11] Congress required the Federal Home Loan Bank Board ("FHLBB"), and now the OTS, to provide for the organization, incorporation, examination, operation, and regulation of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States."[12]  Consistent with this language, OTS has made clear in its lending regulations its intent to carry out this congressional objective by giving federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.[13]  That uniform federal scheme occupies the field of regulation for lending activities.  The comprehensiveness of the HOLA language demonstrates that Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary.[14]

OTS occupies the field to enhance safety and soundness and enable federal savings associations to conduct their operations in accordance with best practices by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden.[15]  Under OTS regulation 560.2(a), federal savings associations may extend credit as authorized under federal law without regard to state laws purporting to regulate or otherwise affect their credit activities.  As described above, the NY law imposes a number of specific restrictions and requirements on home loans.  The NY law would regulate areas covered by regulation 560.2 and therefore does not apply to federal savings associations' home lending.

OTS has described with specificity the scope of its occupation of the field of lending regulation by noting the types of state laws encompassed within the preemption. They include many of the types of provisions found in the NY law.  For example, 12 C.F.R. § 560.2(b)(4) preempts state laws on terms of credit, § 560.2(b)(5) preempts

---

[10]  As per a January 16, 2003 telephone discussion between you and OTS staff, however, this opinion does not address the restriction on mandatory arbitration clauses in N.Y. Banking Law § 6-l(2)(g).  Nor does it address the responsibilities of home improvement contractors under N.Y. Gen. Bus. Law § 771-a, since the Association is not a home improvement contractor.

[11]  12 U.S.C.A. § 1461 *et seq.* (West 2001).

[12]  HOLA § 5(a); 12 U.S.C.A. § 1464(a) (West 2001).

[13]  12 C.F.R. § 560.2(a) (2002).

[14]  See *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).  OTS regulations preempt the field of lending regulation for federal savings associations whether or not OTS adopts a regulation governing the precise subject of the state law. *Lopez v. World Savings and Loan Ass'n*, No. A095666, 2003 WL 152956 (Cal. App. 1 Dist. Jan. 23, 2003).

[15]  12 C.F.R. § 560.2(a) (2002).

4

state laws on loan-related fees, § 560.2(b)(9) preempts state laws on disclosure and advertising, and § 560.2(b)(10) preempts state laws on processing, origination, servicing, sale, purchase, investment, and participation in mortgages. This conclusion is further supported by numerous opinions of OTS, and its predecessor, the FHLBB.[16]

The NY law would thwart the more general congressional objective that OTS have exclusive responsibility for regulating the operations of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States.[17] Congress gave OTS, not the States, the task of determining the best practices for thrift institutions and creating nationally uniform rules. OTS conducts regular examinations of thrift lending operations for safety and soundness and compliance with established consumer protections. OTS also maintains a toll-free consumer hotline to respond to consumer questions and complaints. OTS seeks to assure that the thrift appropriately responds to the consumer's concern. If OTS's review indicates a violation of federal consumer laws or regulations occurred, OTS may require the institution to take appropriate corrective action.

Federal savings associations must comply with the requirements of federal law, including restrictions on abusive practices such as those in the Home Ownership Equity Protection Act ("HOEPA"), the Real Estate Settlement Procedures Act ("RESPA"), and their implementing regulations.[18] Subjecting federal savings associations to the burdens of complying with a "hodgepodge of conflicting and overlapping state lending requirements" would undermine the federal objective of permitting federal savings associations to exercise their lending powers "under a single set of uniform federal laws and regulations. This [uniformity] furthers both the 'best practices' and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden."[19]

---

[16] *See, e.g.*, OTS Op. Chief Counsel (January 21, 2003) (preemption of state predatory lending law); OTS Op. Counsels (Banking and Finance) (May 16, 2001) (preemption of state law on terms of credit); FHLBB Op. Gen. Counsel (February 1, 1982) (same); OTS Ops. Chief Counsel, (December 14, 2001, April 21, 2000, and March 10, 1999) (preemption of state law on loan-related fees); OTS Op. Chief Counsel (December 24, 1996) (preemption of state law on loan-related fees and disclosures); OTS Mem. Dep. Chief Counsel (May 10, 1995) (preemption of state law on disclosures).

[17] 12 U.S.C.A. § 1464(a) (West 2001).

[18] *See* 15 U.S.C.A. § 1639 (WESTLAW 2002) (HOEPA); 12 C.F.R. pt. 226, subpart E (2002) (HOEPA regulations); 12 U.S.C.A. § 2601 *et seq.* (WESTLAW 2002) (RESPA); 24 C.F.R. pt. 3500 (2002) (RESPA regulations).

[19] 61 Fed. Reg. 50,951, 50,965 (Sept. 30, 1996) (Final Rule: Lending and Investment).

5

You also ask whether the NY law's multifaceted compliance scheme, including the potential threat of litigation and application of the foreclosure provisions, is preempted for federal savings associations. The NY law's compliance scheme could not be applied to federal savings associations in a manner that would compel them to comply with the preempted provisions, including intrusive lending restrictions. Such a result would have more than an incidental affect on the lending operations of federal savings associations and would run contrary to HOLA's purpose of allowing federal savings association to exercise their lending powers in accordance with a uniform federal scheme.[20]

We trust that this responsive to your inquiry. If you have further questions, please contact Richard Bennett, Counsel (Banking and Finance), at (202) 906-7409.

Sincerely,

Carolyn J. Buck
Chief Counsel

cc:    Regional Directors
       Regional Counsel

---

[20] *See* 12 C.F.R. § 560.2(a) (2002). Real property laws are not preempted to the extent that they only incidentally affect the lending operations of federal savings associations or are consistent with HOLA's purposes. *See* 12 C.F.R. § 560.2(c) and (c)(2) (2002). The NY law's foreclosure provisions, however, would not appear to fit that description since they would be used to compel compliance with the lending restrictions in the NY law.

# EXHIBIT C

## Preemption of New York Escrow Account Laws

**Summary Conclusion:** Federal law preempts, for federal savings associations, provisions of New York state law requiring payment of interest on mortgage escrow accounts. In addition, a reference to federal law and state law in a mortgage document does not establish an obligation to pay escrow interest that would not otherwise exist.

**Date:** October 6, 2003

**Subjects:** Home Owners' Loan Act/Savings Association Powers

P-2003-7



**Office of Thrift Supervision**
Department of the Treasury

**P-2003-7**

*Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6251

October 6, 2003

[                ]
[                 ]
[                  ]
[                 ]

Re: Preemption of New York Laws Purporting to Regulate Escrow Accounts

Dear [          ]:

You have asked whether federal law preempts, for a federal savings association, New York state requirements to pay interest on escrow accounts established pursuant to mortgage loan agreements. You also ask whether a mortgage document containing a choice of law provision that references both federal law and New York law establishes a contractual provision to pay escrow interest.

We conclude that the New York requirements about which you inquire are preempted by federal law from applying to federal savings associations. We also conclude that the reference to federal law and state law in a choice of law provision includes the preemptive effect of federal law and does not establish an obligation to pay escrow interest that would not otherwise exist.

**Background**

Your client, [                            ] (Bank), is a state-chartered commercial bank supervised by the FDIC. The Bank is the successor, by merger in [     ], to the former [                            ] (Association), a federal savings association. You have provided us with the following information in support of your inquiry.

Before Association was merged into Bank, Association made residential mortgage loans. Association sold certain loans, but retained the servicing on such loans. With respect to a particular mortgage loan that Association made and sold, but for which the Association retained the servicing, the borrowers have alleged in a lawsuit that Association failed, in violation of New York law, to pay interest on escrow funds

2

Association held for the borrowers.[1] One section of the mortgage document[2] signed by the borrowers provides that the lender is not required to pay any interest or earnings on escrow funds unless the parties agree in writing that the lender will pay such interest or the law requires the payment of interest on escrow funds.[3] Another section of the mortgage document provides that it is governed by "federal law and the law that applies in the place where the Property is located." The property securing the mortgage is located in the State of New York.

You indicate that several provisions of New York law are at issue. One provision requires every "mortgage investing institution," including federal savings associations, that maintains an escrow account pursuant to a mortgage agreement to pay interest on the funds on deposit in that account.[4] The same provision also authorizes the New York banking board to prescribe by regulation the method of computing interest. A second provision of New York law authorizes the state banking board to prescribe by regulation a minimum rate of interest that a mortgage investing institution is required to pay on escrow accounts maintained with respect to mortgage loans.[5] Another section of the same law provides that the payment of interest shall not be required on escrow accounts where "the payment of such interest would violate any federal law or regulation."[6] Two other provisions of New York law require mortgage investing institutions to pay interest on escrow accounts established for payment of real property taxes and hazard insurance premiums.[7] Finally, New York State Banking Department regulations prescribe the method of computing interest that should be paid on escrow accounts.[8]

---

[1] [                                ]

[2] The mortgage document at issue is titled "Mortgage" and is denominated "New York – Single Family – FNMA/FHLMC Uniform Instrument."

[3] There was no written agreement by Association to pay interest on the funds it held in escrow for the borrowers and Association did not pay such interest.

[4] N. Y. Gen. Oblig. L. § 5-601 (McKinney, WESTLAW through L.2003). The term "mortgage investing institution" is defined to include any "federal savings and loan association." N.Y. Banking L. § 14-b(5) (McKinney 2001).

[5] N.Y. Banking L. § 14-b(1) (McKinney, WESTLAW through L.2003).

[6] N.Y. Banking L. § 14-b(4)(ii) (McKinney, WESTLAW through L.2003).

[7] N.Y. Real Property Tax L. § 953(2) (McKinney, WESTLAW through L.2003); N.Y. Banking L. § 6-k(2)(b) (McKinney, WESTLAW through L.2003).

[8] N.Y. Comp. Codes R. & Regs. tit. 3, §10.1 (WESTLAW through March 15, 2003).

3

## Discussion

Federal law preempts for federal savings associations the provisions of New York law discussed above, which purport to require the payment of interest on mortgage related escrow accounts. We have addressed this issue on several previous occasions in several different formats.

First, OTS regulations, promulgated pursuant section 5 of the federal Home Owners' Loan Act,[9] provide that OTS occupies the fields of lending regulation and deposit-related regulated regulation for federal savings associations.[10] OTS regulations provide illustrative examples of the types of state laws that are preempted, as well as the types of state laws that generally are not preempted.[11] Section 560.2(b)(6) of OTS's lending regulations specifically preempts state laws that purport to impose requirements regarding escrow accounts.[12]

Second, in a 1991 opinion involving a provision of New York law, OTS concluded that federal law preempts a state law requiring the payment of interest on escrow accounts and, therefore, such a law is not applicable to federal savings associations.[13] Third, OTS's predecessor agency, the Federal Home Loan Bank Board (FHLBB), had concluded that federal savings associations are not obligated to pay interest on escrow accounts absent an express contractual provision to the contrary, and that state laws purporting to require associations to pay interest on escrow accounts are preempted.[14] We direct you to the reasoning and analyses set forth in the OTS and FHLBB opinions. In 1998, OTS noted the continued validity of the conclusions in these

---

[9] 12 U.S.C.A. § 1464 (West 2001).

[10] 12 C.F.R. § 560.2(a) (Lending and Investment) and 12 C.F.R. § 557.11(b) (Deposits) (2003).

[11] See 12 C.F.R. § 560.2(b) and (c) (2003).

[12] 12 C.F.R. § 560.2(b)(6) (2003).

[13] Op. OTS Chief Counsel (January 3, 1991). The opinion concluded that § 953 of the New York Real Property Tax Law is preempted "to the extent it purports to regulate interest payments, service charges, and the disclosure of information on escrow accounts for mortgages between Federal savings associations and their borrowers."

[14] Op. FHLBB General Counsel (August 13, 1985) and Op. FHLBB General Counsel (September 24, 1984). *See also,* Wisconsin League of Financial Institutions v. Galecki, 707 F.Supp. 401 (W.D. Wisc. 1989), which found a Wisconsin law regulating tax escrow accounts maintained in connection with mortgage loans preempted. The law required lenders to provide certain disclosures and notices to borrowers, and to pay interest on escrow accounts under certain conditions. Although the court's decision focused on the state disclosure requirements, the court stated, "federal regulation in this area preempts state regulation of mortgage loan escrow accounts and disclosures, . . .." 707 F. Supp. at 406.

4

OTS and FHLBB opinions regarding federal preemption of state laws purporting to regulate escrow accounts.[15]

You also ask us to confirm that a choice of law provision in the mortgage document that invokes federal law and the law of the state where the real property is located, in this case New York, does not establish a contractual agreement to pay interest on escrow accounts "as if the preempted provisions of New York State law were not pre-empted." The reference in the mortgage loan document to the law of the place the property is located (New York), together with a reference to federal law, is insufficient to establish a contractual agreement to pay interest on escrow funds. The reference to federal law and state law in the same provision of the mortgage document includes the preemptive effect of federal law. In other words, Federal law continues to operate so as to preempt an impermissible state requirement. The reference to state law does not nullify or negate the preemptive effect of federal law. The Supreme Court has recognized that even where a federal regulation arguably incorporates state law, "the incorporation of state law does not signify the inapplicability of federal law."[16] New York law also appears to recognize the applicability of federal law because New York law specifically provides that the payment of interest on escrow accounts is not required where such payment would violate any federal law or regulation.

In *de la Cuesta* the Supreme Court also rejected a contention that deeds of trust stating that they were to be governed by the law of the jurisdiction in which the property is located constituted an agreement to be bound by local law. Thus, even in the absence of a specific reference in the deeds to federal law, the Court observed that the " 'law of the jurisdiction' includes federal as well as state law."[17] The Court also noted that the purpose of the language was "not to elevate state law over federal law, but to provide a uniform choice-of-law provision to be used when interstate disputes arose regarding the interpretation of a mortgage."[18]

---

[15] *See* Letter dated November 17, 1998 by OTS Assistant Chief Counsel.

[16] *Fidelity Federal Savings and Loan Association v. de la Cuesta*, 458 U. S. 141, 157 (1982) (*de la Cuesta*). The Court explained that a "fundamental principle in our system of complex national polity" mandates that "the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution." *Id.* The provision at issue in de la Cuesta was a due on sale provision; federal regulations permitted federal savings association to use such clauses, but state law limited the use of such clauses.

[17] 458 U.S. 157, n. 12. The "law of the jurisdiction" language at issue in *de la Cuesta* was contained in paragraph 15 of a "uniform mortgage instrument developed by the Federal Home Loan Mortgage Corporation [FHLMC] and the Federal National Mortgage Association [FNMA]" and did not also include a reference to federal law. 458 U. S. 148, n.5. The language that is the subject of your inquiry also appears in paragraph 15 of a FNMA/FHLMC uniform mortgage document and includes a specific reference to federal law.

[18] 458 U. S. 157, n.12, citing the amicus brief filed by the FHLMC and the FHLBB in the de la Cuesta case.

5

Accordingly, we conclude that the Association was not required to pay interest on the escrow accounts Association held for borrowers. Federal law preempted the New York requirements to pay escrow interest, and the reference in the mortgage document to the law of the place where the property is located does not change this result.

In reaching the foregoing conclusions, we have relied on the factual representations made in the material you submitted to us as summarized herein. Our conclusions necessarily depend upon the accuracy and completeness of those facts. Any material difference in facts or circumstances from those described herein could result in different conclusions.

We trust that this is responsive to your inquiry. If you have further questions, please contact Vicki Hawkins-Jones, Special Counsel, at (202) 906-7034.

Sincerely,

Carolyn J. Buck
Chief Counsel

cc: Regional Directors
    Regional Counsel

# EXHIBIT D

**Preemption of Georgia Fair Lending Act**

**Summary Conclusion:** Federal law preempts application of various provisions of the Georgia Fair Lending Act to federal savings associations and their operating subsidiaries.

**Date:** January 21, 2003

**Subjects:** Home Owners' Loan Act/Savings Association Powers

P-2003-1

P-2003-1



**Office of Thrift Supervision**
Department of the Treasury                                                    *Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6251

January 21, 2003

[                    ]
[                    ]
[                    ]
[                  ]
[                ]

Re:    Preemption of Georgia Fair Lending Act

Dear [            ]:

    This responds to your recent letter on behalf of [            ] ("Association"), a federal savings association, and its operating subsidiary, [            ], ("Operating Subsidiary"). In your letter, you ask the Office of Thrift Supervision ("OTS") to confirm that federal law preempts the application to the Association and the Operating Subsidiary of the recently enacted Georgia Fair Lending Act ("GFLA").[1] We conclude that GFLA provisions purporting to regulate the terms of credit, loan-related fees, disclosures, or the ability of a creditor to originate or refinance a loan, are preempted by federal law from applying to federal savings associations and their operating subsidiaries.

**Background**

    The restrictions GFLA imposes differ depending upon whether a loan is a "home loan," a "covered home loan," or a "high-cost home loan."[2] All "home loans" are subject to certain restrictions on the terms of credit and loan-related fees. These include prohibiting the financing of credit insurance, debt cancellation coverage, or suspension coverage, and limiting late fees and payoff statement fees.

    "Covered home loans" are subject to a further restriction on the terms of credit and the refinancing of a loan. GFLA limits the number of times a loan may be refinanced and the circumstances in which a refinancing may occur.

---

[1] GFLA is to be codified as Ga. Code. Ann. §§ 7-6A-1 *et seq.* Notwithstanding the title of the statute, GFLA does not address lending discrimination.

[2] GFLA § 7-6A-2 defines these terms. In general, the category into which a loan falls depends on the annual percentage rate and amount of points and fees charged.

2

"High-cost home loans" are subject to all of these restrictions, plus numerous other disclosure requirements and restrictions on the terms of credit and loan-related fees. Creditors must disclose to borrowers that the loan is high-cost. Borrowers must attend loan counseling before the creditor may make the loan. Restrictions on the terms of credit and loan-related fees include prohibiting prepayment penalties, balloon payments, negative amortization, increases in the interest rates after default, advance payments from loan proceeds, fees to modify, renew, extend, amend or defer a payment, and accelerating payment at the creditor's or servicer's sole discretion.

## Discussion

GFLA provisions purporting to regulate the terms of credit, loan-related fees, disclosures, or the ability of a creditor to originate or refinance a loan, are preempted by federal law from applying to federal savings associations.[3] In enacting the Home Owners' Loan Act ("HOLA"),[4] Congress required the Federal Home Loan Bank Board ("FHLBB"), and now the OTS, to provide for the organization, incorporation, examination, operation, and regulation of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States."[5] Consistent with this language, OTS has made clear in its lending regulations its intent to carry out this congressional objective by giving federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.[6] That uniform federal scheme occupies the field of regulation for lending activities. The comprehensiveness of the HOLA language demonstrates that Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary.

OTS occupies the field to enhance safety and soundness and enable federal savings associations to conduct their operations in accordance with best practices by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden.[7] Under OTS regulation 560.2(a), federal savings associations may extend credit as authorized under federal law without regard to state laws purporting to regulate

---

[3] Those provisions are Ga. Code. Ann. §§ 7-6A-3, 7-6A-4, 7-6A-5, and 7-6A-7(f). As per telephone discussions between you and OTS staff, however, this opinion does not address certain specific provisions within those sections: GFLA § 7-6A-5(11)-(13), which imposes certain requirements for foreclosures on high-cost home loans and GFLA §§ 7-6A-5(6), which pertains to the ability of borrowers to assert claims or defenses in court.

[4] 12 U.S.C.A. § 1461 *et seq.* (West 2001).

[5] HOLA § 5(a); 12 U.S.C.A. § 1464(a) (West 2001).

[6] 12 C.F.R. § 560.2(a) (2002).

[7] *Id.*

3

or otherwise affect their credit activities. As described above, GFLA imposes a number of specific restrictions and requirements on home loans. GFLA would regulate areas covered by regulation 560.2 and therefore does not apply to federal savings associations' home lending.

OTS has described with specificity the scope of its occupation of the field of lending regulation by noting the types of state laws encompassed within the preemption. They include many of the types of provisions found in GFLA. For example, 12 C.F.R. § 560.2(b)(4) preempts state laws on terms of credit, § 560.2(b)(5) preempts state laws on loan-related fees, § 560.2(b)(9) preempts state laws on disclosure and advertising, and § 560.2(b)(10) preempts state laws on processing, origination, servicing, sale, purchase, investment, and participation in mortgages. This conclusion is further supported by numerous opinions of OTS, and its predecessor, the FHLBB.[8]

GFLA would thwart the more general congressional objective that OTS have exclusive responsibility for regulating the operations of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States.[9] Congress gave OTS, not the States, the task of determining the best practices for thrift institutions and creating nationally uniform rules. OTS conducts regular examinations of thrift lending operations for safety and soundness and compliance with established consumer protections. Federal savings associations must comply with the requirements of federal law, including restrictions on abusive practices such as those in the Home Ownership Equity Protection Act and its implementing regulations.[10] Subjecting federal savings associations to the burdens of complying with a "hodgepodge of conflicting and overlapping state lending requirements" would undermine the federal objective of permitting federal savings associations to exercise their lending powers "under a single set of uniform federal laws and regulations. This [uniformity] furthers both the 'best practices' and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden."[11]

---

[8] See, e.g., OTS Op. Counsels (Banking and Finance), 5/16/01 (preemption of state law on terms of credit); FHLBB Op. Gen. Counsel, 2/1/82 (same); OTS Ops. Chief Counsel, 12/14/01, 4/21/00, and 3/10/99 (preemption of state law on loan-related fees); OTS Op. Chief Counsel, 12/24/96 (preemption of state law on loan-related fees and disclosures); OTS Mem. Dep. Chief Counsel, 5/10/95 (preemption of state law on disclosures).

[9] 12 U.S.C.A. § 1464(a) (West 2001).

[10] See 15 U.S.C.A. § 1639 (WESTLAW 2002) (HOEPA); 12 C.F.R. pt. 226, subpart E (2002) (HOEPA regulations).

[11] 61 Fed. Reg. 50,951, 50,965 (Sept. 30, 1996) (Final Rule: Lending and Investment).

4

   With regard to the application of GFLA to the Operating Subsidiary, we note that in both its regulations and opinions, OTS has consistently indicated that state laws purporting to regulate the activities of a federal savings association's operating subsidiary are preempted by federal law to the same extent such laws are preempted for the federal savings association itself.[12] Accordingly, to the extent that the Association conducts its lending operations through the Operating Subsidiary, federal law preempts application of the same GFLA provisions to the Operating Subsidiary as are preempted for the Association.

   Finally, you have inquired whether the Association or the Operating Subsidiary may fund loans in the Association's or the Operating Subsidiary's name arranged by independent mortgage brokers where the loan terms do not comply with GFLA. As discussed above, OTS regulations specifically preempt state laws purporting to impose requirements on federal savings associations regarding processing and origination of mortgages.[13] Accordingly, GFLA would not restrict the Association or the Operating Subsidiary from funding loans in its own name, even where the loans contain terms that do not meet those GFLA requirements and restrictions that are preempted for federal savings associations and operating subsidiaries.[14] The loan documents, however, must evidence that the Association or the Operating Subsidiary is the lender.

   We trust that this responsive to your inquiry. If you have further questions, please contact Richard Bennett, Counsel (Banking and Finance), at (202) 906-7409.

                    Sincerely,

                    Carolyn J. Buck
                    Chief Counsel

cc:    Regional Directors
       Regional Counsel

---

[12] *See* 12 C.F.R. § 559.3(n)(1) (2002); OTS Op. Chief Counsel (July 26, 1999) (and authorities cited therein).

[13] 12 C.F.R. § 560.2(b)(10) (2002).

[14] Whether federal preemption applies to entities other than federal savings associations or operating subsidiaries is beyond the scope of this opinion.

# EXHIBIT E

### Preemption of New Mexico Home Loan Protection Act

**Summary Conclusion:**  Federal law preempts various provisions of the New Mexico Home Loan Protection Act for federal savings associations.  The NM Act's multifaceted scheme could not be applied to federal savings associations in a manner that would compel them to comply with the preempted provisions.

**Date:**  Sept. 2, 2003

**Subjects:**  Home Owners' Loan Act/Savings Association Powers

P-2003-6

**P-2003-6**



**Office of Thrift Supervision**
Department of the Treasury                                    *Chief Counsel*

1700 G Street, N.W., Washington, DC  20552 • (202) 906-6251

September 2, 2003

[

]

Re:    Preemption of New Mexico Home Loan Protection Act

Dear [                    ]:

    This responds to your recent letter on behalf of [
] ("Association"), a federal savings
association.  In your letter, you request a legal opinion on whether federal law preempts
the New Mexico Home Loan Protection Act ("NM Act") for federal savings
associations.[1]

    This office has previously addressed preemption of similar Georgia, New York,
and New Jersey legislation.[2]  Many of the NM Act provisions are the same as, or similar
to, provisions of these other states' predatory lending laws.  These provisions (1) prohibit
the financing of credit insurance, debt cancellation, or debt suspension agreements
(§ 4A), balloon payments (§ 5B), negative amortization (§ 5C), default interest rates
(§ 5D), loan modification fees (§ 5J), acceleration clauses (§ 5N), and prepayment
penalties (§ 5O); (2) limit the financing of points and fees (§ 5A), the number of
payments paid in advance from loan proceeds (§ 5E), payment deferral fees (§ 5K), and
late fees (§ 5M); (3) prohibit the encouragement of default (§ 5L), (4) require special
disclosures for borrowers (§ 5P); (5) prohibit loan flipping (§ 4B) and lending without
regard to repayment ability (§ 5H); (6) mandate housing counseling (§ 5G); and
(7) restrict payments to home improvement contractors (§ 5I).[3]

---

[1] 2003 N.M. Laws Ch. 436 (S.B. 449).  The statute takes effect January 1, 2004.

[2] *See* OTS Ops. Chief Counsel (January 21, 2003) ("1/21/03 Op."), January 30, 2003 ("1/30/03 Op."), and July 22,
2003 ("7/22/03 Op.").

[3] As per a July 29, 2003 telephone discussion between you and OTS staff, however, and consistent with our prior
opinions, we are not addressing preemption of provisions pertaining to the ability of borrowers to assert claims or
defenses in court (§ 5F).  *See* 7/22/03 Op. at 4 n.6; 1/30/03 Op. at 3 n.10; 1/21/03 Op. at 2 n.3.  While we are not

2

A few of the NM Act provisions are not like ones we have addressed in these prior opinions. These provisions are triggered upon default on high-cost home loans rather than at loan origination. They (1) require creditors to accept any partial payment made or tendered in response to a default notice (§ 6A); (2) reinstate the borrower to the same position as if a default had not occurred and nullify an acceleration of an obligation (§ 6B); and (3) prohibit charges, fees or penalties for curing a loan default (§ 6C).

All of these NM Act provisions – whether they are triggered at loan origination or upon default – purport to regulate the terms of credit, loan-related fees, disclosures, mortgage processing, origination, refinancing, and servicing, and disbursements. Thus, they are preempted from applying to federal savings associations for the same reasons OTS has stated in its prior opinions.[4]

For the same reasons OTS has stated in its prior opinions, the NM Act's multifaceted compliance scheme could not be applied to federal savings associations in a manner that would compel them to comply with the preempted provisions.[5] The NM Act provisions preempted from applying to federal savings associations in this manner are those (1) using state foreclosure law as tool to compel compliance (§§ 6D and 6E); (2) allowing borrowers to bring civil action for violations (§ 9) and to assert claims, defenses, counterclaims, and actions against creditors or subsequent holders or assignees including in foreclosure actions (§§ 11B and 11C); (3) making violations unfair or deceptive trade practices (§ 12); and (4) providing for administrative enforcement by the

---

addressing provisions subjecting creditors, holders, or servicers to the same claims and defenses as a borrower could assert against a manufactured home seller or home improvement contractor (§ 7), the analysis we provided of a similar provision in New Jersey legislation would apply. *See* 7/22/03 Op. at 4 n.6 and 6 n.14. We also are not addressing provisions amending other legislation (§§ 15-17).

[4] 7/22/03 Op. at 3-6; 7/30/03 Op. at 2-4; 1/21/03 Op. at 2-4. The same conclusions would apply to federal savings association operating subsidiaries and the loans they originate. OTS has consistently concluded that state laws purporting to regulate the activities of a federal savings association's operating subsidiary are preempted by federal law to the same extent such laws are preempted for the federal savings association itself. *See* 12 C.F.R. § 559.3(n)(1) (2003); 7/22/03 Op. (and authorities cited therein).

Since the provisions triggered upon loan default are preempted under 12 C.F.R. § 560.2(b) (2003), we do not reach whether they might be considered real property laws under 12 C.F.R. § 560.2(c)(2) (2003). 61 Fed. Reg. 50,951, 50,966-50,967 (September 30, 1996). We note, however, that depending on how the provisions might ultimately be interpreted, they could substantially interfere with the ability to foreclose on high-cost home loans. Such a result would be inconsistent with the purposes of the Home Owners' Loan Act, including being potentially contrary to safety and soundness and prudent loan administration. *See* 12 C.F.R. §§ 560.1(b), 560.2(a), 560.101 and App. to 560.101 (2003).

[5] *See* 7/22/03 Op. at 6 and n.17; 1/30/03 Op. at 5 and n.20.

3

Financial Institutions Division of the New Mexico Department of Regulation and Licensing (§ 13).

We trust that this is responsive to your inquiry. If you have further questions, please contact Richard Bennett, Counsel (Banking and Finance), at (202) 906-7409.

Sincerely,

Carolyn J. Buck
Chief Counsel

cc:     Regional Directors
        Regional Counsel

# EXHIBIT F



**P-2006-3**

## Office of Thrift Supervision
### Department of the Treasury

*John E. Bowman, Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6372

June 9, 2006

[

]

Re:    Preemption of State Gift Card Restrictions

Dear [                    ]:

      This responds to your recent letter on behalf of [                    ] [                    ] (the "Association"). Your letter asks us for a legal opinion on whether a federal savings association must comply with five types of state law restrictions on gift cards. In sum, we conclude that federal law preempts these restrictions for federal savings associations and their operating subsidiaries.

Background

      You represent that the Association offers "open loop" gift cards, which means that the cards' acceptance is not limited to particular retailers. Customers can buy the gift cards using a Visa or MasterCard credit or debit card through Internet web sites the Association operates.[1] The cards are accepted where signature-based – as opposed to Personal Identification Number ("PIN") based – Visa or MasterCard debit cards are accepted. The gift cards do not have PINs. They cannot be used for cash withdrawals or cash advances at Automated Teller Machines ("ATMs") or elsewhere.[2]

---

[1] You indicate that, in the future, customers may be able to buy them at the Association's branches and fund the cards through a transfer or withdrawal from an existing deposit account at the Association.

[2] You indicate that the gift cards are offered through two programs, which only differ in minor respects not relevant to our analysis. The cards offered through one program (1) are accepted where signature-based *MasterCard* debit cards are accepted and (2) are only available to customers who already hold a Visa or MasterCard credit or debit card *issued by the Association* and can only be purchased using those cards. In contrast, the cards offered through the other program (1) are accepted where signature-based *Visa* debit cards are accepted and (2) can be purchased using any Visa or MasterCard credit or debit card even if not issued by the Association.

2

The gift cards are "non-reloadable," which means that value cannot be added to them after purchase. Rather, they are sold in various denominations between $25 and $500. The cards come with certain fees such as a fee for the initial sale, a card shipping fee, a monthly service fee, a fee for receiving the remaining funds on the card via check, and a replacement fee for a card that is lost or stolen. The cards also have an expiration date.

You make several additional representations about protections the Association affords to the customer. The fees and expiration date, as well as the other rules, restrictions, and terms of the gift cards, including privacy rights, are clearly and prominently disclosed. The fees and expiration date are part of the terms and conditions that the purchaser must accept before completing the purchase on the Association's web site. Copies of the disclosures are also delivered with the cards. The expiration date is on the front of the card. A notice about fees, along with the web site address and toll-free number for fee and transaction information, is on the back of the card. The Association provides balance and transaction history information to the customer free of charge through both a website and a toll-free telephone number. Depending on the merchant, the card holder may be able to pay for a purchase using the card for partial payment with the remainder paid using another means. The Association relieves the customer of any unauthorized merchant charges if the card is lost or stolen as long as the customer reports the loss or theft immediately. The Association also maintains procedures for resolving errors and disputes.

You further describe the many safeguards the Association has in place to ensure that the Association complies with all Bank Secrecy Act requirements. The Association maintains records reflecting the identities of the purchasers and, if the customer is purchasing the gift card for another person, the identity of the intended recipient. The Association only accepts U.S. addresses as billing or mailing addresses. If the value of the gift card is below a certain threshold, the Association will mail it to the purchaser's address or the recipient's address; if the value is above the threshold, the Association will only mail it to the purchaser's address.[3] Further, the cards are not sold through third party outlets.

You ask about preemption of five types of state laws, citing examples of each:

---

[3] The Association's safeguards vary somewhat depending on which gift card program is involved. For one program (1) the threshold is $100 and (2) as part of the sales transaction, the Association gathers, among other information, the buyer's name, address, date of birth, and social security number, and takes steps to verify the identity of the buyer in compliance with the Association's customer identification program ("CIP") and checks the buyer's name against relevant Office of Foreign Assets Control ("OFAC") and related lists. For the other program (1) the threshold is $200 and (2) the Association already has sufficient information on the identity of the buyer because the cards are only sold to existing Association cardholders so no further CIP review is done on the buyer at the time of purchase, although the buyer is subject to an OFAC check. For both programs, if the gift card is bought for another person, the Association gathers the recipient's name, address, and home telephone number, and checks the recipient's name against the relevant OFAC and related lists.

3

1. Licensing requirements for those who issue or sell gift cards;[4]
2. Disclosure requirements such as on fees and expiration dates;[5]
3. Fee restrictions such as on issuance fees, inactivity fees, maintenance fees, and redemption fees;[6]
4. Expiration date restrictions such as requiring the cards to remain valid for a minimum number of years or in perpetuity;[7] and
5. Requirements to allow the cardholder to redeem the card for cash, such as where the card balance drops below a certain value or for a guaranteed percentage of the card's face value.[8]

Some of these state laws are part of broader state laws on unfair or deceptive acts or practices or abandoned property. Others are separate state laws governing gift cards, gift certificates, and other types of devices.

Discussion

*Authority to Issue Gift Cards*

While your question asks about preemption, we preface our response by confirming that federal savings associations and their operating subsidiaries[9] may issue the types of gift cards about which you inquire. Several legal bases support this conclusion.

First, issuance of gift cards falls within a federal savings association's funds transfer service authority. OTS regulation § 545.17 authorizes federal savings

---

[4] Michigan Sale of Checks Act, Mich. Comp. L. § 487.903.

[5] Ariz. Rev. Stat. § 44-7402(1); Cal. Civ. Code § 1749.45(a); Official Code Ga. § 10-1-393(b)(33)(A); 33 Me. Rev. Stat. § 1953.1(G-1); Md. Comm. L. § 14-1320(b)-(d) (effective July 1, 2006); Mass. Gen. L. ch. 200A, § 5D; N.Y. Gen. Bus L. § 396-i(2-a) and (3); and 8 Vt. Stat. §§ 2702 & 2705.

[6] Iowa Code § 556.9(2); N.H. Rev. Stat. § 358-A:2(XIII); N.Y. Gen. Bus. L. § 396-i(5)(b); R.I. Gen. L. § 6-13-12; and 8 Vt. Stat. § 2703(a).

[7] Conn. Gen. Stat. § 42-460(a); 33 Me. Rev. Stat. § 1953.1(G-1); Mass. Gen. L. ch. 200A, § 5D; N.H. Rev. Stat. § 358-A:2(XIII); R.I. Gen. L. § 6-13-12; and 8 Vt. Stat. § 2702.

[8] Mass. Gen. L. ch. 200A, § 5D; R.I. Gen. L. § 6-13-12; and 8 Vt. Stat. § 2704.

[9] After notifying OTS in accordance with 12 C.F.R. § 559.11, a federal savings association operating subsidiary may engage in any activity that a federal savings association may conduct directly. 12 C.F.R. § 559.3(e)(1) (2006).

4

associations to engage in funds transfer services.[10]  Specifically, the regulation allows a federal savings association to transfer customers' funds from any account of the customer (including a line of credit) at the association or at another financial intermediary to third parties or other accounts of the customer on the customer's order or authorization using any mechanism or device.  The regulation further stipulates that federal savings associations may charge a fee for this service and that the transfer may occur by any means conforming to applicable law and established commercial practices.  While the regulation cites cashier's checks as an example of a permitted funds transfer mechanism, OTS's Electronic Operations rule allows federal savings associations to engage in any authorized activity through electronic means that they may conduct through more traditional delivery mechanisms.[11]

Here, the Association transfers funds from a customer's "account"[12] when the customer purchases the gift card.  That account is either a deposit account accessed through a Visa or MasterCard debit card or a line of credit accessed through a Visa or MasterCard credit card.[13]  When the customer uses the gift card to make purchases, the Association transfers funds to third parties upon the customer's order, using the electronic mechanism of the gift card accessing a payment network.

Second, issuance of gift cards is subsumed within deposit-related powers.  Section 5(b) of the Home Owners' Loan Act ("HOLA") authorizes federal savings associations, subject to the terms of its charter and OTS regulations, to raise funds through deposit, share or other accounts and issue passbooks, certificates, or other evidence of accounts.[14]  OTS's Deposits rule is consistent with the statutory language.[15]

Here, the gift card functions much like a deposit account.  The customer's purchase of the gift card operates like depositing money into an account.  The customer's

---

[10] 12 C.F.R. § 545.17 (2006).  The United States Court of Appeals for the Ninth Circuit has ruled that a similar activity, operating automated teller machines ("ATMs"), is a funds transfer service under this OTS regulation.  *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 560-61 (9th Cir. 2002).

[11] 63 Fed. Reg. 65,673, 65,675 (Nov. 30, 1998) (quoting 12 C.F.R. § 555.200(a)).

[12] OTS regulation § 561.2 defines "account" to include a savings or demand account.  12 C.F.R. § 561.2 (2006).  The definition of "account" in § 561.2 applies to § 545.17.  *See* 12 C.F.R. § 561.1 (2006).

[13] As noted above, for one of the gift card programs, the Association must issue the Visa or MasterCard debit or credit card used to buy the gift card.  For the other program, any financial institution may issue the Visa or MasterCard debit or credit card used to buy the gift card.

[14] 12 U.S.C.A. § 1464(b)(1) (West 2001).

[15] 12 C.F.R. § 557.10 (2006).

5

use of the gift card operates like withdrawing money from an account using an access device such as a typical debit card. The Association retains the funds gift card purchasers provide in exchange for the gift cards in an omnibus account for the benefit of all gift cardholders.[16]

Third, issuance of gift cards is an incidental power of federal savings associations. OTS has previously concluded that under the incidental powers doctrine, a federal savings association may market and sell another type of stored value card – prepaid telephone cards – as agent for a telephone company.[17] The traditional four-part incidental powers test applied to prepaid telephone cards applies equally to the issuance of gift cards. One, the activity relates to the financial intermediary role that federal savings associations were intended to play as discussed above. Two, the activity is similar to, if not part of, expressly authorized activities, such as funds transfer services and deposit-related services as also discussed above.[18] Issuing gift cards facilitates customers' ability to pay bills and expenses, just as issuing traveler's checks and credit cards, two authorized activities for federal savings associations, facilitate paying bills and expenses.[19] Three, offering gift cards is consistent with Congress's intent that federal savings associations meet the needs of consumers in convenient "one-stop family financial centers."[20] Four, it is an activity necessary to enable federal savings association to remain competitive and relevant in the modern economy. The Office of the Comptroller of the Currency, for example, has authorized similar activities for national banks and their operating subsidiaries.[21]

---

[16] Section 557.10 states that 12 C.F.R. pts. 204 (Regulation D, "Reserve Requirements of Depository Institutions") and 230 (Regulation DD, "Truth In Savings") apply to "deposit activities." This opinion, however, does not address whether gift cards are subject to those regulations. For guidance on the application of Regulations D and DD to electronic banking, *see* OTS Compliance Handbook section 370 and the FFIEC Interagency Guidance on Electronic Financial Services and Consumer Compliance contained therein, *available at* http://www.ots.treas.gov/docs/4/48710.pdf.

[17] OTS Op. Chief Counsel Aug. 29, 1996.

[18] The activity also bears some similarities to secured credit card lending. The customer's purchase of the gift card could be likened to the security a customer provides for a secured credit card. The customer's use of the gift card could be likened to drawing on a line of credit. Since gift cards are not underwritten the way credit cards are underwritten, they are available to customers who would not qualify for a credit card and can serve as a substitute for a credit card in many circumstances.

[19] FHLBB Op. Gen. Couns., Nov. 24, 1965 (traveler's checks); FHLBB Ops. Dep. Ch. Couns., Mar. 16, 1988 and Feb. 1, 1982 (same); 12 U.S.C. § 1464(c)(1)(T) (West 2001) (credit cards); and 12 C.F.R. §§ 560.3 and 560.30 (2006) (same).

[20] S. Rep. No. 96-368, at 13 (1979), *as reprinted in* 1980 U.S.C.C.A.N. 236, 248.

[21] *See* 12 C.F.R. §§ 5.34(e)(v)(Y) and 7.5002(a)(3) (2006); *accord* OCC Conditional Approval No. 658, Oct. 13, 2004. *See also* OCC Conditional Approval No. 220, Dec. 2, 1996 (national banks may acquire membership interests in limited liability corporations that operate open stored value card systems); OCC Interpretive Letter No. 855,

6

*Federal Preemption*

· Turning to federal preemption, as OTS has explained in prior opinions, the doctrine of federal preemption has its roots in the Supremacy Clause of the United States Constitution[22] and applies to three situations. First, the United States Supreme Court has recognized that, within constitutional limits, Congress may expressly preempt state law.[23] Second, absent explicit preemption language, congressional intent for federal preemption of state law may be inferred when federal law occupies a particular field.[24] Third, even if federal law has not occupied a field, state law is nullified to the extent that it conflicts with federal law.[25] Such conflict may arise when compliance with both federal and state laws is a physical impossibility or when state law stands as an obstacle to the accomplishment of the objectives of Congress.[26] For preemption purposes, regulations promulgated by agencies of the United States have the same preemptive effect as federal statutes.[27] The same preemption principles are equally applicable to federal savings association operating subsidiaries.[28]

Under §§ 4(a) and 5(a) of the Home Owners' Loan Act ("HOLA"),[29] OTS is authorized to provide for the safe and sound operation of federal savings associations and has exclusive and plenary authority to regulate all aspects of the operations of federal savings associations. Federal courts, OTS, and its predecessor, the Federal Home Loan Bank Board ("FHLBB"), have all found that § 5(a) of the HOLA, and implementing regulations of OTS and the FHLBB, preempt state laws that purport to regulate the activities or operations of federal savings associations because Congress

---

Mar. 1, 1999 (same); OCC Conditional Approval No. 568, Dec. 31, 2002 (national bank operating subsidiary may invest in a joint venture that will develop and market a stored value system); and OCC Advisory Letter No. 2004-6, May 6, 2004 (national banks may offer payroll cards and other pre-paid payment services).

[22] U.S. Const. art. VI, cl. 2.

[23] *Pacific Gas and Electric Co. v. State Energy Resources and Development Comm.*, 461 U.S. 190, 203-04 (1983) ("*Pacific Gas*"); *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982) ("*de la Cuesta*").

[24] *de la Cuesta*, 458 U.S. at 153.

[25] *Id.*

[26] *Id.* and cases cited therein; *see also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

[27] *de la Cuesta*, 458 U.S. at 153-54.

[28] 12 C.F.R. § 559.3(n)(1) (2006). *See, e.g.*, OTS Op. Chief Counsel, July 26, 1999 and authorities cited therein.

[29] 12 U.S.C.A. §§ 1463(a) and 1464(a) (West 2001).

7

conferred on the FHLBB and OTS exclusive authority to regulate the operations of federal savings associations.[30] Federal courts, including the Supreme Court, also have found that FHLBB regulations preempted state law where the law in question was an obstacle to the achievement of the objectives of federal regulations.[31]

OTS has affirmed through the rulemaking process its long-held position (and that of the FHLBB) that it totally occupies the field of the regulation of the operations of federal savings associations, including their deposit-taking and lending activities. Section 545.2 of OTS's regulations, originally adopted by the FHLBB in 1983 to implement the HOLA, states that OTS's Operations rule at Part 545 is promulgated pursuant to the "plenary and exclusive authority of the [OTS] to regulate all aspects of the operations of Federal savings associations" and that the agency's exercise of such authority is "preemptive of any state law purporting to address the subject of the operations of a Federal savings association."[32]

Courts have consistently ruled that when the federal government preempts by "occupying the field," no state law can operate in the area.[33] Similarly, OTS and the FHLBB have consistently opined that the federal regulatory scheme "occupies the field" of regulation affecting the operations of federal thrifts.[34] Indeed, OTS has specifically

---

[30] *See, e.g., Conference of Federal Savings and Loan Ass'ns v. Stein*, 604 F.2d 1256, 1260 (9th Cir. 1979) ("[T]he regulatory control of the [FHLBB] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control . . . . The broad regulatory authority over the federal associations conferred upon the [FHLBB] by HOLA does wholly preempt the field of regulatory control over these associations."), *aff'd mem.*, 445 U.S. 921 (1980); *FHLBB v. Empie*, 628 F. Supp. 223, 225 (W.D. Okla. 1983) ("Congress intended the HOLA to preempt all state regulation over federally-chartered savings and loan institutions."), *aff'd*, 778 F.2d 1447 (10th Cir. 1985); *People v. Coast Federal Savings and Loan Ass'n*, 98 F. Supp. 311, 316 (S.D. Cal. 1951) ("The FHLBB has adopted comprehensive rules and regulations governing the powers and operations of every Federal savings and loan association from its cradle to its corporate grave."). *See also* OTS Op. Chief Counsel Jan. 18, 1996 (state reporting requirements preempted); OTS Op. Chief Counsel Oct. 11, 1991 (deposit taking); FHLBB Op. General Counsel Apr. 28, 1987 (lending and examination).

[31] *de la Cuesta*, 458 U.S. at 156, 159 (preempting state limitation on due on sale practices that conflicted with FHLBB regulation); *see also First Federal Savings and Loan Ass'n of Boston v. Greenwald*, 591 F.2d 417, 425 (1st Cir. 1979) (preempting Massachusetts law requiring payment of interest on tax escrow account that conflicted with FHLBB regulation); *Kupiec v. Republic Federal Savings and Loan Ass'n*, 512 F.2d 147-50 (7th Cir. 1975) (preempting "common law" right to inspect and copy membership list that conflicted with FHLBB model by-law governing communication between members or depositors).

[32] 12 C.F.R. § 545.2 (2006).

[33] *de la Cuesta*, 458 U.S. at 141; *Pacific Gas*, 461 U.S. at 203-04.

[34] *See, e.g.*, OTS Op. Acting Chief Counsel Oct. 17, 1994 (lending); FHLBB Op. General Counsel Apr. 28, 1987 (lending and examination); OTS Op Chief Counsel Oct. 11, 1991) (deposit taking); and OTS Op. Chief Counsel Nov. 17, 1993 (branching), and cases cited therein.
   Similarly, in the areas of the deposit activities and the lending activities of federal savings associations, OTS's regulations at Parts 557 (Deposits) and 560 (Lending and Investment) establish a comprehensive regulatory scheme

8

concluded that state laws that purport to regulate activities authorized by OTS's fund transfer services regulation in § 545.17 are expressly preempted by OTS regulation § 545.2.[35]

All five categories of state law provisions governing gift cards that you inquire about are preempted for federal savings associations. OTS has occupied the field of regulation of the operations of federal savings associations generally, including electronic operations and deposit-taking activities. Federal savings associations are chartered by OTS and derive their powers from the HOLA and from their federally-approved charters.[36]

While none of OTS's legal opinions on preemption have dealt with the type of gift cards in question here, one has dealt with funds transfer services and several have dealt with electronic means and facilities such as ATMs and ATM access devices.[37] These opinions have already addressed many of the same types of state restrictions that are the subject of your inquiry. We follow the same analysis here as in those prior opinions in concluding that HOLA and OTS regulations preempt the state restrictions in question.

All five categories of state law provisions are preempted under OTS regulation § 545.2 because the state restrictions impermissibly affect the operations of federal savings associations. All of these state restrictions are, in essence, impermissible mechanisms designed to add an additional layer of regulation and to control the ability of federal savings associations to conduct operations in those states and deny federal savings associations flexibility.

The state licensing requirements illustrate the analysis. States may not impinge upon a federal savings association's authority to conduct any authorized activity by requiring state approvals as a condition to exercising such authority. As OTS has previously stated, "[t]he power to license is the power to prohibit, and the states cannot prohibit what federal law has authorized."[38] Licensing requirements are among the types

---

and reflect the agency's traditional position that it occupies the regulation of those fields. This position is expressly reiterated in OTS regulations. *See* 12 C.F.R. §§ 557.11(b) and 560.2(a) (2006).

[35] OTS Op. Dep. Chief Counsel Dec. 14, 1994, at 3 n.4.

[36] *See* OTS Op. Chief Counsel Jan. 9, 1990.

[37] *See* OTS Op. Dep. Chief Counsel Dec. 14, 1994; OTS Ops. Chief Counsel July 1, 1998, Nov. 22, 1999, and Dec. 7, 1999; and OTS Mem. Chief Counsel Dec. 22, 1998.

[38] *See, e.g.,* OTS Mem. Chief Counsel Dec. 22, 1998, at 10 and OTS Op. Chief Counsel July 1, 1998, at 10 and authorities cited therein.

9

of state laws that are specifically preempted for federal savings associations.[39]  Indeed, OTS has previously concluded that state licensing requirements to conduct fund transfer services authorized under § 545.17 are expressly preempted by § 545.2.[40]

State gift card disclosure requirements also illustrate the analysis.  OTS and the FHLBB have previously stated that the disclosure of the terms of accounts "is part of the exclusive authority of the [agency] to regulate" to which occupation of the field applies.[41] It is well established that state laws that purport to impose disclosure requirements, including disclosure of fees, on federal savings associations are preempted.[42]

Fee restrictions are also among the types of state laws that are specifically preempted for federal savings associations.[43]  Since issuing gift cards is a funds transfer service, the state fee restrictions are in direct conflict with OTS regulation § 545.17, which allows federal savings associations to charge a fee for such services.  Indeed, the United States Court of Appeals for the Ninth Circuit has ruled that HOLA and OTS regulations preempt local ordinances prohibiting fees for funds transfer services.  While that case involved a fee for a different funds transfer service (ATM fees for non-customers), the court reasoned that operating ATMs is a funds transfer service under OTS regulation § 545.17 and that regulation expressly authorizes federal savings associations to charge a fee for such services.  Further, OTS regulation § 545.2 preempts the field of regulation of the operations federal savings associations, including funds transfer services.  Thus, the court concluded that HOLA and OTS regulations preempt local ordinances limiting ATM fees.[44]  The state restrictions on fees for gift card funds

---

[39] *See, e.g.,* OTS Mem. Chief Counsel Dec. 22, 1998, at 10-11 and OTS Op. Chief Counsel July 1, 1998, at 10-12 and authorities cited therein.  To the extent that issuing gift cards is a deposit-related activity, OTS's preemption regulation at 12 C.F.R. § 557.12(g) (2006) (preemption of state laws governing licensing or registration requirements) would apply directly.

[40] OTS Op. Dep. Chief Counsel Dec. 14, 1994.

[41] FHLBB Op. Acting Deputy General Counsel May 7, 1986, at 3. *See also* OTS Op. Chief Counsel July 1, 1998, at 9 n.30 and FHLBB Op. General Counsel Apr. 28, 1987, at 4-5.

[42] *See, e.g.,* OTS Op. Chief Counsel July 19, 1998 (ATM fee disclosures) and authorities cited therein. To the extent that issuing gift cards is a deposit-related activity, OTS's preemption regulation at 12 C.F.R. § 557.12(c) (2006) (preemption of state laws governing disclosure requirements) would directly apply, in addition to § 545.2.

[43] *See, e.g.,* OTS Ops. Chief Counsel Nov. 22, 1999, at 3-14 (ATM fees) and Dec. 7, 1999 (same) and authorities cited therein.  To the extent that issuing gift cards is a deposit-related activity, OTS's preemption regulation at 12 C.F.R. § 557.12(f) (2006) (preemption of state laws governing service charges and fees) would directly apply, in addition to § 545.2..

[44] *Bank of America v. City and County of San Francisco*, 309 F.3d 551, 560-61 (9th Cir. 2002).

10

transfer services would likewise be preempted.[45]  State imposed expiration date restrictions and requirements for redemption of the gift cards for cash at the cardholder's request are also preempted.[46]

Preemption of these state law provisions does not create a regulatory vacuum. OTS conducts regular examinations of thrifts for safety and soundness and compliance with established consumer protections.  OTS expects the Association to ensure that customers receive all pertinent information about the cards such as how they work, fees, and expiration dates.  Federal savings associations issuing gift cards are subject to a host of federal requirements and consumer protections.  Among them are:[47]

1.  OTS's Funds Transfer Services rule, which requires the activity to conform to applicable laws and established commercial practices;[48]
2.  OTS's Electronic Operations rule, which requires numerous precautions including, identifying, assessing and mitigating risk, implementing security measures, and complying with security device requirements in 12 C.F.R. part 568;[49]
3.  OTS's Advertising rule, which prohibits savings associations from using any advertising or promotional material or making any representation that is inaccurate in any particular or that in any way misrepresents the services offered;[50]

---

[45] *See, e.g.,* OTS Op. Chief Counsel July 8, 1992 (preemption of state prohibition on dormancy charges on inactive deposit accounts); FHLBB Op. Dep. General Counsel Oct. 9, 1986 (same).

[46] To the extent that issuing gift cards is a deposit-related activity, OTS's preemption regulation at 12 C.F.R. § 557.12(b) (2006) (preemption of state laws governing abandoned and dormant accounts) would directly apply, in addition to § 545.2.

[47] Your letter comments specifically on whether regulations of the Board of Governors of the Federal Reserve ("Federal Reserve") and the Federal Deposit Insurance Corporation ("FDIC") should apply to gift cards. This opinion does not address whether the Electronic Funds Transfer Act ("EFTA") and Federal Reserve Regulation E, or the Federal Deposit Insurance Act, 12 U.S.C. § 1813(l) (West 2001) and the FDIC's Deposit Insurance Coverage rule, 12 C.F.R. pt. 330 (2006), apply to gift cards.  As your letter notes, the Federal Reserve and FDIC have issued guidance. *See, e.g.,* 71 Fed. Reg. 1473, 1475 (Jan. 10, 2006) and 70 Fed. Reg. 45571, 45576, 45578 (Aug. 8, 2005). As your letter also notes, OTS Compliance Activities Handbook section 370 and the Interagency Guidance on Electronic Financial Services and Consumer Compliance republished therein contain additional guidance on the application of Regulation E and a wide array of other consumer protection regulations to electronic technologies including stored value cards. *See* www.ots.treas.gov/docs/4/48709.pdf.

[48] 12 C.F.R. § 545.17 (2006).

[49] 12 C.F.R. § 555.210 (2006).

[50] 12 C.F.R. § 563.27 (2006).

11

4. OTS's Nondiscrimination rule, which prohibits discrimination not just in lending but in other services as well;[51]
5. Section 5 of the Federal Trade Commission Act, which prohibits, among other things, unfair or deceptive acts or practices in or affecting commerce;[52] and
6. The Bank Secrecy Act and implementing regulations.[53]

In reaching the conclusions set forth herein, we have relied on the factual information and materials submitted to us. Our conclusions depend upon the accuracy and completeness of such information and materials. Any material differences in the facts or circumstances submitted to us and described herein could result in different conclusions.

We trust that this is responsive to your inquiry. If you have further questions, please contact Richard Bennett, Counsel, at (202) 906-7409.

Sincerely,

/s/

John E. Bowman

cc:     Regional Directors
        Regional Counsel

---

[51] 12 C.F.R. pt. 528 (2006).

[52] 15 U.S.C.A. § 45 (West 1997). OTS may take enforcement action against a savings association for violating § 5 under § 8 of the Federal Deposit Insurance Act. OTS Op. Chief Counsel Oct. 25, 2004 at 10 n.37. The Federal Trade Commission has recently highlighted the need for gift card issuers to provide consumers clear and conspicuous disclosures, particularly of fees and expiration dates. *See* Letter from FTC Chairman to Hon. Joe Barton, Feb. 14, 2006.

[53] 12 U.S.C.A. 1818, 1829b, and 1951-1959 (West 2001 & Supp. 2005); 31 U.S.C.A. 5311 *et seq.* (West 2003 & Supp. 2005); 12 C.F.R. §§ 563.177 and 563.180 (2006); 31 C.F.R. pt. 103 (2005).

# EXHIBIT G



**Office of Thrift Supervision**
Department of the Treasury

*West Region*

P.O. Box 7165, San Francisco, CA 94120-7165
Telephone: (650) 746-7000 • Fax: (650) 746-7001

November 6, 2007

**VIA FED-EX**

Mr. Kenneth DeGiorgio
General Counsel
First American Corporation
c/o Richard F. Hans, Esq.
Thacher Proffitt & Wood LLP
Two World Financial Center
New York, NY 10281

Dear Mr. DeGiorgio:

As previously discussed in our conference call today, the Office of Thrift Supervision (OTS), as the regulator of First American Corporation, directs the company to take all steps necessary to preserve all documentation related to the use of eAppraiseIT by Washington Mutual Bank to perform appraisal services for the bank and to maintain those documents until OTS provides further notice.

Sincerely,

*Nicholas J. Dyer*

Nicholas J. Dyer
Assistant Director

cc: Kevin B. Swanson

# EXHIBIT H

**11/07/07:  Attorney General Press Conference**

Good afternoon my name is Eric Corngold.  I am the Executive Deputy Attorney General for

Economic Justice.  I will be speaking first followed by Terry Dunkin, who is the President of the

Appraisal Institute and then by Attorney General Cuomo.

**Eric Corngold**

In a series of emails which we quoted in our court papers, our lawsuit lays out systemic and far

reaching patterns of illegal behavior among the top executives at First American and

eAppraiseIT, who, in an effort to maintain and increase their business with Washington Mutual,

and in violation of federal and state laws and regulations, agreed to exclusively use a list of

Washington Mutual's proven appraisers.   Proven not because they are good sound and

independent appraisers, but because Washington Mutual knows that the appraisers will deliver

the values Washington Mutual wants.  And even while admitting in the emails that their actions

would violate the federal and state laws regulations, the executives at First American and

EappraiseIT caved into the pressures applied by this massive bank and agreed to just "roll over

and just do it."  Now, there are two important points to make about the case that we bought last

week.  First, as we did discuss last week, we're not talking about bad conduct that occurred in

the distant past.   The fraud and illegality that we have identified is happening now, and the

emails were being written and the deals were being made right in the middle of the market

meltdown that's now swept the country.  Second, the conduct we've identified is not an isolated

instance of fraud.  Over the last nine months during the course of our wide ranging investigation

of the mortgage industry, we have talked to hundreds of appraisers and bankers and brokers and

we've looked at literally millions of pages of documents, and the one uniform message we've

1

gotten is that the appraisal process is broken.  The hallmark of the appraisal process, the independence of the appraisal process so that appraisers are not subject to pressure and undue influence in order to reach crucial numbers, has been severely challenged by a web of conflicts of interests and really out right fraud.  And all this raises the important question - what happens to the loans that banks like Washington Mutual enter into if they're based on these problematic and false and fraudulent appraisals?  While in the past lenders held on to their mortgages. Today, the vast majority of the loans are sold to the public and to and through investment banks and to entities like Fannie Mae and Freddie Mac, and they become investments that are sold to the public.  But these investments are infected with the same problem that affects the underlying mortgages.  If the appraisal process is broken, the loans and the investments on which they are based may not be worth what the investors are led to believe that they're worth.  And that's what brings us here today.  But before the Attorney General talks about the steps that we're taking today, I'd like to introduce the President of the Appraisal Institute – Terry Dunkin.


**<u>Terry Dunkin</u>**

Thank you very much.  It's a pleasure to be here on behalf of Appraisal Institute and I'd like to thank Attorney General Cuomo for inviting us to participate in this press conference today.  I'd like to read a brief statement on behalf of my organization.  The Appraisal Institute is a global membership association of professional real estate appraisers with more than 20,000 members and 92 chapters across the United States.  Everyday, professional real estate appraisers perform vital services for home owners, lending institutions and investors when they analyze and estimate the value of property using established industry standards.  Importantly, and fundamentally, the appraiser is an impartial third party with no financial interest in the collateral.  Unfortunately,

this independence was severely challenged in the years of the booming mortgage market as appraisers were pressured to inflate the value of property, or worse, turn a blind eye to outright mortgage fraud. I wish I could say that I am shocked by the discoveries made by the Attorney General and his staff. Sadly, what allegedly happened between First American and Washington Mutual is not an isolated incident. Rather, it is symbolic of a problem that has plagued the appraisal industry for years. Members of the Appraisal Institute have long documented the pressure applied on them to make the deal work. The overwhelming majority of professional and ethical appraisers do stand up to the pressure, but not without consequences. As the allegations against First American show, the mortgage industry's secret has been that banks exert tremendous pressure to influence appraisers by threatening to withhold future work or by refusing to work with appraisers that won't play ball. Banks have coerced appraisers into providing inflated appraisals to feed the demand for mortgages and mortgage-backed securities. Such behavior has helped to set the nation's mortgage crises in motion. Everyone in the mortgage industry knew this was a problem; the banks, the secondary market participants, the investors and even the appraisers. It was their dirty little secret. But no one was willing to fix or were able to fix the problem. The Federal Government ignored it and the crisis accelerated. Well, now the chickens have come home to roost. The pressure on appraisers to inflate values has fueled a volatile housing market leading to foreclosures on homes and great losses on investments. While we continue to work with Congress on this issue, I want to thank Attorney General Cuomo and his staff for shining a light on this problem. His work will help maintain the integrity of the appraisal industry and it will help protect investors and consumers alike. Thank you.

3

**Andrew Cuomo**

I want to thank Eric Corngold and his team, and Mr. Dunkin on behalf the Appraisal Institute of America. This case is very straight-forward as we discussed before. We believe it is widespread, it is prevalent as Mr. Dunkin is speaking to. And in this case, "follow the money," the old expression, is "follow the mortgage". We talked last week about the primary mortgage industry, a bank making a loan to a buyer. Today we follow the mortgage from the primary market to the secondary market, and those primary mortgages between a bank and buyer are then sold to the secondary markets. Secondary market is Fannie Mae, Freddie Mack and investment banks. They securitized those mortgages and sell them to the public, and they then become bond holdings. The chart to my left shows that very simply. The initial fraudulent process, in our opinion, gets sold to the secondary market, Freddy Mac, Fannie Mae and investment banks, it then goes to on bond holders, to funds, but the underlying fraudulent problem continues and in many ways gets worse. We sent a letter to Fannie Mae and Freddie Mac outlining this issue in general, the Wamu – First American case specifically. We asked for an independent examiner to examine the mortgages done by First American and Washington Mutual before Fannie and Freddie buy them and sell them in the secondary market. They have agreed to appoint an independent examiner. We also issued what's called Martin Act Subpoenas to Fannie Mae and Freddy Mac for the purpose of investigating the underlying situation with the appraisals. Our belief is the appraisals in many cases were fraudulent, that there was widespread pressure on the appraisers to change the appraisals, that that has been going on for a long period of time and that that exists today in the primary and secondary markets. So these subpoenas commence an investigation on Fannie and Freddie, also the investigating investment banks on the secondary market side, that goes on. Fannie and Freddie did agree to an independent examiner for the

4

specific purpose of looking at the Washington Mutual – First American loans. That's where we are today. Any questions for me, Mr. Corngold or Mr. Dunkin?

**Question:**  Can you explain to me how home owners are possibly harmed here and how bondholders are harmed as well?

**Andrew Cuomo:**   Buying a home is the great American dream. It is, for most families, the largest single asset of their lives. It's their retirement fund, it's the college education for their children, it's the number one source of the first small business loans is the equity in a person's home. So it is probably the most important purchase of their life from a consumer point of view. The appraisal is supposed to be "an independent appraisal" by an independent party who does not have a vested interest in the transaction, who is not being pressured by anyone, and that appraisal in many ways verifies the homebuyer's decision. I go to buy a home, I think it's worth $220,000, I'm ready to pay $220,000, you do an appraisal, the appraisal comes in and says it's worth $220,000. I take confidence in that appraisal. The bank relies on the appraisal also. All the forces on the initial sale, the real estate broker, the mortgage broker, the banker, all the pressures are to make the sale go through. Even the buyer wants to see the sale go through. But the other parties have an economic interest in seeing it go through. The appraisal has to come in "the right number" the expression that Mr. Dunkin used. If the appraisal is inflated, it means the house is not worth what the buyer believed and was told it was worth and the house may not be worth what the buyer is paying.  It's even worse on the refinancings which has been a predominant section of the market lately. The refinancings are you own the home, you get a call, someone says "by the way did you know your house was now worth twice what you paid for it,

5

and you have $200,000 equity in your home, and I have an appraisal that shows your house is worth twice and we can give you $200,000 in equity and you can take out that equity and buy a new car, buy a boat and go on vacation in Florida and you're going to be fine. Yeah, you're going to be fine - unless it turns out that your house was not actually worth that. You see the foreclosures now starting to spike. So if the consumer is mislead, either in the initial purchase, they buy a house that wasn't worth what they thought it was worth, or on a refinancing they take out money that they never really had. The house was never worth that amount and you took out $200,000 equity that you believed existed in the house, you spent that $200,000, except it was never there in the first place. You were told in essence by a banker you have $200,000 in the bank go spend it, but you didn't. That is, I believe, one of reasons you see a spike in foreclosures. The bank now has a loan based on an appraisal that isn't accurate, the bank sells that loan to the secondary market, Fannie Mae, Freddy Mac and investment banks. The secondary market pools the loans, what they call "wraps them", sells them to bondholders, or sells them to a pension fund, or sell them to an investment fund and the people in this room then wind up buying those mortgages. All again, based on the appraisals and the appraisals may be fraudulent. So, it starts on the primary side of the market, affects the consumer either on the initial purchase of a home or a refinancing of a home and then that appraisal carries itself all the way through the process and comes out the other end in a security through the secondary market. That was a long answer to a short question, I'm aware of that.

**Question**: So basically, the investors or bondholders of funds are paying X for something that is really not worth that?

**Andrew Cuomo:**  The appraisal remains the fundamental security for both the initial house transaction and the aggregate of the appraisals are the basis for that security.  So in the secondary market they'll sell a security based on 1,000 home mortgages.  What is the security within that pool?  It's the aggregate of the 1,000 mortgages.  If you add up the 1,000 appraisals and if it each appraisal was a little bit off, then the value that you thought was there, isn't there.

**Question:**  Does your office contend that the secondary market was at all aware of these appraisals originally [inaudible].

**Andrew Cuomo:**  We believe, as Mr. Dunkin spoke to eloquently, we believe this is not a new situation.  We believe people in the marketplace knew very well that the appraisers were being pressured.  And if you look back over the past ten years there is plenty of evidence where the appraisers have spoken up and said you ought to understand we're suppose to be independent, but we're being pressured by everyone.  The banks are saying to the appraisers if you want us to send you business, you have to be a flexible, compliant, cooperative appraiser.  And this was common place in the market.  Mr. Dunkin's expression, this is not the exception, it's the rule.  Our case with First American and Washington Mutual that we bought last week was not the exception, it was the rule.  We brought that case as a single case because we believe there was a very graphic demonstration of this problem.  It was a graphic demonstration because Washington Mutual is one of the largest S&Ls in the country, if not the largest.  First American is a very large company, you can't dismiss it as an outlie.  And the collusion between the two parties was clear.  The banking people were saying to the appraisers we want you to come back with an

appraisal that justifies the sale of the house because if we don't complete a mortgage nobody makes money.

**Question:** So, last week's lawsuit was filed against Washington Mutual plus this other appraisal company?

**Andrew Cuomo:** Last week's lawsuit was bought against a company called First American which owns the appraisal company eAppraiseIT, for colluding with Washington Mutual which was the bank. And we believe Washington Mutual, with the appraisal company, worked out an arrangement where they were getting favorable appraisals, cooperative appraisers to do the appraisals so that it would expedite their loans. If the appraiser does not appraise the home high enough, the bank can't make the mortgage. The banks want to make the mortgage because that's how they make money. If the appraisal or the appraiser is willing to just adjust up the appraisal, then the mortgage can go through. I understand why the bank wants that, it's not in the consumer's best interest, because you should be paying the right price for the house, and if an appraiser comes back to you and says "Molly the house isn't worth what you want to pay," you would probably say "boy thanks very much for that information, I almost made a terrible mistake, I knew I shouldn't have listened to my husband." But you would want to know that, the bank wants to make the mortgage because that's how the bank gets paid. That's the problem on the primary side or refinancing which I believe in some ways is a larger problem with the consumers and it's been widespread. People refinance because the market has gone up, the appraisals come in very high, people are seduced into taking the equity out of the home, they spend the equity, their monthly payment goes up, they get into trouble, they go to sell the home,

it turns out they can't sell the house for what the appraisal said it was, and now they have a debt problem for the rest of their lives.

**Question**: So what, if any, action are you planning to take against Washington Mutual?

**Andrew Cuomo:** We've commenced action against First American last week. Washington Mutual is a party involved in the allegations we made in the case against First American.

**Question**:   Last week WaMu actually announced they said they severed their ties with eAppraiseIT and First American and then all three said that they're shocked and outraged and that the investigation has no basis in fact or law.  Can you respond to that?

**Andrew Cuomo:** Well, then, obviously I disagree.  The reason we brought the First American and Washington Mutual case, was I believe that the evidence is damning in that case.  We released the emails that went back and forth – you read the emails and you tell me what you think they mean.  And these were emails from senior officials that were very clear, in my opinion, and don't need a lot of interpretation.  I understand that Washington Mutual took action. Our point with Fannie Mae and Freddie Mac Freddie was different.  To the extent they have an ongoing relationship with Washington Mutual where they're buying those loans.  Today, as we sit here, they're buying loans from Washington Mutual based on the appraisals that we believe may be problematic.  What is Fannie Mae and Freddie Mac doing? Are they just going to continue buy those problematic loans and package them and sell them to you, and you, and you and to you?  Or, now that they're on notice are they taking action?  We called on them to do one

9

or two things – either stop buying Washington Mutual loans, or if you want to continue to buy them, appoint an independent examiner, an independent monitor who can come in and who can review the Washington Mutual loans, and the appraisals and First American and the First American appraiser process, to see if there is ongoing fraud and if Fannie Mae and Freddie Mac are then buying fraudulent mortgages. They have agreed to do that, they have agreed to appoint an independent examiner. We will approve the independent examiner, and that will, in the short term, I believe, address the immediate issue of the Washington Mutual loans. We have an ongoing problem which, as we said, I don't think it's just about Washington Mutual. I believe it's widespread, I believe it's the rule not the exception and we are investigating Fannie Mae and Freddie Mac and other investment banks as to the underlying practices that have allowed this to go on for so long.

**Question**: How much is at stake in this diagram over here, both in terms of the potential losses on home equity and the potential losses for investors if you add in all the structure and leverage that exists in the mortgage bonds that the banks and Freddie Mac and Fannie Mae issue?

**Andrew Cuomo**: What's interesting to me and what is dramatic to me is, from one end to the other, the consequences are dire. If an individual losses his or her home, that's a lifetime crisis. If a home is foreclosed on and the person can't get their value out of the home and winds up with debt, they're working on that problem for the rest of their lives. So, one home, one mistake here, can literally affect a family's economics for the rest of their lives, their credit ratings, etc. On the back end, on the secondary market side, it would be in the billion if not trillions of dollars. And I believe, what we are talking about today, actually long term will wind up helping the housing

market. Because look, the housing market is in crisis. We're aware of that. I was in Washington, the day before yesterday with Congressman Kanjorski talking about a housing bill, Congressman Barney Frank's bill, I went down to support. There's a housing crisis. We know that. Part of the housing crisis, I believe, is a valuation crisis. Lack of consumer confidence, because people don't really know that the homes are worth what they say the homes are worth, or the home they brought is worth – what they paid for it. Investors have serious questions about valuation. Everyday you now see these portfolios for major investment banks being under-valued, over-valued through the billions of dollars. There is a valuation crisis. Let's admit, let's address and let's resolve it. I believe the valuation crisis starts with the appraisals, because the appraisals are the building blocks for the valuation. You go through the entire process, it comes back to the appraisal. Whether it's the initial purchase of the home, or it's a security from Fannie and Freddie that's an aggregate of the appraisals. Now they'll say we have due diligence, we have letters of credit, we have wraps, it all comes down, but the building block was the appraisal. So let's start with the foundation, since we're talking about homes, start with the foundation and build up, and that's what we're trying to do and I believe this a good thing for the market. I've been in housing for many, many years, before this job. I was the HUD Secretary, I understand housing, I've worked on this issue, I worked on issues like this with Fannie Mae and Freddie Mac for many years, and I believe this is not just a good legal action, I believe it's good long term housing policy. Sir? Excuse me, do you have any points you want to raise?

**Mr. Dunkin:** Going back to the very first question about how does it affect the homeowner? I think that Attorney General Cuomo really summarized it, but I just wanted to just add a couple of points, and that is, in the transaction, as I mentioned in my remarks, the only independent

unbiased party involved in the process is the appraiser. Everyone else has a vested interest. The bankers, the mortgage companies, they want to earn a fee and close the matter. The real estate agent wants to make a commission by selling the house. The buyer [sic] wants to sell the house and make a return. If those loans are sold in secondary market as Attorney General Cuomo mentioned, it's no longer on the bank's books at that point. The buyer [sic] has his money, the real estate agent has their commission, the one left holding the bag is the home buyer. And when these things get sold in the secondary market, if the values are inflated, the consumers, the public that buys these bonds as part of their retirement package, they're the ones that are left holding the bag. I think this important for the public to understand that.

**Question**:  If you and others in the appraisal industry were aware of this pressure  [inaudible], did it take the AG's investigation to raise the red flag, or was their steps taken by the Appraisal Institute to try to off-set this "pressure" from the banks?

**Mr. Dunkin**:  We've been working with Congress for many months now to try to get some legislation in place to address these issues. As Attorney General Cuomo mentioned, he was down in Washington supporting a bill. We've been working with Congress on these issues for many months now, and I believe very shortly those efforts will come to fruition.

**Question:**  For many months, but that's since the AG's investigation started. Was there anything done in years past when the Institute was aware, that the appraisal industry was aware, of this pressure, to try to combat it?

**Mr. Dunkin:**  Again, we've been working with Congress for actually years now on these issues. We also have an industry panel that works with the Appraisal Institute, mortgage lenders, and we've been working with them as well.

**Andrew Cuomo:**  Let me just [inaudible] on that for one second if I might.  The appraisers have been talked to about this.  But it was like yelling into the wind because just remember the context, the housing market was going crazy, the values were going up, up and up. Everyone was demanding property.  The Wall Street firms were demanding product.  They were looking for the securitizations and it fed on itself and the pressure on the appraisers grew and grew and it was tremendous and for a period, the harm wasn't evident.  Why?  Because as long as the housing values are going up, you almost don't see the harm because even if the appraisal is initially high, since the market is going up, the values catch up to the appraisal.  And, if you have a housing market that's going up 10, 20 30% in some markets every year, well, you did a refinancing or you bought a home, even if it wasn't worth what you paid for it on day one, year 2, year 3, year 4, the value caught up.  It works until it doesn't work.  It works as long as the market keeps going up.  As soon as the market plateaus, or those values start to slow or drop, then you see the foreclosures and you see the problems.  It was just like the Wall Street scams. Margin accounts, all these creative schemes, as long as the stock market kept going up and up and up, everybody was making money, it covered a lot of sins.  As soon as the stock market went flat, or the stock market dropped, then the over leverage, the harm of the over leverage was apparent.  The housing market has been the same thing.  It was very hot, it was a feeding frenzy.  The appraisals were the lynchpin.  They were pressured, but no harm no foul, the values kept going up and up and up and now we see the price as, Mr. Dunkin said, the chickens have come home to roost.

13

Now we have to pay the piper and that is the situation that we are now in. So my point is let's be honest about what happened. Let's actually remedy it so we can say to the markets we understand why you are nervous, we understand the valuation crisis, and we are going to remedy it. The unfortunate circumstance, one of them, to me, why we have to relearn the same lesson, over and over and over. If you go back and read what happened after the S&L crisis, the savings and loan crisis, in this 25 or 30 years ago, one of the lessons was even when a market overheats the appraiser and the appraisal process is sacrosanct and must be independent. Because that's the sober saying voice in the room, and the appraiser is going to make sure that everybody's doing business with the same basic set of facts and they're not inflating the values, they're not inflating the appraisals. So the independence of the appraiser, we understood this for a long period of time and we understood and we paid the price in the S & L crises when you violate that independence. I think in some ways we did the same thing here.

**Question:** [inaudible]

**Andrew Cuomo:**    Martin Act Subpoenas are basically subpoenas to investigate potential, possible securities fraud. They are possibly criminal in nature, or civil in nature. A Martin Act investigation allows the prosecutor the flexibility to pursue either path depending on the evidence and the facts. So, from a Martin Act investigation you could wind up proceeding with a criminal case, you could wind up proceeding with a civil case or you could wind up finding no wrong doing whatsoever. Those subpoenas were served on Fannie Mae and Freddie Mac. We have previously served subpoenas on investment banks that are involved in this process and this, as I said last week, this is an ongoing investigation, so you can expect further developments as

we go down the road. But today it's Martin Act Subpoenas on Fannie and Freddie and they have agreed to an independent examiner which is a demand we placed on them to make sure there's no potential fraud carrying over from the Washington Mutual mortgages.

**Question:** [inaudible]

**Andrew Cuomo:** We sent Fannie Mae and Freddie a letter of what we call a "Letter of Notice and Demand" an L&D we call it here because everything is an acronym. The Notice was of Martin Act Subpoenas that were going to be served on them. The Demand was to either to cease and assist, stop buying Washington Mutual loans, or appoint an independent examiner who we approve of. Fannie agreed to appoint an independent examiner, so they can continue to purchase Washington Mutual loans, supervised, examined by the independent examiner. We also will serve them forthwith with the subpoenas on the underlying investigations.

**Question:** [inaudible].

**Andrew Cuomo:** Yes, I can. Will I is a different question, and I won't. Sir, last question.

**Question:** The independent examiner, that is going to be a private sector person that you [inaudible].

**Andrew Cuomo:**  Person, in combination with firms, because they need to supervise and examine the loans, the appraisals, the appraisal process of First American, reevaluate the actual appraisals that are accompanying those Washington Mutual loans, so it's a lot of work.

**Question:** Just quickly, as you know, Fannie and Freddie only account for the performing mortgages, there's trillions more in Alt-A, sub-prime, jumbo mortgages that are being packaged by the investment banks, are you trying to apply similar pressure on these investment banks to appoint an independent examiner for loans going forward?

**Andrew Cuomo:** Today we're talking about Fannie Mae and Freddie Mac.  As I mentioned we have an ongoing investigation involving some investment banks, but your point is not lost on us. Fannie Mae and Freddie Mac are not the only purchasers of Washington Mutual loans and we have the same general concerns for whoever is purchasing them.

**Question:**  And is any of this ever going to be retrospective?  Will anyone ever find out how much was over-appraised in loans that were purchased by Fannie Mae and Freddie Mac in the past.

**Andrew Cuomo:**  That's one of the things we are exploring in the investigation.  Okay.  That's it, thank you for taking the time.  Thank you Mr. Dunkin and Mr. Corngold.

# EXHIBIT I

## Press Releases

Office of the New York State Attorney General Andrew M. Cuomo

| | |
|---|---|
| Department of Law<br>120 Broadway<br>New York, NY 10271<br>212-416-8060 | Department of Law<br>The State Capitol<br>Albany, NY 12224<br>518-473-5525 |

November 1, 2007

For Immediate Release:

### NY ATTORNEY GENERAL SUES FIRST AMERICAN AND ITS SUBSIDIARY FOR CONSPIRING WITH WASHINGTON MUTUAL TO INFLATE REAL ESTATE APPRAISALS

*Washington Mutual (WaMu) Demanded Appraisers Who Inflated Property Values*

*Internal E-Mails Show eAppraiseIT Executives Knew Their Scheme Was Illegal:*
*"We have agreed to roll over and just do it"*

NEW YORK, NY (November 1, 2007) – Attorney General Andrew M. Cuomo today announced that he is suing one of the nation's largest real estate appraisal management companies and its parent corporation for colluding with the largest savings and loan in the country to inflate the appraisal values of homes.

In a scheme detailed in numerous e-mails, eAppraiseIT ("EA"), a subsidiary of First American Corporation (NYSE: FAF), caved to pressure from Washington Mutual ("WaMu") (NYSE: WM) to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes. The e-mails also show that executives at EA knew their behavior was illegal, but intentionally broke the law to secure future business with WaMu.

"The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. First American and eAppraiseIT violated that independence when Washington Mutual strong-armed them into a system designed to rip off homeowners and investors alike," said Attorney General Cuomo. "The blatant actions of First American and eAppraiseIT have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing Washington Mutual to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion."

As First American acknowledged in its 2006 annual report, appraisal fraud can damage the entire housing market, including consumers and investors alike. Consumers are harmed because they are misled as to the value of their homes, increasing the risk of foreclosure and hindering their ability to make sound economic decisions. Investors are hurt by such fraud because it skews the value and risk of loans that are sold in financial markets.

In April 2006, EA began providing appraisal services for WaMu, which became EA's biggest client. Within weeks, WaMu began complaining to EA that its appraisals were not high enough. WaMu pressured EA to employ exclusively a new panel of appraisers that WaMu hand-selected as "Proven Appraisers." This set of appraisers was chosen by WaMu specifically because they inflated property appraisals. WaMu profited from these higher appraisals because they could close more home loans, at greater values. Over the course of their relationship, between April 2006 and October 2007, EA provided approximately 262,000 appraisals for WaMu.

Attorney General Cuomo's investigation uncovered a series of e-mails between executives at EA, First American, and WaMu that show EA officials were willingly violating state and federal appraisal independence regulations to comply with WaMu's demands:

- On February 22, 2007, in response to a description of the WaMu "Proven Appraiser" program as one in which "we will now assign all Wamu's work to Wamu's 'Proven Appraisers'... [and] Performance ratings to retain position as a Wamu Proven Appraiser will be based on how many come in on value," eAppraiseIT's president told senior executives at First American: "**we have agreed to roll over and just do it...**"

- On April 4, 2007, eAppraiseIT's executive vice president stated in an e-mail to First American: "we as an AMC [Appraisal Management Company] need to retain our independence from the lender or it will look like collusion... eAppraiseIT is clearly being directed who to select. The reasoning... is bogus for many reasons including the most obvious – the proven appraisers bring in the values."

- On April 17, 2007, eAppraiseIT's president wrote an e-mail to First American explaining why its conduct was illegal: "We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation."

- E-mail evidence also shows that WaMu pressured EA to inflate appraisals as a condition for doing future business together:

- On September 27, 2006, First American's vice chairman reported that a WaMu executive told him: "if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship..."

Attorney General Cuomo continued, "Just as my office stepped in when colleges and loan companies were profiting at students' expense, this lawsuit and my ongoing investigation into the mortgage industry should send a clear message: companies must play by the rules or they will have to account for their misdeeds."

Attorney General Cuomo's lawsuit seeks to end the illegal relationship between First American and EA and WaMu. It also seeks penalties and disgorgement from First American and EA. The lawsuit alleges that First American and EA violated appraiser independence laws, which regulate the conduct of real estate appraisers. The lawsuit was filed in the Supreme Court of New York, New York County.

This case is being handled by Assistant Attorney General Christopher Mulvihill, under the supervision of Deputy Chief Trial Counsel Nicole Gueron and Executive Deputy Attorney General for Economic Justice Eric Corngold.

Attachment

- EA Complaint

# EXHIBIT J



# OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT

*1700 G STREET NW  WASHINGTON DC 20552  (202) 414-3801*

**OFFICE OF THE DIRECTOR**

November 8, 2007

The Honorable Andrew M. Cuomo
New York State Attorney General
120 Broadway
New York City, NY  10271

Dear Attorney General Cuomo:

I read with interest and concern the letters you sent to Fannie Mae and Freddie Mac and your associated press release, and listened to your press conference as well. As the former Secretary of HUD, you know that the Office of Federal Housing Enterprise Oversight (OFHEO) is the federal safety and soundness regulator of Fannie Mae and Freddie Mac, the two government-sponsored Enterprises (GSEs) chartered by Congress to provide support and stability to the nation's secondary mortgage market.

OFHEO shares your concerns about fraudulent appraisals and their impact on the mortgage markets and homeownership. Additionally, we have a core interest in the safety and soundness of the Enterprises. These allegations of appraisal fraud are a serious matter to the Enterprises and OFHEO and require vigilant attention by all relevant government agencies. Active and early consultation is appropriate in such circumstances.

After reviewing these materials, I feel that you and your staff may not fully understand the differences between the mortgage-backed securities (MBS) issued by the GSEs and those issued by other entities. In particular, unlike the issuers of private label MBS, when Fannie Mae or Freddie Mac issues an MBS, they retain the credit risk on the underlying mortgages by guaranteeing repayment to MBS holders. Consequently, they have no economic incentive to knowingly purchase or guarantee mortgages with inflated appraisals. The two firms already have programs in place to prevent this and other types of mortgage fraud as well as contract terms to put back mortgages in such situations to the primary lender. For the past several years, OFHEO has been working with the two firms as they have continued to improve these anti-fraud programs.

I am disappointed that your office did not contact OFHEO before or even after subpoenaing the GSEs and issuing certain threats regarding their future business activity. As I see it, we each have responsibility, as part of our respective mandates, to help ensure that fraud is not perpetrated on mortgage borrowers or on market participants. Pursuing this mutual goal will be more effectively accomplished, at less disruption to the integrity and soundness of the mortgage market, by cooperation. Indeed, it is OFHEO's mission to promote housing and a strong national housing finance system by ensuring the safety and soundness of Fannie Mae and Freddie Mac.

The Honorable Andrew M.Cuomo                                          Page 2
New York State Attorney General

      Given the importance of the mortgage markets to the U.S. and world economies, we need to meet with you at your earliest convenience.  Some of the issues we believe need to be discussed include:

- The Enterprises' efforts to monitor and prevent appraisal fraud and OFHEO's oversight of that activity.  As you know, there is pervasive Federal law, regulation and guidance about appraisal fraud.

- Your demand that two federally-chartered and federally-regulated Enterprises cease doing business with a major federally-chartered bank, which you have not charged or subpoenaed, unless certain conditions stipulated by you are met.

- The scope, authority and supervision of the independent examiner, which we will also be discussing with the Enterprises.

- The potential expansion of the examination to other financial institutions from which the Enterprises buy mortgages.

- Since purchasers of the Enterprises' MBS receive a corporate guarantee of repayment from the Enterprises, whether this issue is more of a safety and soundness matter than a securities issue.

      Again, OFHEO shares your concern that mortgage fraud, including fraudulent appraisals, be eliminated. I also recognize that the mortgage market in recent months has been subject to much turmoil.  I believe that all relevant government agencies shoulder a responsibility to eliminate fraudulent and otherwise bad actors from the market while also respecting the many legitimate parties – borrowers, appraisers, lenders, and investors – trying to participate in this market during this uncertain period.  We need not aggravate the latter in pursuit of the former.

      I look forward to hearing from you soon and discussing ways that we and our staffs can work together on addressing these issues that are important to all of us.

Sincerely,

James B. Lockhart III
Director

# EXHIBIT K

Office of the Comptroller of the Currency
Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
Office of Thrift Supervision
National Credit Union Administration

# INDEPENDENT APPRAISAL AND EVALUATION FUNCTIONS

October 27, 2003

The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the National Credit Union Administration (NCUA) (the agencies) are jointly issuing this statement to address concerns identified during examinations about the independence of the collateral valuation process. This statement applies to all real estate-related financial transactions originated or purchased by a regulated institution for its own portfolio or as assets held for sale. It provides further clarification of, and should be reviewed in conjunction with, the agencies' appraisal and real estate lending regulations[1] and the *Interagency Appraisal and Evaluation Guidelines* (Guidelines).[2]

An institution's board of directors is responsible for reviewing and adopting policies and procedures that establish and maintain an effective, independent real estate appraisal and evaluation program (program) for all of its lending functions. The real estate lending functions include commercial real estate mortgage departments, capital market groups, and asset securitization and sales units. These independence concerns include the risk that improperly prepared appraisals may undermine the integrity of credit underwriting processes. More broadly, an institution's lending functions should not have undue influence that might compromise the program's independence.

## Selecting Individuals to Perform Appraisals or Evaluations

The Guidelines establish minimum standards for an effective program, including standards for selecting individuals who may perform appraisals or evaluations. Among other considerations, the selection criteria must provide for the independence of the individual performing the appraisal or evaluation. That is, the individual has neither a direct nor indirect, interest, financial or otherwise, in the property or transaction. Institutions also need to ensure that the individual

---

[1] OCC: 12 CFR 34, subparts C and D; FRB: 12 CFR 208 subpart E and appendix C, and 12 CFR 225 subpart G; FDIC: 12 CFR 323 and 12 CFR Part 365; OTS: 12 CFR Part 564, and 12 CFR 560.100, and 12 CFR 560.101; and NCUA: 12 CFR Part 722.5.

[2] The interagency guidelines may be found in: *Comptroller's Handbook for* Commercial Real Estate and Construction Lending for OCC; SR letter 94-55 for FRB; FIL-74-94 for FDIC; and Thrift Bulletin 55a for OTS. NCUA was not a party to the Guidelines; however, the NCUA applies the content to credit unions, when applicable.

selected is competent to perform the assignment. Consideration should be given to the individual's qualifications, experience, and educational background. Selection occurs when, based on an oral or written agreement, the individual accepts the assignment to appraise or evaluate a particular property. Moreover, appraisal or evaluation development work should not commence until the institution finalizes the selection process.

The agencies' appraisal regulations address appraiser independence and require that an institution, or its agent, directly engage the appraiser. The only exception to this requirement is that an institution may use an appraisal prepared for another financial services institution, provided that the institution determines that the appraisal conforms to the agencies' appraisal regulations and is otherwise acceptable. Independence is compromised when an institution uses an appraiser who is recommended by the borrower or allows the borrower to select the appraiser from the institution's list of approved appraisers.

Institutions may not use an appraisal prepared by an individual who was selected or engaged by a borrower. An institution's use of a borrower-ordered appraisal violates the agencies' appraisal regulations. Likewise, institutions may not use "readdressed appraisals" – appraisal reports that are altered by the appraiser to replace any references to the original client with the institution's name. Altering an appraisal report in a manner that conceals the original client or intended users of the appraisal is misleading and violates the agencies' appraisal regulations and the Uniform Standards of Professional Appraisal Practice (USPAP).

It is also important to ensure that the program is safeguarded from internal influence and interference from an institution's loan production staff. Individuals independent from the loan production area should oversee the selection of appraisers and individuals providing evaluation services. The agencies recognize that it may not be possible or practical for small institutions to separate the collateral valuation and loan production processes. To ensure independence, loan officials, officers or directors with the responsibility for ordering appraisals and evaluations should not have sole approval authority for granting the loan request.

When selecting and engaging individuals, an institution needs to identify the assignment and order the appropriate appraisal or evaluation, as discussed in the Guidelines. To foster control and accountability, the agencies encourage an institution to use written engagement letters when ordering appraisals, especially for large, complex, or out-of-area commercial real estate properties. An institution should include a copy of the written engagement letter in the permanent loan file. An appraiser may also incorporate an engagement letter in the appraisal report. The engagement letter confirms that the assignment was made in a manner that complies with the institution's procedures and the agencies' regulations and Guidelines.

**Appraisal and Evaluation Compliance Reviews**

An institution's appraisal and evaluation program must maintain effective internal controls that promote compliance with program standards and the agencies' appraisal regulations and Guidelines. Internal controls should, among other criteria, confirm that appraisals and evaluations are reviewed by qualified and adequately trained individuals who are not involved in the loan production processes. The institution's standards for and the depth of such reviews

2

should reflect the risk of the transaction and the process through which the appraisal or evaluation is obtained. An institution should establish more in depth review procedures for appraisals of large, complex or out-of-area commercial real estate credits and for those appraisals and evaluations that are ordered by agents of the institution, such as loan brokers or another financial services institution.

Even in small institutions when absolute lines of independence cannot be achieved, effective internal controls should be implemented to ensure that no single person has sole authority to render credit decisions involving loans on which they ordered or reviewed the appraisal or evaluation. Further, lending officials, officers, or directors should abstain from any vote or approval involving loans for which they performed the appraisal or evaluation.

**Supervisory Approach**

Examiners will review an institution's standards of independence, taking into consideration the size of the institution and the nature and complexity of its real estate-related activities. Examiners will consider whether policies and procedures are comprehensive and applied uniformly to all units engaging in federally related transactions.

If an institution suspects that a licensed or certified appraiser is violating applicable laws or USPAP, or is otherwise engaging in other unethical or unprofessional conduct, the institution should make referrals directly to the appropriate state appraiser regulatory authorities. Examiners finding evidence of unethical or unprofessional conduct, including improperly prepared appraisals or evaluations and readdressed appraisals, should forward their findings and their recommendations to their supervisory office for appropriate disposition and referral to the state appraiser regulatory authority, as necessary. Institutions and institution-affiliated parties, including lenders, staff and fee appraisers, are reminded that they could be subject to enforcement actions, which include removal/prohibition orders, cease and desist orders, and civil money penalties, for violations of the agencies' appraisal and real estate lending regulations.

# EXHIBIT L



# The Federal Line

## The Appraisal Institute's exclusive interviews with appraisal policymakers

**December 2003:**

### Tom Watson
**National Bank Examiner and Credit Risk Specialist**
**Office of the Comptroller of the Currency**

### OCC's Watson Reaffirms Importance of Appraiser Independence

In response to concerns over the independence of the collateral valuation process, the five federal bank regulatory agencies issued a joint statement to financial institutions October 28, 2003, clarifying the existing standards within the appraisal and real estate lending regulations regarding this matter.

A key element of the statement include the fact that the agencies' real estate appraisal and evaluation program must rest on the independent selection of qualified and experienced individuals to appraise or evaluate real estate. The individuals selected also must be independent of the transaction, and not subject to external or internal influence. Finally, a qualified individual who is not involved in loan production should review the reports.

Tom Watson, National Bank Examiner and Credit Risk Specialist with the Office of the Comptroller of the Currency, one of the five agencies involved, sat down with *The Federal Line*, the Appraisal Institute's monthly exclusive one-on-one interview series with appraisal policymakers, to explain the reasoning behind the appraiser independence statement, to discuss lender pressure in general, and how the recent General Accounting Office's report on state appraisal regulation affects the federal landscape.

Watson, who has been at the OCC for more than 34 years, said the agencies issued the statement in response to an increasing number of interpretative questions dealing with appraiser independence. "We thought it was important to reaffirm the existing requirements for independence and clarify that banks are required to separate their collateral valuation function from their loan production process under interagency regulations and guidelines," he said.

"It's important to remember that this statement is primarily a reaffirmation of the existing regulation and guidance. The only 'new' item is a definition that specifies when an appraiser is deemed to have been selected. Selection is defined as occurring when the assignment agreement is reached between the two parties and before work commences."

The definition of "selection" is important since the joint statement also clarifies the 1994 *Interagency Appraisal and Evaluation Guidelines*, which apply to all commercial or residential real estate-related financial transactions originated or purchased by a national bank or operating subsidiary for its own portfolio or as assets held for sale. Both the 1994 document and the recent joint statement explicitly

state that borrowers and loan production officers may not exert influence over the selection of appraisers, Watson said.

In addition to complaints that such selection practices do go on, Watson said the concerns most often cited by examiners include the use of borrower-ordered appraisals and the lack of separation between collateral valuation functions and loan production. "The use of borrower-ordered appraisals or readdressed appraisals violates the appraisal regulation," he said. In addition, "pressure on appraisers to 'hit a number or you won't work for us again' is overt coercion, an unacceptable practice and one that violates the independence paragraph of the appraisal regulation."

Watson emphasized that appraisers need to play an active role in monitoring coercion by submitting complaints to the bank's primary regulator or Ombudsman from one of the financial institution regulatory agencies (see sidebar below). He said that the OCC issued a statement three or four years ago saying that if an appraiser provided a written complaint, they would investigate the situation and take corrective action. To date, they have not received any complaints. Watson said the OCC has a system in place in which it forwards such complaints to the appropriate supervisory office so that an investigation can be conducted. Watson said the other agencies follow similar practices.

"It is a relatively straightforward function for examiners to review a bank's internal controls and processes to determine whether collateral valuation functions are separate from loan production," Watson said.

Since not all institutions fall under the Financial Institutions Reform, Recovery and Enforcement Act, some loans are originated by a non-regulated institution and are later co-invested in by an institution that does fall under FIRREA. Watson said that the regulation permits "other financial services institutions" to order appraisals and allows an insured institution to accept that appraisal, subject to their review and determination that the appraisal complies with the regulation. "However, no regulated institution is obligated to accept any appraisal ordered by another financial services institution. It is their business decision," he said.

**Reporting Inappropriate Activity**

Each of the five federal financial institution regulatory agencies is responsible for regulating a specific category of financial institutions, including safeguarding against inappropriate client pressure through such efforts as ensuring appraiser independence. In short, the OCC regulates all national banks; the OTS is in charge of regulating thrift institutions; the Federal Reserve regulates state charter banks; the NCUA regulates all federal credit unions and state chartered credit unions that qualify for share insurance; and the FDIC regulates over 12,000 member banks and savings associations.

The following individuals serve as Directors of their respective Office of Bank Supervision and are the primary contacts for issues pertaining to appraiser independence. To determine which specific regulator to report an instance of client pressure to, use the National Information Center Web site managed by the Federal Financial Institutions Examinations Council (www.ffiec.gov/nic) to search for the lending institution by name, state, city or type of lending institution. The site will list which regulator has jurisdictional oversight. Then, you can write to one of the following directors below to outline your

(continued on next page)

Watson added that the regulated institution should ensure that the independence rules were followed when the non-regulated institution ordered the appraisal. "A regulated institution may accept and use an appraisal performed for a non-regulated institution, as long as the regulated institution reviews the appraisal and determines that the appraisal complies with the regulation. I would expect to find the documentation supporting this determination in the regulated institution's files. If the non-regulated institution did not follow the independence requirements, the appraisal report does not comply with the regulation and must be deemed unacceptable by the regulated institution. Therefore, if non-regulated institutions intend to [co-invest] their loans to a regulated institution, it is in their best interests to comply with the guidance."

Watson was unable to comment about the activities of specific institutions, or break down whether the problem was more prevalent in smaller or larger institutions. He was also unable to discuss any action taken against institutions as a result of breakdowns in appraisal independence.

Watson did discuss the recent GAO report on the state of the appraisal regulation and how the lack of consistent enforcement of appraisal standards by the states poses problems for the agencies.

"The GAO concluded that the current regulatory framework is complex and I would agree," Watson stated. "The states, the FFIEC Appraisal Subcommittee, the banking agencies and other groups were all charged with different responsibilities under the FIRREA statute. Sometimes there are conflicting opinions concerning which group has responsibility for certain aspects of the statute."

issue of concern. As a secondary or back-up contact, the agency's Ombudsman is listed where appropriate, as is the head of each agency.

**Office of the Comptroller of the Currency**
Emory Wayne Rushton
Senior Deputy Comptroller and
Chief National Bank Examiner
Comptroller of the Currency
Independence Square
250 E Street, S.W.
Washington, D.C. 20219
T 202.874.2870 F 202.874.4950
E-mail: wayne.rushton@occ.treas.gov

cc: John D. Hawke, Jr.
Comptroller of the Currency

*Ombudsman*
Samuel P. Golden
Office of the Comptroller
Comptroller of the Currency
1301 McKinney Street, Suite 3725
Houston, TX 77010-0304
T 713.336.4350 F 713.336.4351
Consumer Hotline: 800.613.6743
E-mail: samuel.golden@occ.treas.gov

**Federal Deposit Insurance Corporation**
Michael J. Zamorski
Director, Division of Supervision
Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429
T 202.898.3946 F 202.898.3638
E-mail: mzamorski@fdic.gov

*Ombudsman*
Cottrell L. Webster
Same address
T 202.942.3715

cc: Donald E. Powell, Chairman

(continued on next page)

However, he said, "There is one uniform appraisal regulation at the federal level affecting all insured financial institutions (banks, thrifts and credit unions) and the agencies continually work as one group to ensure consistent implementation." Watson explained the process by which they resolve potential infractions: "Whenever we detect problems with appraisals during examinations, we work with the bank to address the issues and we recommend that they make referrals when appropriate. Sometimes we will deal directly with the state, other times we might ask the [Appraisal Subcommittee] to make inquiries for us," he said.

The joint statement, issued by the OCC, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration, is available as part of the Appraisal Institute's larger look at appraiser independence in the collateral valuation process, including the organization's response to the joint statement, at www.appraisalinstitute.org/govtaffairs/ Aprsr_Indpndnc.asp.

*Building on the success of its 2003 Washington Appraisal Summit, the Appraisal Institute is interviewing a regulatory official each month on a breaking news topic of interest to the appraisal profession and real estate industry as a whole. Make sure to check out The Federal Line on the Appraisal Institute's Web site at* www.appraisalinstitute.org/govtaffairs/ default.asp

**Office of Thrift Supervision**
Scott M. Albinson
Managing Director of Supervision
Office of Thrift Supervision
5th Floor
1700 G Street, N.W.
Washington, D.C. 20552
T: 202-906-7984 F: 202-898-0230
E-mail: scott.albinson@ots.treas.gov

Ombudsman
Randy W. Thomas
Same Address
Phone: 202-906-7945
E-Mail: ombudsman@ots.treas.gov

CC: James E. Gilleran, Director

**Federal Reserve System**
Richard Spillenkothen
Director, Banking Supervision
and Regulation Division
Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
T: 202-452-2773 F: 202-452-2770
E-mail: richard.spillenkothen@frb.gov

CC: Alan Greenspan, Chairman

**National Credit Union Administration**
Marcia Sarrazin
Director, Supervision Division
Office of Examination and Insurance
National Credit Union Administration
1775 Duke Street
Alexandria, VA 22314-3437
T: 703-518-6360 F: 703-518-6666
E-mail: eimail@ncua.gov

CC: Dennis E. Dollar, Chairman