UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK by
ANDREW M. CUOMO, Attorney General of the State of
New York,

|  | **ECF Case** |
|---|---|

Civ. Action No.:  07-10397 (LTS)
(HP)

Plaintiff,

*against,*

FIRST AMERICAN CORPORATION and FIRST
AMERICAN EAPPRAISEIT,

Defendants.

**MEMORANDUM OF LAW
OF DEFENDANTS THE FIRST AMERICAN
CORPORATION AND EAPPRAISEIT, LLC IN
SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

## Table of Contents

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

PROCEDURAL HISTORY............................................................................................... 3

BACKGROUND ............................................................................................................... 3

ARGUMENT ..................................................................................................................... 6

Point I

The Attorney General's Claims Are Preempted By Federal Law ...................................... 6

A.  Congress Intended To Occupy the Field of the Regulation of Federally Chartered
    Savings and Loan Associations ............................................................................... 6

B.  The Attorney General's Regulatory Efforts Are Preempted Because They Are In
    Conflict With The Detailed OTS Regulations Governing Appraiser Selection And
    Independence ........................................................................................................... 15

Point II

The Attorney General's Claim.......................................................................................... 20

CONCLUSION................................................................................................................. 24

## **Table of Authorities**

### Federal Cases

*Bank of Am. v. City and County of San Francisco*, 309 F. 3d 551 (9th Cir. 2002) ....... 6, 7

*Barnett Bank v. Nelson*, 517 U.S. 25 (1996) .................................................................. 15

*Broder v. Cablevision Sys. Corp.*, 418 F.3d 187 (2d Cir. 2005).................... 20, 21, 22, 23

*Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) ....................... 10

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992) ........................................... 12

*Clean Air Markets Group v. Pataki*, 338 F.3d 82 (2nd Cir. 2003) .................................. 16

*Conboy v. AT&T*, 241 F.3d 242 (2d Cir. 2001) ............................................................... 21

*Conference of Fed. Sav. and Loan Associations v. Stein*, 604 F.2d 1256
    (9th Cir. 1979) ............................................................................................................ 9

*Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta,* 458 U.S. 141 (1982) ................. 7, 8, 9

*Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178 (2d Cir. 2005)............................ 8

*Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638 (2d Cir. 2005) ........................... 12

*Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) ................................................................. 15

*In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222 (S.D.N.Y. 2005) ........... 22

*In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2005) ................................................... 15

*Mosseri v. F.D.I.C.*, 95 Civ. 0723, 2001 WL 1478809 (S.D.N.Y. 2001) ......................... 22

*Office of the Comptroller of The Currency v. Spitzer*, 396 F.Supp 2d 383
    (S.D.N.Y. 2005) ............................................................................... 7, 9, 10, 23

*SPGGC, LLC v. Blumenthal,* __ F.3d __, Docket No. 05-4711-cv, 2007 WL 3036812
    (2d Cir. Oct. 19, 2007) .............................................................................................. 14

*State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207 (D. Conn., 2006)........................ 9

*United States v. Locke*, 529 U.S. 89 (2000) ..................................................................... 6

### State Cases

*Hsin Shen v. Astoria Fed. Sav. & Loan,* 295 A.D.2d 319 (2d Dep't 2002) ..................... 23

*Rego Park Garden Owners, Inc. v. Rego Park Gardens Assocs.*, 191 A.D.2d 621 (2d
    Dep't 1993).................................................................................................................. 23

*Vermeer Owners, Inc. v. Guterman*, 78 N.Y.2d 1114 (1991).......................................... 23

*Walts v. First Union Mortgage Corp.*, 259 A.D.2d 322 (1st Dep't 1999) ....................... 23

## Federal Statutes

12 U.S.C. § 64 ........................................................................................................ 7

12 U.S.C. § 1461 .................................................................................................... 6

12 U.S.C. § 1462 .................................................................................................... 7

12 U.S.C. § 1463 ............................................................................................... 7, 12

12 U.S.C. § 1813 .................................................................................................. 13

12 U.S.C. § 3301 .................................................................................................. 10

12 U.S.C. § 3310 ............................................................................................. 10, 11

12 U.S.C. §§ 3346-3348 ...................................................................................... 15

## State Statutes

New York Executive Law § 6363 ........................................................................ 15

New York General Business Law § 349 .............................................................. 15

## Federal Regulations

12 C.F.R. § 34 ................................................................................................ 13, 14

12 C.F.R. § 225 .................................................................................................... 13

12 C.F.R. § 323. ................................................................................................... 13

12 C.F.R. § 545 .................................................................................................... 12

12 C.F.R. § 560 ............................................................................................ 11, 12, 22

12 C.F.R. Part 564 ............................................................................................. 6, 11

12 C.F.R § 564 ......................................................... 11, 13, 15, 16, 17, 19

## State Regulations

19 N.Y.C.R.R. § 1106 ..................................................................................... 14, 22

Defendants The First American Corporation and eAppraiseIT, LLC ("eAppraiseIT") (The First American Corporation and eAppraiseIT collectively, "First American"), by and through their attorneys, Thacher Proffitt & Wood LLP, respectfully submit this Memorandum of Law, and the accompanying declaration of Richard F. Hans dated November 26, 2007 ("Hans Dec."), in support of their motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Complaint for failure to state a claim upon which relief can be granted.[1]

## <u>PRELIMINARY STATEMENT</u>

Mr. Cuomo has strayed into territory over which he has neither regulatory authority nor oversight responsibility. Through two comprehensive federal statutes, the Home Owners Loan Act ("HOLA") and the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), Congress has broadly empowered the federal Office of Thrift Supervision ("OTS") to promulgate and enforce federal regulations governing all aspects of federal savings and loan activities, including the manner in which appraisals are obtained in connection with mortgage loan transactions. By design, this regulatory framework leaves no room for state regulation. OTS regulations include a detailed set of rules governing the constitution and use of appraisal panels, including staff and fee appraisers. More importantly, appraisers who conduct appraisals for federal savings and loan transactions are "institution-affiliated parties" subject to the direct enforcement authority of the OTS. The federal regulations expressly: require independence for appraisers and detail the manner in which such independence can be insured for both fee and staff appraisers; allow the use of a predetermined panel of appraisers; do not prohibit

---

[1]    The Complaint names First American Corporation and First American eAppraiseIT as defendants. The proper legal names of these entities are The First American Corporation and eAppraiseIT, LLC.

a thrift's lending department from having input into the composition of that panel; and specify what is meant by the selection of appraisers. All of these topics, specifically addressed by OTS regulations are directly implicated in the Attorney General's Complaint against First American.

Congress granted to OTS the exclusive power to enforce federal regulations governing the constitution and control of appraisal programs used by savings associations. Despite the clear and comprehensive federal interest evident in the very federal regulations he cites, the Attorney General's Complaint focuses entirely on eAppraiseIT's relationship with Washington Mutual ("WaMu"), the nation's largest savings and loan association. By this action, the Attorney General seeks to push aside the OTS, making clear his intent to enforce federal law and regulation governing the standards of appraiser panel independence as applied to the WaMu/eAppraiseIT relationship. But it could not be simpler: the Attorney General is not authorized to take such action. Courts have repeatedly held that state regulators may not maintain enforcement proceedings that encroach upon the exclusive domain of federal savings and loan operations. The WaMu/eAppraiseIT relationship lies within that domain. Moreover, the Attorney General's incomplete and incorrect reading of the OTS regulations, vaguely supported by state regulations which do not speak to the conduct alleged, conflicts with the requirements of those federal regulations. In sum, the Attorney General is preempted from acting against First American.

Furthermore, the Attorney General may not sidestep his preempted regulatory authority by pleading a claim under Section 349 of New York's General Business Law. That law, which prohibits deceptive business practices, may not be used to enforce

federal statutes and laws for which Congress has not created any private right of action. Neither FIRREA nor the OTS regulations drawn from that statute provide for a private right of action and the Attorney General may not employ Section 349 to thwart Congressional intent on such a significant scale.

For all of these reasons, set forth in more detail below, the Attorney General's Complaint must be dismissed.

## PROCEDURAL HISTORY

On November 1, 2007, the People of the State of New York by Andrew Cuomo, Attorney General of the State of New York (the "Attorney General") filed a Complaint against First American in the Supreme Court of the State of New York, County of New York (the "Complaint") alleging (i) fraudulent or illegal business practices under Executive Law § 63(12); (ii) deceptive acts or practices under General Business Law § 349 and (iii) unjust enrichment. *See* Hans Dec., Ex. A. On November 16, 2007, First American timely removed this action to the United States District Court for the Southern District of New York pursuant to provisions of Sections 1441 and 1446 of Title 28 of the United States Code based upon federal question jurisdiction.

## BACKGROUND

Defendant eAppraiseIT, together with another firm, Lender Services, Inc. ("LSI"), has administered WaMu's appraisal program since June 2006. Nearly one-half of the appraisals performed for WaMu in that time have been ordered through eAppraiseIT. Those orders are placed electronically by WaMu and are assigned randomly to either LSI or eAppraiseIT. Orders received by eAppraiseIT are assigned to available, local appraisers through an automated, blind, round robin system. The vast majority of orders have been assigned to "fee appraisers" who are essentially independent contractors and

are not employees of eAppraiseIT or WaMu. eAppraiseIT employs 8 of its own staff appraisers in New York, but these individuals performed only a small fraction of the total appraisals completed.

At the outset of the relationship and through most of 2006, appraisals were conducted principally by fee appraisers on eAppraiseIT's panel. Since early 2007, at WaMu's direction, eAppraiseIT and LSI increasingly moved away from using their own panels in favor of a panel of fee appraisers selected by WaMu (the "WaMu Proven Panel"). Those fee appraisers are known as WaMu Proven Appraisers. The WaMu Proven Appraisers are not employees of WaMu, but rather independent contractors who work for a host of banks and mortgage companies within their chosen geographic area. While the WaMu Proven Panel has performed the majority of appraisals since the Spring of 2007, approximately 15% of all appraisals administered by eAppraiseIT are performed by eAppraiseIT staff appraisers and fee appraisers on the eAppraiseIT panel.

When an order for an appraisal is received and accepted by an appraiser, the appraiser undertakes to perform the appraisal within the prescribed period. Once the appraiser has completed the appraisal, he or she submits it electronically to eAppraiseIT, which in turn subjects the appraisal to certain quality control checks. If it passes those checks, the appraisal is forwarded electronically to WaMu. Upon receipt, WaMu may ask eAppraiseIT to have the appraiser reconsider the value offered. To place a request for a "reconsideration of value," also known as an "ROV" or "rebuttal", WaMu must provide or identify additional evidence that the appraiser failed to consider in the original appraisal; *e.g.*, more relevant comparable sales or upgrades to the property. An ROV will not be performed unless WaMu provides additional relevant evidence.

All told, eAppraiseIT filled approximately 10,000 appraisal and evaluation orders in New York from the inception of its relationship through the time of the filing of the Complaint. Although the Attorney General suggests that appraiser pressure is inherent in the ROV process, in fact, the number of ROVs ordered by WaMu is quite small.

In May 2007, the Attorney General issued a subpoena to First American Corporation, requesting documentation relating to its appraisal programs in New York. Although the Attorney General has no jurisdiction to regulate appraisal programs of savings and loan associations such as WaMu, or the parties with whom WaMu affiliates in administering those programs, First American cooperated with the Attorney General and produced over 15,000 pages of documents relating to appraisal work in New York and its relationship with WaMu. In addition, First American produced 13 employees for depositions and interviews before the Attorney General's office. During the course of its investigation, the Attorney General's office requested and reviewed only 8 appraisals prepared for WaMu through eAppraiseIT. The Attorney General did not ask to review any other appraisals conducted by or through eAppraiseIT.[2]

---

[2]     Two of the 8 appraisals received were for a multi-million dollar property in Sag Harbor, New York referred to in paragraph 86 of the Complaint. WaMu requires two independent appraisals for any property where the estimated value exceeds $1 million. This is reasonable as large, expensive properties in summer resort areas like Sag Harbor are often complex and difficult to value. In this particular instance, the first appraisal came in at $3.6 million, the second at $2.9 million. When eAppraiseIT was pressed to decide which appraisal it would stand behind, it selected and stood behind the lower appraisal, even though the lower appraisal may not have allowed the contemplated transaction to proceed.

## ARGUMENT

### Point I

### THE ATTORNEY GENERAL'S
### CLAIMS ARE PREEMPTED BY FEDERAL LAW

The Attorney General's Complaint purports to target the appraisal services rendered by eAppraiseIT for WaMu, asserting that eAppraiseIT's appraisals were not sufficiently independent from WaMu's loan production process.  *See* Complaint ¶8. Claiming violations of New York's consumer protection statutes, the Attorney General specifically alleges that the WaMu Proven Panel was improperly influenced by WaMu's loan production group in violation of federal and thus state law.  *See* Complaint ¶¶37-39. The Attorney General is wrong on the law, and wrong to insert himself into this arena. The Attorney General's effort to regulate WaMu's appraiser selection procedures as administered by eAppraiseIT, is preempted by a comprehensive scheme of federal law and regulation which exclusively governs the operations of savings and loan associations and institution-affiliated parties.  *See, e.g.,* Home Owners Loan Act ("HOLA") 12 U.S.C. §1461 *et seq.*; 12 C.F.R. Part 564.[3]

**A.     CONGRESS INTENDED TO OCCUPY THE FIELD OF THE REGULATION OF FEDERALLY CHARTERED SAVINGS AND LOAN ASSOCIATIONS**

1.     *HOLA Created a Pervasive Federal Regulatory Scheme Which Leaves No Room for State Regulation or Oversight*

Federal preemption of state law and regulation is assured wherever the state purports to "regulate[] in an area where there has been a history of significant federal presence."  *United States v. Locke*, 529 U.S. 89, 108 (2000); *Bank of Am. v. City and*

---

[3]     Mr. Cuomo concedes his lack of jurisdiction over WaMu by failing to name WaMu as a defendant in this action.  By suing First American in connection with the appraisal services it renders for WaMu, the Attorney General is trying to end-run applicable federal law and, in fact, regulate the activities of WaMu. His comments since the filing of the Complaint confirm his purpose.  *See infra* at pg. 14.

*County of San Francisco*, 309 F. 3d 551, 558 (9th Cir. 2002); *Office of the Comptroller of The Currency v. Spitzer*, 396 F.Supp 2d 383, 391-92 (S.D.N.Y. 2005).  The field of banking is one such area.  *Bank of America*, 309 F. 3d at 558.  Through HOLA, 12 U.S.C. § 1461 *et seq*., Congress established a "significant federal presence," regulating all aspects of the operation of federal savings associations.  *Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 144 (1982).  "Congress delegated to the [Federal Home Loan Bank Board ("FHLBB"), now the OTS] broad authority to establish and regulate 'a uniform system of [savings and loan] institutions where there are not any now,' and to 'establish them with the force of the government behind them, with a national charter.'  .  .  .  And the [OTS] has exercised that discretion, regulating comprehensively the operations of these associations, including their lending practices and, specifically, the terms of loan instruments."  *Id.* at 166 (citation omitted).[4]  Given this pervasive "federal presence" in every aspect of the operation of federal savings associations, it cannot be presumed that state laws purporting to regulate their practices, including appraisal practices, are permissible.

In enacting HOLA, Congress intended to rectify the inadequacies of the existing state systems and, in doing so, Congress clearly envisioned that "federal savings [associations] would be governed by what the [OTS] -- not any particular State -- deemed to be the 'best practices.'" *de la Cuesta*, 458 U.S. at 161 (citation omitted).  The statute makes clear that the OTS is empowered "under such regulations as the Director may prescribe to provide for the organization, incorporation, examination, operation and regulation of associations to be known as Federal savings associations."  12 U.S.C. §

---

[4]    The OTS is the successor to the FHLBB.  Except as otherwise noted, the FHLBB will be referred to as the "OTS."

64(a)(1).[5]  To be sure, the broad language of the statute "expresses no limits on the [OTS'] authority to regulate the lending practices of federal savings and loans." *de la Cuesta*, 458 U.S. at 145, 159-160 (confirming that Congress intended the OTS to have plenary and exclusive authority to regulate, monitor and examine federal savings associations from cradle to grave).

*de la Cuesta* is instructive.  There, the Supreme Court reviewed the presumptive effect of a federal regulation concerning due-on-sale clauses in loans made by federal savings associations.  The Court held that a California limitation on the enforcement of due-on-sale clauses to those instances in which the lender's security was impaired was invalid.  458 U.S. at 162.  Noting that the federal regulation's preemptive intent was clarified in the final regulation's preamble, the Court found that it preempted conflicting state law.  Where Congress has delegated discretionary power to an administrator the preemptive power of the administrator's regulation is subject only to the scope of his statutory authority.  In sum, the federal regulations have the same preemptive power of statute.  *Id.* at 162-165.

"Congress expressly contemplated, and approved, the Board's promulgation of regulations superseding state law." *de la Cuesta*, 458 U.S. at 162.  Indeed, Courts have recognized the OTS' regulation of federal savings associations to be "so pervasive as to leave no room for state regulatory control" and that OTS regulations therefore preempt the field of regulation of federal savings banks.  *See Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 183-184 (2d Cir. 2005) (holding HOLA and OTS regulations preempt

---

[5]  *See also* 12 U.S.C. § 1462a(b)(2) ("The Director may prescribe such regulations and issue such orders as the Director may determine to be necessary for carrying out this chapter and all other laws within the Director's jurisdiction."); 12 U.S.C. §1463(a)(2) ("The Director may issue such regulations as the Director determines to be appropriate to carry out the responsibilities of the Director or the Office.")

the field of regulation of mortgage escrow accounts held by federal savings associations); *see also State Farm Bank, F.S.B. v. Burke*, 445 F. Supp. 2d 207 (D. Conn., 2006) (Connecticut banking commissioner permanently enjoined from directly or indirectly regulating the mortgage lending and deposit-related activities of savings association or its exclusive agents).

The OTS has asserted and courts have confirmed its dominance over every aspect of the life and operation of savings and loans. So complete is that dominance that it permits no other regulator into that space. "The comprehensiveness of the HOLA language demonstrates that Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary." *See* Hans Dec., Ex. B (OTS Opinion P-2003-2, issued January, 30, 2003, at 3 & n.14 (citing, *inter alia*, *de la Cuesta*, 458 U.S. at 153, and concluding that the New York Predatory Lending Law was "preempted by federal law from applying to federal savings and loan associations")); *see also Conference of Fed. Sav. and Loan Associations v. Stein*, 604 F.2d 1256, 1260 (9th Cir. 1979) ("In our judgment the regulatory control of the [OTS] over federal savings and loan associations is so pervasive as to leave no room for state regulatory control"), *aff'd*, 445 U.S. 921 (1980). As the Supreme Court observed, "'it would have been difficult for Congress to give the [OTS] a broader mandate.'" *de la Cuesta*, 458 U.S. at 161 (citations omitted). In sum, HOLA, and particularly the broad language of section 5(a), establishes the OTS' unlimited authority to regulate all aspects of federal thrifts' lending operations.[6]

---

[6]     The OTS' opinions on preemption of state laws purporting to regulate the activities of savings and loan associations are numerous and unequivocal in pronouncing that the regulation of savings and loan associations falls within the exclusive domain of the OTS. *See, inter alia*, OTS Opinion P-2003-7, issued October 6, 2003 (New York State laws requiring savings and loan associations to pay interest on escrow accounts preempted by federal law occupying the field of lending regulation for savings and loans); *see* OTS Opinion P-2003-1, issued January 21, 2003 (state law regulating the terms of credit, loan related fees and disclosures for savings and loans preempted by federal law); OTS Opinion P-2003-6, issued September

Where, as here, the agency's interpretation of its powers is "based on a permissible construction of the statute," the agency's interpretation is granted deference and "controlling weight."  *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984); *see also OCC v. Spitzer*, 396 F.Supp 2d at 391, 405-06.  In *OCC v. Spitzer*, this Court barred the Attorney General from infringing on the visitorial authority of the OCC over national banks and their operating subsidiaries.  *Id*. at 407-08.  So too here, the Attorney General may not infringe upon the OTS' authority and obligation to regulate in this area.

2.    *FIRREA Extended the OTS' Pervasive Reach to Appraisal Programs and Institution-Affiliated Parties Such as First American*

With passage of the FIRREA in 1989, Congress amended HOLA and, among other things, expanded Federal oversight of savings and loan associations to include review and regulation of appraisal programs.  *See* 12 U.S.C. § 3301 *et seq.*  Congress intended to:

> provide that Federal financial and public policy interests in real estate transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision.

12 U.S.C. § 3310.  Under FIRREA, the exclusive responsibility for examination of the real estate lending and appraisal programs implemented by federally regulated savings and loans falls to the OTS. *Id.*

---

2, 2003 (same); OTS Opinion P-2006-3, issued June 9, 2003 (state laws regulating gift cards issued by savings and loans preempted by federal law). *See* Hans Dec., Exs. C, D, E and F.

Congress enacted FIRREA in the wake of the savings and loan crisis of the 1980s. Its legislative history makes clear that Congress attributed the "perilous condition of the thrift industry" to, among other things, "...the dismal performance of some thrift managements, inadequate oversight, supervision and regulation by government regulatory agencies...and outright fraud and insider abuse...." *Financial Institutions Reform, Recovery, and Enforcement Act of 1989*, 1989 H.. Rep. No. 101-54(I), at 294 (1989) *reprinted* in 1989 U.S.C.C.A.N., 1, 90. Specifically, the legislative history suggests that reforming the appraisal industry was a large part of the reform: "[e]xtensive Congressional hearings, GAO reports and regulatory agency studies have documented the pervasive use of faulty and fraudulent real estate appraisals by unscrupulous thrift managements... [and c]ollusion between thrift managers, real estate appraisers and borrowers has cost the FSLIC billions of dollars". As such, "[i]n order to thwart real estate appraisal abuses" FIRREA established a system of uniform national real estate appraisal standards. *Id*. at 311.

Further to the broad authority granted it under Title XI of FIRREA, the OTS issued extensive regulations specifically addressing the composition and construction of appraisal programs undertaken by and for savings and loan associations. *See* 12 CFR Part 564. The purpose and scope of the regulations were made clear:

> Title XI provides protection for federal financial and public policy interests in real estate transactions by requiring real estate appraisals used in connection with federally related transaction to be performed in writing, in accordance with uniform standards, by appraisers whose competency has been demonstrated and whose professional conduct will be subject to effective supervision. *This part implements the requirements of title XI and applies to all federally related transactions entered into by the OTS or by institutions regulated by the OTS.*

12 CFR § 564.1(b) (emphasis added).   Regulations issued pursuant to FIRREA and HOLA confirm the OTS broad charter: "OTS hereby occupies *the entire field of lending* regulation for federal savings associations." 12 C.F.R. § 560.2(a) (emphasis added). Consistent with congressional intent, "[t]his exercise of the [OTS'] authority is preemptive of *any* state law purporting to address the subject of the operations of a Federal savings association." 12 C.F.R. § 545.2 (1996) (emphasis added).[7]   When a federal law "occupies the field" it is known as field preemption. Field preemption is one of the three forms of "defensive preemption" which defeat a plaintiff's state law claim. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992); *see also Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 641 (2d Cir. 2005).

---

[7]         12 CFR § 560.2, "Applicability of law," provides in pertinent part:

(a) *Occupation of field.* Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), *OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations* when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), *OTS hereby occupies the entire field of lending regulation for federal savings associations.* OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation.   *Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities*, except to the extent provided in paragraph (c) of this section or §560.110 of this part. For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.

(b) *Illustrative examples.* Except as provided in §560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

*             *             *

(10*) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;* . . .

(emphasis added).

Critically, the regulations extend not only to savings and loans, but also to "*institution-affiliated parties*, *including staff and fee appraisers,*" who are subject to federal penalties for violation of any applicable regulation. 12 C.F.R. at § 564.7 (emphasis). "Institution-affiliated parties" are defined under the Federal Deposit Insurance Act ("FDIA"), to include independent contractors through whom the thrift operates, including staff and fee appraisers. 12 U.S.C. § 1813(u)(4). Like the thrifts governed by the OTS, appraisers and other institution-affiliated parties who violate Part 564 are subject to various penalties contemplated by the regulations and the FDIA. Lest there be any doubt, the OTS has asserted its status as the regulator of First American. *See* Hans Dec., Ex. G, (Letter from Nicholas Dyer, Ass't Director of the OTS, dated November 6, 2007).

The OTS regulations in the field of appraisals are exhaustive. The regulations identify which real estate-related financial transactions require the services of an appraiser; prescribe which categories of federally related transactions shall be appraised by a state certified appraiser or a state licensed appraiser; and prescribe minimum standards for the performance of real estate appraisals in connection with federally related transactions under its jurisdiction. *See* 12 C.F.R. §§ 564.2(b)(1)-(3), 564.3 and 564.4.[8]

That the Attorney General intends to use the Complaint against First American to indirectly regulate and affect the business practices of WaMu is most apparent. Indeed, he has made that his explicit purpose. References to WaMu and its appraisal program are

---

[8]    The OCC, Federal Reserve and FDIC have all promulgated regulations pursuant to FIRREA identical to those issued by the OTS in 12 C.F.R. 564.1 – 564.6. *See* 12 C.F.R. 34.41 – 34.47 (OCC); 12 C.F.R. 225.61 – 225.67 (Federal Reserve); and 12 C.F.R. 323.1 – 323.7 (FDIC).

replete throughout the Complaint, the Attorney General's press releases and his repeated statements to the press:

> Our case with First American *and Washington Mutual* that we brought last week was not the exception it was the rule. We brought that case as a single case because we believe there was a very graphic demonstration of this problem.

*See* Hans Dec., Ex. H (Transcript of November 7, 2007 Attorney General Press Conference). The Attorney General has acknowledged that the appraisal independence claims against First American directly and intentionally implicate WaMu and its lending practices. *See, e.g.,* Hans Dec., Exs. H (Transcript of November 7, 2007 Press Conference) and I (November 1, 2007 Press Release from the Attorney General's Office). To the extent the Attorney General's enforcement of federal or state law tends to interfere with WaMu's or First American's ability to operate under FIRREA and the OTS regulations, it is and must be preempted. *See SPGGC, LLC v. Blumenthal*, __ F.3d __, Docket No. 05-4711-cv, 2007 WL 3036812, *1 (2d Cir. Oct. 19, 2007) (barring enforcement of Connecticut Gift Card law to extent preempted by OCC oversight of national banks).

In light of Congress' clear expression of its intent to occupy the field of federal savings association regulation, the Attorney General's effort to undertake an enforcement initiative in this area is completely inappropriate. Congress has left no room for any state regulation of thrifts in their core function of mortgage loan origination, much less this Attorney General's free-wheeling attempt to regulate an entire industry that has been exclusively under federal purview for generations.[9]

---

[9]    Federal regulators have also recognized that the Attorney General has strayed beyond his appointed domain. On November 8, 2007, James B. Lockhart III, the Director of the Office of Federal Housing Enterprise Oversight ("OFHEO"), responded to the letters issued by the Attorney General to

**B.      THE ATTORNEY GENERAL'S REGULATORY EFFORTS ARE PREEMPTED BECAUSE THEY ARE IN CONFLICT WITH THE DETAILED OTS REGULATIONS GOVERNING APPRAISER SELECTION AND INDEPENDENCE**

The Complaint's meager reference to New York Executive Law § 63(12), General Business Law § 349, 12 C.F.R. § 34.44 and 19 N.Y.C.R.R. § 1106.1 is unavailing and the Attorney General knows it.  Not one of these statutes or regulations addresses appraisal *panel* independence -- the central issue of the Complaint.  Indeed, the Attorney General relies entirely on alleged violations of federal statutes and regulations which he now uniquely interprets.  The Attorney General alleges that "federal statutes and regulations require that appraisals be accurate and independent" (Compl. ¶18), and  that "[f]ederal law sets independence standards for appraisers involved in federally-related transactions" (Compl. ¶19).  In addition, the Attorney General cites federal law as the standard by which First American's conduct should be governed. (Compl. ¶19).  The Attorney General's foray here into appraisal panel composition directly conflicts with the very same exhaustive federal regulations which he claims to now enforce.  That foray cannot stand.  Federal law preempts state law, even where there is no express or implied intent of Congress to preempt state regulation, if, as here, the state law conflicts with federal law or regulation.  Conflict may arise where, as here, state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also Barnett Bank v. Nelson*, 517 U.S. 25 (1996);

---

Fannie Mae and Freddie Mac demanding that they cease doing business with WaMu "which [the Attorney General has] not charged or subpoenaed" or appoint an independent examiner.  Mr. Lockhart noted OFHEO "is the federal safety and soundness regulator of Fannie Mae and Freddie Mac" and noted his "disappointment that [the Attorney General's] office did not contact OFHEO before or even after subpoenaing [Fannie Mae and Freddie Mac] and issuing certain threats regarding their future business activity."  *See* Hans Dec., Ex. J.

*Clean Air Markets Group v. Pataki*, 338 F.3d 82 (2nd Cir. 2003); *In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2005).

FIRREA, and its accompanying regulations, expressly limit the state's role in the appraisal arena to the supervision of the professional conduct of *individual* appraisers. *See* 12 U.S.C. §§3346-3348. The state may not separately interpret or enforce federal regulations relating to the composition or control of a thrift's appraisal program. Moreover, in 12 C.F.R. §564.5, the OTS directly addresses and defines "Appraiser independence" for both staff and fee appraisers. "Staff appraisers," that is, those who are employed directly by the lending institution, must "be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 CFR §564.5(a). "Fee appraisers," that is, those who are independent contractors employed to conduct appraisals of particular properties on a fee basis, "shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property or transaction." *Id.* at §564.5(b). The regulations simply do not require absolute separation of a thrift's lending function and fee appraisers. That the regulators do not express the same stated concern for independence from lending when a fee appraiser is engaged is not surprising; the fee appraiser is not an employee of the bank or mortgage company and so already is, by definition, independent. The distinctions drawn and the obligations imposed by the regulators between staff appraisers and fee appraisers are significant and, here, not without a difference. The very network of which the Attorney General complains is one of *fee appraisers*, independent contractors selected for particular transactions by a

separate entity, here eAppraiseIT.  To that end, federal regulations are not only *not* violated, but in fact are fully satisfied.

The OTS and other federal banking regulators, including the OCC, the FDIC and the Federal Reserve (collectively, the "Federal Regulators"), have continued to issue specific guidance regarding appraisals to their regulated entities, first issuing Interagency Appraisal and Evaluation Guidelines in 1994 (the "1994 Interagency Guidelines") speaking to the separation of the appraisal process from an institution's loan production process.[10]  In October 2003, the Federal Regulators issued supplemental guidance, providing "further clarification" of the 1994 Interagency Guidelines ("2003 Interagency Guidelines").[11]

The 2003 Interagency Guidelines are particularly relevant to any analysis.  Noting that the 1994 Interagency Guidelines "establish[ed] minimum standards for an effective program, including standards for *selecting* individuals who may perform appraisals and evaluations," the 2003 Interagency Guidelines specifically address and define the appraiser "*selection*" process and it is in this process where "independence" is critical:

> Among other considerations, the *selection* criteria must provide for the independence of the individual performing the appraisal or evaluation.  That is, the individual has neither a direct nor indirect, interest, financial or otherwise, in the property or transaction.

*Id*. (emphasis added).  That selection process is, however, a narrowly defined moment:

> *Selection* occurs when, based on an oral or written agreement, the individual accepts the assignment to appraise or evaluate a particular property.

---

[10]    *Comptroller's Handbook for Commercial Real Estate and Construction Lending* for OCC; SF Letter 94-55 for Reserve Board; FIL-74-94 for FDIC; and Thrift Bulletin 55a for OTS.

[11]    *See* Hans Dec., Ex. K (Independent Appraisal and Evaluation Functions, October 27, 2003, (FDIC FIL -84-2003)).

*Id.* at 2 (emphasis added).  In short, the term "selection" refers to that moment in time when an order to appraise a property is assigned to a particular appraiser.  The 2003 Interagency Guidelines go on to provide that:

> It is important to ensure that the program is safeguarded from internal influence and interference from an institution's loan production staff. *Individuals independent from the loan production area should oversee the selection of appraisers and individuals providing evaluation services.*

*Id.* (emphasis added).

While the 2003 Interagency Guidelines were intended to be a reaffirmation of the existing regulations and earlier guidelines, the Federal Regulators took pains to define "selection" and make clear its narrow application:

> The only 'new' item is a definition of that specifies when an appraiser is deemed to have been selected.  Selection is defined as occurring when the assignment agreement is reached between two parties and the work commences.

*See* Hans Dec., Ex. L (*Statement of Tom Watson, OCC National Bank Examiner and Credit Risk Specialist*, appearing in The Federal Line, a publication of the Appraisal Institute, December 2003).

Understanding the distinctively narrow definition of the term *selection* and how the selection process is performed in the WaMu program then is critical.  *Selection* does not refer to the appointment of an appraiser to the panel of available appraisers in the first instance, but rather refers to that limited instance in which an appraiser is picked to perform an appraisal on a particular property.  Here, WaMu's loan production staff *does not select* the appraisers to perform individual appraisals – eAppraiseIT and LSI do, precisely as the 2003 Interagency Guidelines require.

18

The Attorney General's reliance on the Federal Regulators' FAQ #5 therefore is inapposite:

> When **_selecting_** residential appraisers, may loan production staff use a revolving pre-approved appraiser list, provide the list is not under their control?
>
> Answer: Yes, loan production staff may use a revolving, board-approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process.

FAQ #5 and the Federal Regulators' response speak only to that limited instance in which a lending institution's loan production staff participates in the *selection* process. It does not speak to those instances when a third, unrelated party – such as eAppraiseIT or LSI – intervenes and runs the selection process. Had the Federal Regulators intended their response to reach those instances in which third parties or agents conduct the selection process, they could easily have done so, as they did in defining the rules applicable to the use of fee appraisers. 12 CFR §§564.5, 34.45, 225.65, and 323.4. But they did not and their decision to limit their response in FAQ #5 must be accorded deference. The Attorney General may not now interpret FAQ #5 to apply a broader and more restrictive rule to the manner in which WaMu may populate its panel. If WaMu and its lending group are not "selecting" the appraiser – as that term has been defined by the regulators – then FAQ #5 is inapplicable. And the Attorney General knows and understands that neither WaMu nor its loan production staff *selects* individual appraisers to review a particular property.

In sum, federal regulations and the subsequently issued Interagency Guidelines do not prohibit WaMu from participating in the appointment of appraisers to the WaMu

Proven Panel from which appraisers were selected by eAppraiseIT for particular assignments, because eAppraiseIT, not WaMu, "selects" the appraisers for particular appraisal assignments.  For these reasons, the WaMu Proven Panel complies in all respects with applicable law governing the independence of appraisals.

The Attorney General's state law claims rely entirely on the existence of a violation of applicable federal law and regulations.[12]   It is not for the Attorney General, however, to either interpret or enforce the OTS regulations – that is for the OTS and OTS alone.   The Attorney General's efforts to thwart the clear Congressional objective to assign exclusive responsibility for regulating thrifts and affiliated institutions to the OTS cannot be tolerated.

## Point II

### THE ATTORNEY GENERAL'S CLAIM
### UNDER GENERAL BUSINESS LAW § 349 MUST BE DISMISSED

Preemption aside, the Attorney General's Second Cause of Action, alleging deceptive practices in violation of New York General Business Law ("GBL") §349 cannot be sustained and must therefore be dismissed.  The Attorney General's GBL § 349 cause of action is merely an attempt to convert alleged violations of federal law into an alleged violation of GBL §349.  Where a plaintiff, including the Attorney General, seeks to rely upon a substantive violation of a federal law to support a claim under GBL §349, the federal law at issue must contain a private right of action. *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005).  The Complaint relies principally upon the

---

[12]      Both state and federal law incorporate USPAP.  As set forth in Point I, *supra*, federal law and regulation occupy this field.  Although the Attorney General purports to assert claims under New York State law incorporating USPAP, that law may not be read inconsistently with federal law.  As the Attorney General himself admits, the standards for "independence" are and necessarily must be drawn from federal law. (Compl. ¶19).

allegations that First American's conduct ran afoul of federal regulations relating to the constitution and control of appraisal panels. But the applicable federal law and regulations on which the Attorney General relies do not provide a private right of action and the Attorney General may not circumvent that limitation by cloaking his claim under GBL § 349. It was not, nor could it have been, the New York State Legislature's intent to allow GBL § 349 "to thwart Congress's intentions on a significant scale." *Id.*

In *Broder*, the plaintiff asserted a claim under GBL § 349, alleging that the defendant's substantive conduct violated the mandate of a federal telecommunications statute. *Id.* at 192, 199. The federal statute provided an affirmative mandate for cable television providers, but, as here, contained no private right of action. *Id.* Several years earlier, the Second Circuit had held that a plaintiff may not circumvent the lack of a private cause of action under New York State law by artfully pleading the claim under GBL §349. *Id.* (citing *Conboy v. AT&T*, 241 F.3d 242, 258 (2d Cir. 2001)). In *Broder,* the question presented was whether a GBL § 349 claim may be based upon violation of a federal statute or regulation that does not contain a private right of action. The Court answered that question in the negative:

> Were we to hold, despite *Conboy*, that *GBL §349* may be used to assert a private right of action for violation of a federal law otherwise lacking one, we would essentially be attributing to the New York legislature an intent to thwart Congress's intentions on a significant scale. And in this case, we would be doing so with respect to a federal law that on its face does not address deceptive or misleading behavior at all; whether a rate structure is uniform has no necessary connection to whether customers are aware of what they are paying for. If 42 U.S.C. §543(d) may be the basis for a claim asserting a private right of action, so may many other federal regulatory laws not having to do with deceptive or misleading acts.

> Neither the text of *GBL §349* nor any other authority cited by Broder suggests that the New York legislature intended to cast its net so broadly. Without deciding whether *Conboy*'s bar on circumvention applies to all federal statutes lacking a private right of action, we hold that it does apply to *47 U.S.C. §543(d)*. The *GBL §349* claim relying on alleged violations of *§543(d)* was thus correctly dismissed.

*Broder,* 418 F.3d at 199 (footnote omitted) (emphasis added) (citing *Conboy*, 241 F.3d at 258).

Here, the Attorney General's Complaint against First American is rooted fundamentally in an alleged violation of FIRREA, HOLA and related federal regulations -- that is, did First American allow WaMu to employ a panel of appraisers which were controlled by and not independent from WaMu's lending department in violation of OTS regulations governing appraiser independence? The Attorney General did not rely upon a New York State corollary to that federal law concerning selection of appraisers, because no such New York State law exists.[13]

FIRREA, however, contains no private right of action. *See Mosseri v. F.D.I.C.*, 95 Civ. 0723, 2001 WL 1478809 at * 4 (S.D.N.Y. 2001). In *Mosseri,* a Southern District of New York Court concluded that only two provisions of FIRREA expressly granted a private right of action: (1) permitting enforcement of lower-income occupancy requirements against purchasers; and (2) permitting prohibition of discrimination against whistleblowers. *Id.* Thus, the Court determined that "Congress did not intend to create a private right of action with respect to the silent provisions of the statute." *Id*; *see also In*

---

[13]     The Attorney General's reference to certain New York State Regulations (see Compl. ¶¶18, 21, citing the Uniform Standards of Professional Appraisal Practice, 19 NYCRR §1106.1) are simply not relevant to the allegations made in the Complaint. Those regulations solely concern the professional obligations of individual appraisers, and the Complaint fails to identify any misconduct by any such individuals. The state regulation may not be applied or otherwise employed in such a way as to affect the credit or lending activities of a thrift or its institution-affiliated parties. 12 CFR §560.2(a), (b).

*re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 232 (S.D.N.Y. 2005) ("[t]he absence of rights-creating language, the existence of an alternative method of enforcement, and the existence of an explicit private right of action for another provision of the statute creates a strong presumption that Congress did not intend to create a private right of action").  As there is no private right of action under the OTS regulations which are at the center of his allegations,  the Attorney General may not then bring a cause of action under GBL § 349 asserting their violation.[14]

Indeed, just as with private rights of action, courts look to Congressional intent in determining whether the Attorney General can bring suit pursuant to substantive federal law. *See OCC v. Spitzer*, 396 F. Supp. 2d at 407.  There, this Court examined the language of the National Bank Act and determined that Congress did not intend to "[permit] state officials to circumvent the limits on their vistorial powers by invoking the power of the courts" and thus held that the Attorney General did not have the authority to enforce federal regulations against National Banks.  *Id*.  Here too, no language in FIRREA suggests that Congress intended that state Attorneys General have the power to enforce FIRREA or its related Federal regulations.  In fact, as detailed in Point I, quite the opposite is true -- not only is there no intent to allow such enforcement, but the language of the federal law and regulations at issue assign the responsibility for regulation and enforcement exclusive to the OTS.

---

[14]    Nor may a plaintiff assert common law claims, where such claims spring from allegations that the defendant failed to comply with a statute under which there is no private right of action.  Such artful pleading does not avoid the same fate as the GBL §349 claim.  *See Broder*, 418 F.3d at 201; *see also Hsin Shen v. Astoria Fed. Sav. & Loan*, 295 A.D.2d 319 (2d Dep't 2002); *Walts v. First Union Mortgage Corp.*, 259 A.D.2d 322 (1st Dep't 1999); *Rego Park Garden Owners, Inc. v. Rego Park Gardens Assocs.*, 191 A.D.2d 621 (2d Dep't 1993); *Vermeer Owners, Inc. v. Guterman*, 78 N.Y.2d 1114 (1991).

As such, the Attorney General's Second Cause of Action pursuant to GBL §349 must be dismissed.

## CONCLUSION

For the foregoing reasons, defendants The First American Corporation and eAppraiseIT, LLC, respectfully request that this Court enter an order (i) granting defendants' motion to dismiss the Complaint in its entirety; and (ii) granting such other and further relief that the Court deems just and proper.

Dated: New York, New York
November 26, 2007

THACHER PROFFITT & WOOD LLP

By: _/s/ Richard F. Hans_____
Richard F. Hans
Patrick J. Smith
Kerry Ford Cunningham

Two World Financial Center
New York, New York 10281
Tel.: (212) 912-7400
rhans@tpw.com
psmith@tpw.com
kcunningham@tpw.com

*Attorneys for The First American Corporation and eAppraiseIT, LLC*