UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                     :

THE PEOPLE OF THE STATE OF NEW YORK  :
by ANDREW M. CUOMO, Attorney General of  :`      ECF Case
the State of New York,  :

                      :      07 Civ. 10397 (LTS) (HBP)

              Plaintiff,  :

                      :

      -against-  :

                      :

FIRST AMERICAN CORPORATION and  :      ORAL ARGUMENT REQUESTED
FIRST AMERICAN EAPPRAISEIT,  :

                      :

            Defendants.  :
---------------------------------------------------------------x


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


ANDREW M. CUOMO
Attorney General of the State of New York
120 Broadway, 25th Floor
New York, New York 10271
Tel: (212) 416-6053

NICOLE GUERON
RICHARD DEARING
CHRISTOPHER MULVIHILL

    – of counsel –

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................. ii

PRELIMINARY STATEMENT ........................................................... 1

BACKGROUND ............................................................................... 2

    A.    Overview of the Real Estate Mortgage Industry ................................... 2

    B.    The Framework of Dual Federal and State
            Regulation of Real Estate Appraisals .................................................. 3

    C.    Statement of the Case ...................................................................... 7

          1.    Procedural History ..................................................................... 7

          2.    The Attorney General's Complaint ............................................. 7

ARGUMENT

    I.    THE ATTORNEY GENERAL'S CLAIMS ARE
       NOT PREEMPTED BY FEDERAL LAW ........................................ 12

         A.    Federal Law Does Not Occupy the
              Field of Appraisal Regulation ................................................. 12

         B.    The Attorney General's Claims Do Not Conflict with Federal Law ....... 17

    II.    THE COMPLAINT STATES A VALID CLAIM
       UNDER GENERAL BUSINESS LAW § 349 .................................... 22

CONCLUSION ............................................................................... 24

## TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE**

Broder v. Cablevision Sys. Corp.,
    418 F.3d 187 (2d Cir. 2005) ................................................................. 22, 23

Conboy v. AT&T Corp.,
    241 F.3d 242 (2d Cir. 2001) ................................................................. 22, 23

Fla. Bar v. Went for It,
    515 U.S. 618 (1995) ............................................................................... 16

Gregory v. Daly,
    243 F.3d 687 (2d Cir. 2001) ................................................................. 12

Int'l Paper Co. v. Ouellette,
    479 U.S. 481 (1987) ............................................................................... 17

Karlin v. IVK Am., Inc.,
    93 N.Y.2d 282 (1999) ............................................................................. 8-9

Lefkowitz v. Scottish Am. Ass'n,
    52 A.D.2d 528 (1st Dep't 1976) ........................................................... 8

Matter of State of New York v. Citibank, N.A.,
    537 F. Supp. 1192 (S.D.N.Y. 1982) ..................................................... 8

Medtronic, Inc. v. Lohr,
    518 U.S. 470 (1996) ............................................................................... 13

Oncor Comm. v. State,
    165 Misc.2d 262 (Sup. Ct. Alb. Co. 1995),
    aff'd, 218 A.D.2d 60 (3d Dep't 1996) ................................................. 8

Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,
    85 N.Y.2d 20 (1995) ............................................................................. 9, 23

People v. Federated Radio Corp.,
    244 N.Y. 33 (1926) ............................................................................... 8

State v. Andersen,
    137 A.D.2d 259 (4th Dep't 1988) ....................................................... 8

## TABLE OF AUTHORITIES (cont'd)

**CASES**                                                                                           **PAGE**

State v. Gen. Elec. Co.,
        302 A.D.2d 314 (1st Dep't 2003) ...................................................................... 8

State v. Life Sci. Church,
        113 Misc.2d 952 (Sup. Ct. N.Y. Co. 1982),
        appeal dismissed, 93 A.D.2d 774 (1st Dep't),
        appeal dismissed, 60 N.Y.2d 643 (1983) .......................................................... 8

State v. Princess Prestige,
        42 N.Y.2d 104 (1977) ....................................................................................... 8

State v. Stevens,
        130 Misc.2d 790 (Sup. Ct. Oswego Co. 1985) ................................................ 8

State v. Winter,
        121 A.D.2d 287 (1st Dep't 1989) ..................................................................... 8

Steel Co. v. Citizens for a Better Env't,
        523 U.S. 83 (1998) .......................................................................................... 12

Walts v. First Union Mortgage Corp.,
        259 A.D.2d 322 (1st Dep't 1999) .................................................................... 23


**FEDERAL STATUTES AND REGULATIONS**

Federal Rule of Civil Procedure 12 ........................................................................ 1, 7

12 U.S.C. § 1813 .................................................................................................. 15, 16

12 U.S.C. § 1818 .................................................................................................. 15, 16

12 U.S.C. § 3332 ......................................................................................................... 6

12 U.S.C. § 3336 ......................................................................................................... 4

12 U.S.C. § 3339 ................................................................................................ 6, 9, 13

12 U.S.C. § 3346 ......................................................................................................... 5

12 U.S.C. § 3347 ......................................................................................................... 5

**TABLE OF AUTHORITIES (cont'd)**

**FEDERAL STATUTES AND REGULATIONS**                                    **PAGE**

12 U.S.C. § 3348 ................................................................... 6, 7, 13, 14, 16

12 U.S.C. § 3350 ................................................................................. 4

28 U.S.C. § 1441 ................................................................................. 7

28 U.S.C. § 1446 ................................................................................. 7

12 C.F.R. § 564.4 ............................................................................ 6, 9


**NEW YORK STATUTES AND REGULATIONS**

Executive Law § 63 ...................................................................... passim

General Business Law article 22-A .......................................................... 7

General Business Law § 349 ............................................................. passim

19 N.Y.C.R.R. § 1106.1 ..................................................................... 9


**MISCELLANEOUS AUTHORITIES**

135 Cong. Rec. S3993 (daily ed. April 17, 1989) .................................. 4, 13

Federal Financial Institutions Examination Council, Appraisal Subcomm.,
ASC History, available at http://www.asc.gov/default.aspx?id=6 ............................. 14

Federal Financial Institutions Examination Council, Appraisal Subcomm.,
Policy Statements Regarding State Certification and Licensing of Real Estate Appraisers,
available at http://www.asc.gov/html/frameSet.aspx?assetPath=/uploads/
Policy%20Statements\PolicyStatements2007Final.pdf (last visited Feb. 6, 2008) ..... 5, 13-14, 21

H. Rep. No. 101-54 (1989), reprinted in 1989 U.S.C.C.A.N. 86 .................................. 4

Office of the Comptroller of the Currency et al., Frequently Asked Questions
on the Appraisal Regulations and the Interagency Statement on Independent
Appraisal and Evaluation Functions (Mar. 22, 2005), available at www.ncua.gov/
letters/2005/CU/05-CU-06-Encl%20-1.doc (last visited Feb. 6, 2008) ....................... 19

**TABLE OF AUTHORITIES (cont'd)**

**MISCELLANEOUS AUTHORITIES**                                           **PAGE**

Office of the Comptroller of the Currency et al., <u>Interagency Appraisal and</u>
<u>Evaluation Guidelines</u> (Oct. 27, 1994), <u>available at</u> http://www.fdic.gov/news/
news/financial/2003/fil0384b.html (last visited Feb. 6, 2008)  .................................................... 19

S. Rep. No. 101-19, at 35-36 (1989), <u>reprinted in</u> 2 Pulles, Whitlock, & Hogg,
<u>FIRREA: A Legislative History and Section-by-Section Analysis</u> (1990)  .............................. 4, 6

The First American Corp., <u>2006 Annual Report</u>, <u>available at</u>
http://thomson.mobular.net/thomson/7/2346/2577 (last visited Feb. 6, 2008) ........................... 23

USPAP Ethics Rule (Conduct), <u>available at</u>
http://commerce.appraisalfoundation.org/html/ 2006%20USPAP/
ETHICS_RULE.htm (last visited Feb. 6, 2008) ........................................................................ 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
                                                    :
THE PEOPLE OF THE STATE OF NEW YORK   :
by ANDREW M. CUOMO, Attorney General of   :`       ECF Case
the State of New York,                              :
                                                    :       07 Civ. 10397 (LTS) (HBP)
                              Plaintiff,            :
                                                    :
                -against-                           :
                                                    :
FIRST AMERICAN CORPORATION and        :            ORAL ARGUMENT REQUESTED
FIRST AMERICAN EAPPRAISEIT,            :
                                                    :
                              Defendants.           :
-------------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, the People of the State of New York, by Andrew M. Cuomo, Attorney General of the State of New York (the "State" or the "Attorney General"), submits this memorandum of law in opposition to defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This suit is not barred by principles of federal preemption. First, the federal government has not occupied the field of appraisal regulation. Rather, Congress expressly contemplated complementary roles for federal and state regulation and enforcement of appraisal standards. This lawsuit accords fully with that congressional purpose. Moreover, this suit presents no conflict between state and federal law. State and federal law run parallel in this area, and defendants' conduct, as alleged in the Attorney General's complaint, violated both. Finally, the Attorney

1

General's allegations are more than sufficient to state a claim under New York General Business Law § 349.

## BACKGROUND

### A.    Overview of the Real Estate Mortgage Industry

Traditionally, before a financial institution would agree to loan an individual funds to purchase or refinance a home, the lender required assurances that the mortgaged property held sufficient value to support the loan in case the borrower defaulted.[1] The lender and borrower thus had a common interest in ensuring that the property was accurately appraised to confirm that the borrower was not overpaying for the property and that the loan collateral was adequate.

In recent times, this landscape has changed dramatically. Lenders today hold far fewer mortgage loans in their own portfolios. Instead, they regularly sell loans in the financial markets, either directly or through investment banks or Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The loans are frequently pooled together, securitized, and sold to the general public as mortgage-backed securities.

This new paradigm has transformed incentives in the industry. It has made lenders less vigilant about making risky loans since any risk is quickly transferred to the purchasers of the loans. Because the lender holds few loans in its own portfolio, its interest in ensuring the accuracy of appraisals is greatly diminished. Moreover, because lenders' profits, at least in the short run, are

---

[1] This overview is drawn from paragraphs twelve through seventeen of the Attorney General's complaint in this action.

2

determined by the quantity not quality of the loans they close, lenders have incentives to pressure appraisers to reach values that will allow loans to close, regardless of whether they accurately reflect property values.

Further skewing incentives, mortgage brokers and lenders' loan production staff are almost always paid on commission, meaning that those individuals' income increases as they close more loans, and in larger amounts.  Accordingly, brokers and loan production staff have strong personal incentives to attempt to secure the maximum possible appraisal, both so that loans will close and so that they will generate maximum commissions.  For these reasons, mortgage brokers and lenders sometimes exert intense pressure on real estate appraisers to change values in appraisal reports. Investment banks and GSEs also have an interest in inflating (or at least not questioning) the value of the pooled loans.  The values of these loans serve as a basis for the value of their mortgage-backed securities; therefore, the higher the value of the loans closed, the greater the amount for which the securities can be sold on the secondary market.

The only parties whose interests favor an accurate appraisal are the borrowers and the persons who ultimately invest in  mortgage-backed securities.  Neither group, however, has any meaningful contact with or control over the appraisal process.

### B.    The Framework of Dual Federal and State Regulation of Real Estate Appraisals

With the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Congress established a framework for the regulation of real estate appraisals in which the federal and state governments play complementary roles. Congress enacted FIRREA in response to the savings-and-loan crisis of the mid-1980s.  At that time, the nation's thrifts and their

federal insurer, the Federal Savings and Loan Insurance Corporation, were in precarious financial condition as a result of fraud and abuses by insiders, deregulation of the thrift industry, and inadequate governmental supervision.  H. Rep. No. 101-54, at 294 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 90.

In FIRREA Congress undertook, among many other things, to reform the regulation of real estate appraisal practices, based upon its finding that "poor quality and . . . fraudulent appraisals" had caused "enormous losses at failed thrifts and contributed measurably to the thrift crisis." S. Rep. No. 101-19, at 35-36 (1989), reprinted in 2 Pulles, Whitlock, & Hogg, FIRREA: A Legislative History and Section-by-Section Analysis, at 1476 (1990) (hereinafter "FIRREA Legislative History"). FIRREA contemplates a cooperative effort between federal and state authorities to regulate appraisals, with the States in the leading role. In debates on the bill, a Senate sponsor observed that "[t]he key to [the FIRREA provisions regarding real estate appraisal standards] lies in the creation of State regulatory agencies and a Federal watchdog to monitor the standards and to oversee State enforcement [of those standards]. . . .  It is this combination of Federal and State action . . . that is the key to assuring that good [appraisal] standards are properly enforced."  135 Cong. Rec. S3993, S4004 (daily ed. April 17, 1989) (remarks of Sen. Dodd).

Before FIRREA, many States had no regulatory program for the oversight of real estate appraisal services.  FIRREA and its implementing regulations changed this by mandating that only appraisers licensed or certified by a State could conduct appraisals in specified "federally related transactions."[2]  12 U.S.C. § 3336.  Congress thereby encouraged the States to develop regulatory

---

[2] "Federally related transactions" are real estate transactions involving financial institutions regulated by the federal government.  12 U.S.C. § 3350(4).

4

programs to license, certify, supervise, and discipline real estate appraisers. Today, all fifty States have such regulatory programs. All of those programs incorporate into state law the Uniform Standards of Professional Appraisal Practice ("USPAP"), a body of generally accepted real estate appraisal standards developed by a private non-profit organization called the Appraisal Foundation. Appraisal Subcomm., Policy Statements at 12.[3] USPAP occupy a status in the appraisal field akin to that of generally accepted accounting principles in the area of financial accounting.

To serve as the federal watchdog of the State's appraisal regulatory programs, FIRREA created an "Appraisal Subcommittee" within the pre-existing Federal Financial Institutions Examination Council. Congress charged the Appraisal Subcommittee with the responsibility of, among other things, monitoring state agencies' supervisory activities. FIRREA empowers the Appraisal Subcommittee to de-certify a particular State's appraisal regulatory program – that is, declare that licenses and certifications granted by the State are not acceptable for use in federally related transactions – upon a written finding that:

> (1) the State agency fails to recognize and enforce the standards, requirements, and procedures prescribed pursuant to [Title XI of FIRREA];
>
> (2) the State agency is not granted authority by the State which is adequate to permit the agency to carry out its functions under this title; or
>
> (3) decisions concerning appraisal standards, appraiser qualifications and supervision of appraiser practices are not made in a manner that carries out the purposes of [Title XI].

12 U.S.C. § 3347(b).

---

[3] "Appraisal Subcomm., Policy Statements" refers to Federal Financial Institutions Examination Council, Appraisal Subcommittee, Policy Statements Regarding State Certification and Licensing of Real Estate Appraisers, available at http://www.asc.gov/html/frameSet.aspx?assetPath=/uploads/Policy%20 Statements\PolicyStatements2007Final.pdf (last visited Feb. 6, 2008)

To further ensure improved quality in real estate appraisals, Congress also required the federal financial institution regulatory agencies, including the Office of Thrift Supervision ("OTS"),[4] to adopt appraisal standards for federally related transactions and to require the use of state licensed and certified appraisers in such transactions. The bill's drafters "decided to build upon work already performed" by the Appraisal Foundation in developing USPAP. S. Rep. No. 101-19, at 35, reprinted in 2 FIRREA Legislative History at 1476. Thus, FIRREA mandates that all the federal financial regulatory agencies adopt USPAP as minimum standards for appraisals in federally related transactions. 12 U.S.C. § 3339; see 12 C.F.R. § 564.4(a) (OTS adopting USPAP). The agencies may also require compliance with additional, more onerous appraisal standards. 12 U.S.C. § 3339. The Appraisal Subcommittee oversees any such additional standards promulgated by the federal financial institution regulators. 12 U.S.C. § 3332.

FIRREA thus establishes complementary and overlapping roles for federal agencies, the States, and the non-profit Appraisal Foundation. The Act makes clear, however, that the States have primary authority over enforcement actions when appraisers fail to adhere to appropriate standards. Section 3348(c) of Title 12 requires the Appraisal Subcommittee and the federal financial institutions regulatory agencies to "report any action of a State certified or licensed appraiser that is contrary to the purposes of [FIRREA], to the appropriate State agency for a disposition of the subject of the referral." At the conclusion of the matter, the state agency must provide the referring federal agency with a report of its disposition. 12 U.S.C. § 3348(c). Only after receiving that report

---

[4] In addition to OTS, the federal financial institutions regulatory agencies include the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the National Credit Union Administration.

may the referring federal agency take any enforcement action of its own, provided such action is "necessary to carry out the purposes" of FIRREA.  <u>Id.</u>

**C.     Statement of the Case**

**1.     Procedural History**

On November 1, 2007, the State filed this lawsuit in New York State Supreme Court, New York County, pursuant to New York Executive Law § 63(12), New York General Business Law article 22-A, and New York common law.

On November 16, 2007, defendants removed the state proceeding to this Court pursuant to 28 U.S.C. §§ 1441 and 1446.  Ten days later, defendants moved to dismiss the complaint under Federal Rule of Procedure 12(b)(6).

On December 3, 2007, the State moved to remand this action to New York state court for lack of federal subject matter jurisdiction.  That motion remains pending before this Court.

**2.     The Attorney General's Complaint**

New York Executive Law § 63(12) authorizes the Attorney General to commence a proceeding in New York state court to enjoin any "repeated fraudulent or illegal acts" or "persistent fraud or illegality" in the conduct of business, and to seek restitution and damages on behalf of injured consumers.[5]  New York courts have construed the words "fraud" and "fraudulent," as used in to § 63(12) , to sweep far more broadly than the doctrine of common-law fraud.  The Attorney

---

[5]The statute defines "repeated" to "[i]nclude repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person."

7

General need not prove the traditional elements of reliance, actual deception, and intent to deceive. See State v. Gen. Elec. Co., 302 A.D.2d 314 (1st Dep't 2003). Rather, the terms encompass "all deceitful practices contrary to the plain rules of common honesty," including "all acts, although not originating in any actual evil design or contrivance to perpetrate fraud or injury upon others, which do by their tendency to deceive or mislead the purchasing public come within the purpose of the law." People v. Federated Radio Corp., 244 N.Y. 33, 38-39 (1926); see also Gen. Elec., 302 A.D.2d at 314 ("the test for fraud [under § 63(12)] is whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud"). The term "illegality" is also interpreted expansively, to include conduct that violates federal, state, or local laws or regulations. See, e.g., Matter of State of N.Y. v. Citibank, N.A., 537 F. Supp. 1192 (S.D.N.Y. 1982) (violation of federal Truth in Lending Act)[6]; State v. Princess Prestige, 42 N.Y.2d 104, 106 (1977) (violation of the New York Home Solicitation Act); State v. Winter, 121 A.D.2d 287 (1st Dep't 1989) (violation of New York City Rent Stabilization Code).

New York General Business Law § 349 prohibits "[d]eceptive acts and practices" in the conduct of business, and authorizes the Attorney General to bring suit to enjoin such acts and obtain restitution on behalf of aggrieved consumers. Section 349 applies to "virtually all economic activity and [its] application has been correspondingly broad." Karlin v. IVK Am., Inc., 93 N.Y.2d 282, 290

---

[6] For other decisions holding that the Attorney General may bring claims under Executive Law § 63(12) that are predicated on violations of federal law, see State v. Andersen, 137 A.D.2d 259, 267 (4th Dep't 1988); Lefkowitz v. Scottish Am. Ass'n, 52 A.D.2d 528 (1st Dep't 1976) (violation of Civil Aeronautics Board regulations); Oncor Comm. v. State, 165 Misc.2d 262, 267 (Sup. Ct. Alb. Co. 1995), aff'd, 218 A.D.2d 60 (3d Dep't 1996); State v. Stevens, 130 Misc.2d 790 (Sup. Ct. Oswego Co. 1985) (violation of FTC regulations); State v. Life Sci. Church, 113 Misc.2d 952 (Sup. Ct. N.Y. Co. 1982), appeal dismissed, 93 A.D.2d 774 (1st Dep't), appeal dismissed, 60 N.Y.2d 643 (1983) (violation of I.R.C. § 501 tax exemption).

(1999).  Acts or practices are "deceptive" within the meaning of § 349 if they are "likely to mislead a reasonable consumer acting reasonably under the circumstances." <u>Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank</u>, 85 N.Y.2d 20, 26 (1995).

The Attorney General's complaint asserts claims under Executive Law § 63(12), General Business Law § 349, and the New York common law of unjust enrichment based on allegations that defendants engaged in fraudulent, deceptive, and illegal business practices in connection with arranging and conducting residential real estate appraisals for their client Washington Mutual ("WaMu").  Defendant eAppraiseIT, LLC ("eAppraiseIT") is an appraisal management company that conducts business in New York and appraises real estate located in New York. Compl. ¶ 4. Defendant The First American Corporation ("First American") is eAppraiseIT's parent company. Compl. ¶ 3. The complaint alleges that these defendants engaged in a course of conduct contrary to USPAP appraisal rules mandating that real estate appraisers maintain strict independence from the parties that engage them, so that appraisals remain fair, objective, and untainted by parties' financial or other incentives to consummate loan transactions.

Specifically, USPAP rules state: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct), <u>available at</u> http://commerce.appraisalfoundation.org/html/2006%20USPAP/ ethics_rule.htm (last visited Feb. 6, 2008).  As noted above, USPAP rules are the appraisal industry standard and are incorporated by reference into both New York and federal law. <u>See</u> 19 N.Y.C.R.R. § 1106.1; 12 U.S.C. § 3339; 12 C.F.R. § 564.4(a). In public statements, defendants claimed to

provide "third-party, unbiased valuations" that complied with these USPAP rules (Compl. ¶¶ 7, 23), but they did not do so.

Rather, the complaint details a course of conduct whereby defendants repeatedly violated USPAP rules governing appraiser independence in several ways. Chief among them, in performing appraisals for WaMu defendants agreed to cease using eAppraiseIT's usual panels of staff and fee appraisers and to instead use a "Proven Appraiser List" composed of real estate appraisers hand-picked by WaMu's loan origination staff because those appraisers provided the valuations WaMu needed to close its loans. Compl. ¶¶ 37-38. Further, defendants permitted WaMu's loan production staff to remove from the "Proven Appraiser List" appraisers who did not deliver the valuations WaMu wanted or accede to WaMu's demands that valuations be "reconsider[ed]."  See Compl. ¶¶ 70-83.

When defendants agreed to use the "Proven Appraiser List," they were well aware that the "proven appraisers" had been selected by WaMu specifically because they "br[ought] in the values" that WaMu's loan officers desired. Compl. ¶ 46. Defendants further knew that agreeing to assign only WaMu's selected "proven appraisers" violated USPAP standards and improperly compromised eAppraiseIT's independence. Compl. ¶¶ 46-48, 50. Indeed, in an e-mail to senior executives at First American, eAppraiseIT's President acknowledged that using the Proven Appraiser Panel was "a violation of the . . . USPAP influencing regulation." In another e-mail, the President remarked: "Sales is the driving force behind the Proven Appraiser List (PAL) which is questionable from regulatory perspective. . . . We feel our reputation in the industry is being tarnished by the implementation of the Proven List since Production selects the appraiser." Compl. ¶ 55.

10

Similarly, eAppraiseIT's Executive Vice President acknowledged that the Proven Appraiser arrangement was "way over the line." Compl. ¶ 45.  In another e-mail, he stressed the importance of appraiser independence and explained how the proven panel arrangement compromised eAppraiseIT's independence: "[W]e . . . need to retain our independence from the lender or it will look like collusion. . . . eAppraiseIT needs to choose the appraisers, not WaMu.  Where it gets really clear that eAppraiseIT is NOT choosing is the proven idea . . . .  eAppraiseIT is clearly being directed who to select." Compl. ¶ 46. Elsewhere, the Executive Vice President identified some of the problems caused by use of the Proven Appraiser Panel – namely, that "the possibility of collusion between the loan officers and appraisers is increased when eAppraiseIT does not control the selection" and that the arrangement tended to foster "possible lender pressure or perception of lender pressure when the only way to get on the WAMU 'proven' panel is through the loan officer." Compl. ¶ 68. Despite their awareness that use of the Proven Panel was illegal and contrary to USPAP rules, defendants "agreed to roll over and just do it" because WaMu insisted upon it. Compl. ¶ 41.

The complaint also alleges additional deceptive and illegal conduct by defendants. At times eAppraiseIT permitted WaMu's loan production staff to direct the selection of a specific individual to perform a particular appraisal assignment. Compl. ¶ 54.  eAppraiseIT also repeatedly allowed WaMu loan production staff to pressure eAppraiseIT's Appraisal Business Managers (themselves former WaMu employees) about appraisal values in telephone and e-mail communications. Compl. ¶¶ 84-86, 87-89. eAppraiseIT's Chief Appraiser described such communications as "a direct picture of Lender Pressure on behalf of WaMu." Compl. ¶ 87. The complaint further alleges that "eAppraiseIT's internal appraisal log entries indicate that its Review Appraisers and [Appraisal

11

Business Managers] increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close." Compl. ¶ 89.

## ARGUMENT

### I.   THE ATTORNEY GENERAL'S CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW

#### A.   Federal Law Does Not Occupy the Field of Appraisal Regulation.

As an initial matter, the Attorney General notes that he has filed a motion to remand this case to New York state court for lack of federal subject matter jurisdiction. That motion, of course, must be decided before defendants' motion to dismiss the complaint on the merits is addressed. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-95 (1998) (subject matter jurisdiction must be decided before merits).

Should this Court reach defendants' Rule 12(b)(6) motion, that motion must be decided based solely on the allegations of the Attorney General's complaint, and without regard to the defendants' improper evidentiary submissions and the factual assertions set forth in their memorandum of law. Defs.' Mem. of Law at 3-5. Moreover, in ruling on defendants' motion, this Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).

Defendants principally argue that the Attorney General's claims under Executive Law § 63(12), General Business Law § 349, and New York common law are barred by principles of field preemption. Defs.' Mem. of Law at 6-14. They claim that the Attorney General, by bringing this suit to enforce laws governing appraiser independence, has intruded upon a field of exclusive federal

authority. That contention cannot withstand scrutiny because FIRREA specifically contemplates dual state and federal regulation and enforcement of appraisal standards.

In all preemption cases, the purpose of Congress is the "ultimate touch-stone." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (internal quotation marks omitted). Discerning congressional purpose requires consideration of statutory text and structure, as well as "the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Id. at 486.Here, those sources prove that Congress has not ousted the States from acting in the area of appraisal regulation.  Quite the opposite is true: Congress recognized in FIRREA that a "combination of Federal and State action . . . is the key to assuring that good [appraisal] standards are properly enforced."  135 Cong. Rec. at S4004 (remarks of Sen. Dodd, bill sponsor).  Congress thus envisioned a complementary relationship between federal and state enforcement of appraisal standards that allows ample room for the Attorney General's suit here.

Several FIRREA provisions demonstrate the States' important role in this area. By its express terms, FIRREA relies upon the States to license and certify appraisers and to oversee and supervise their conduct in providing appraisal services.  12 U.S.C. §§ 3346-3348. The Act plainly also contemplates that States will develop and enforce appraisal standards: one basis upon which the Appraisal Subcommittee may de-certify a State's regulatory program is if it finds that the State's "decisions concerning appraisal standards . . . and supervision of appraiser practices are not made in a manner that carries out the purposes of [Title XI of FIRREA]." 12 U.S.C. § 3347(b)(3); see also Appraisal Subcomm., Policy Statements, at 12 ("Any State . . . agency . . . may impose additional appraisal standards if they consider such standards necessary to carry out their responsibilities.").

13

Indeed, FIRREA establishes the States as the primary enforcer of appraisal standards against those performing appraisal services: the Act requires federal agencies to refer any instances of appraiser misconduct to the States and to defer any federal enforcement action until after the State's disposition of the referral. 12 U.S.C. § 3348(c). Clearly, as the federal Appraisal Subcommittee has observed, in FIRREA Congress "recognized that the States were in the best administrative position to certify and license real estate appraisers and to supervise their appraisal-related activities." Federal Financial Institutions Examination Council, Appraisal Subcomm., ASC History, available at http://www.asc.gov/default.aspx?id=6 (last visited Feb. 6, 2008). Nothing about this regime supports defendants' assertion that the federal government has "occupied the field."

Surely recognizing that federal law does not oust the States from acting in this area, defendants try to divert this Court's attention to an entirely different field: the regulation of federal savings and loan associations' lending practices under the federal Home Owners' Loan Act ("HOLA"). See Defs.' Mem. of Law at 6-10. Defendants therefore cite numerous cases holding that state laws governing mortgage lending cannot be applied against federal savings and loan associations. Those cases are inapposite, however, because the extent of federal preemption regarding regulation of federal savings and loans has nothing to do with this case. The Attorney General has not sued a federal savings and loan and does not seek to enforce any law against a federal savings and loan, let alone any law regulating the lending activities of such associations.

Rather, the Attorney General is acting in a wholly different field. He has sued defendants that are in the business of providing appraisal services for alleged violations of laws governing appraisal standards. Defendants attempt to blur the two areas, but an important purpose of appraiser independence rules is precisely to ensure that appraisal activities remain separate and apart from

14

lending activities. And regulation of appraisal services, unlike regulation of the lending activities of federal savings and loans, is a field in which the States possess primary authority by express congressional design, as embodied in FIRREA. Hence, defendants' extended discussion about the scope of preemption as to state regulation of the lending activities of federal savings and loans under HOLA is irrelevant to this case.

In a vain attempt to bridge the divide between savings and loan associations and appraisal service providers like themselves, defendants cite 12 U.S.C. § 1813(u)(4), which provides that an "independent contractor (including [an] appraiser, attorney, or accountant)" who performs work for a federally insured depository institution will be considered an "institution-affiliated party" in certain defined circumstances. That provision, however, has a narrow purpose wholly unrelated to preemption of state law. Section 1813(u)(4) merely makes an independent contractor subject to potential administrative action by a federal financial institution regulator, where the independent contractor "knowingly or recklessly participates in . . . any violation of a law or regulation, . . . any breach of fiduciary duty, . . . or any unsafe or unsound practice, which caused or is likely to cause more than a minimal loss to, or a significant adverse effect on, the insured depository institution." 12 U.S.C. § 1813(u)(4); see also id. § 1818 (making any "institution-affiliated party" subject to administrative proceedings ). The import of 12 U.S.C. § 1813(u)(4) is that OTS and other federal regulators have the ability to institute administrative proceedings against independent contractors who engage in knowing and reckless wrongdoing that harms a financial institution. Nothing in federal law suggests that this federal enforcement power was meant to be exclusive, and FIRREA itself contradicts any such claim, for the reasons discussed above. Unsurprisingly, defendants are

able to muster no authority for the proposition that OTS alone may take enforcement action against independent contractors who engage in misconduct while working for federal thrifts.

Moreover, defendants' argument proves far too much. Consider the case of an individual appraiser who unlawfully accepts an appraisal assignment from a federal savings and loan for which his compensation is contingent upon the valuation he gives in the appraisal, and assume that the appraiser acted knowingly or recklessly and in a manner likely to cause the savings and loan harm. That appraiser would qualify as an "institution-affiliated party" within the meaning of § 1813(u)(4), but 12 U.S.C. § 3348(c) leaves no doubt that the state agency would have primary authority to bring enforcement proceedings against him and that a federal agency could act only after the state agency had disposed of the matter. Thus, an independent contractor's potential status as an "institution-affiliated party" does not preempt state law or state enforcement efforts.[7]

Defendants also argue that "FIRREA, and its accompanying regulations, expressly limit the state's role in the appraisal arena to the supervision of the professional conduct of <u>individual</u> appraisers," and do not allow the State to enforce appraisal standards against appraisal management companies like eAppraiseIT. Defs.' Mem. of Law at 16. To be sure, FIRREA focuses heavily on state supervision of individual appraisers, perhaps because appraisal management companies were far less prevalent at the time of FIRREA's passage than they are today. But no provision of the Act "expressly limits" the State's role to the regulation of individual appraisers, or suggests that

---

[7]For another example, consider that § 1813(u) also specifically lists attorneys as a category of independent contractors that are considered "institution-affiliated parties" in cases of knowing and reckless misconduct. However, the State would clearly retain authority to discipline attorneys for misconduct in work they perform for federal savings and loans. <u>See, e.g.</u>, <u>Fla. Bar v. Went for It</u>, 515 U.S. 618, 635 (1995) ("[T]he standards and conduct of state-licensed lawyers have traditionally been subject to extensive regulation by the States.").

16

corporate misconduct in the provision of appraisal services is beyond the purview of state regulation and enforcement. FIRREA demonstrates that Congress intended that the States would play an active role in setting appraisal standards and enforcing those standards, and that role logically encompasses the activities of the appraisal management companies that dominate the appraisal marketplace today, as well as individual appraisers. Defendants offer no reason why the occurrence of preemption should turn on the mere form of business organization through which appraisal services are delivered, and there is none.

**B.     The Attorney General's Claims Do Not Conflict with Federal Law.**

In the alternative to their field preemption argument, defendants argue for preemption on the ground that this lawsuit is "in conflict with" OTS's regulations governing appraiser selection and independence. Defs.' Mem. of Law at 15. As defendants correctly note, state law is deemed to conflict with federal law when "state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Defs.' Mem. of Law at 15 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  This occurs where state law, if allowed to stand, would "frustrate the goals" of federal law. Int'l Paper Co. v. Ouellette, 479 U.S. 481, 498-99 (1987) .

That is not the case here for two principal reasons. First, the conduct alleged by the Attorney General violated federal as well as state appraisal standards, so there can be no contention that holding defendants liable for that conduct would frustrate the goals of federal law.  Second, even if state standards did go beyond what federal law prescribes, FIRREA permits States to impose additional appraisal standards that exceed federal minimum standards.

17

Both federal and state law incorporate USPAP standards of appraiser independence. The Attorney General's complaint alleges that defendants violated those standards, and pleads a host of specific facts supporting that claim. The complaint further alleges that defendants' conduct was "fraudulent" and "deceptive" within the meaning of New York law, and was "illegal" under both state and federal law, thus supporting causes of action under Executive Law § 63(12), General Business Law § 349, and New York common law.

Defendants appear to concede, as they must, that if the facts pleaded by the Attorney General state a claim for the violation of federal standards of appraiser independence, then the Attorney General's state-law claims cannot conflict with federal law. See Defs.' Mem. of Law at 20 n.12. Thus, to prevail on this motion to dismiss, defendants must show that the allegations of the complaint, liberally construed, cannot support any reasonable inference that their conduct violated federal standards of appraiser independence. Defendants attempt this showing, but do not succeed in it.

As a threshold point, defendants limit their argument to the "Proven Appraiser List" issue. They do not address the allegations in the complaint that (1) eAppraiseIT permitted WaMu loan origination staff to direct the selection of specific appraisers for particular assignments (Compl. ¶ 54); and (2) eAppraiseIT allowed WaMu loan origination staff to exert direct pressure on eAppraiseIT's Appraisal Business Managers to increase valuations (Compl. ¶¶ 84-86, 87-89). Those allegations, therefore, are beyond the scope of defendants' conflict preemption arguments.

On the Proven Appraiser List issue, the Attorney General's complaint alleges that defendants agreed to use that list developed and maintained by WaMu's loan production staff, with full knowledge that the staff had selected appraisers who delivered the values needed to close loans.

This conduct was contrary to USPAP standards of appraiser independence, and contrary in particular to the interpretation of those standards set forth in "Interagency Guidelines" collectively published by the federal financial institution regulators.  Those guidelines leave no doubt that defendants' conduct violated federal law.  The initial Interagency Guidelines, published in 1994, emphasized that "[b]ecause the appraisal and evaluation process is an integral component of the credit underwriting process, it should be isolated from influence by the institution's loan production process." Office of the Comptroller of the Currency et al., Interagency Appraisal and Evaluation Guidelines, at. 2 (Oct. 27, 1994), available at http://www.fdic.gov/news/news/financial/2003/fil0384b.html (last visited Feb. 6, 2008). More recently, the agencies published responses to a number of "frequently asked questions," or "FAQs," about appraisal practices.  In answering one of the FAQs, the agencies made clear that loan production staff must not control the "development and maintenance" of any preapproved list used for appraiser selection:

> [Question:] When selecting residential appraisers, may loan production staff use a revolving preapproved appraiser list, provided the list is not under their control?
>
> Answer: Yes, loan production staff may use a revolving, board-approved list to select a residential appraiser, provided the development and maintenance of the list is not under their control. Staff responsible for the development and maintenance of the list should be independent of the loan production process.

Office of the Comptroller of the Currency et al., Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions (Mar. 22, 2005), available at www.ncua.gov/letters/2005/CU/05-CU-06-Encl%20-1.doc (last visited Feb. 6, 2008). Here, the Attorney General alleges that WaMu loan production staff controlled the development and maintenance of the Proven Appraiser List that defendants agreed to use in assigning appraisers.  That plainly violates the above federal guidance.

There is no merit to defendants' argument that the federal guidance applies only in cases where loan production staff "selects" a particular appraiser from a preapproved list for a particular assignment, and not when an appraisal management company like eAppraiseIT performs that individual selection at the loan officers' behest. Defs.' Mem. of Law at 17-19. The "frequently asked question" to which the guidance responds contemplated that individual selection would be done on a "revolving" basis – i.e., that the next name on the preapproved list would be selected as each assignment arose. The question therefore did not envision the exercise of judgment by anyone in the selection of a particular appraiser for an assignment. The import of the guidance could not be clearer: whether it is loan production staff or someone else who reads the next name off of the preapproved list for a particular assignment, the contents of such a list cannot be controlled and maintained by a client's loan production staff.

Even if defendants' hypertechnical parsing of the federal guidance were correct, their conclusion that defendants therefore complied with federal law would not follow. The guidance is merely illustrative; it does not purport to exhaustively describe all practices that compromise appraiser independence.  Defendants offer no principled reason why it should matter whether loan production staff or some other party selects individual appraisers from a preapproved list for particular assignments, when the game has already been fixed because loan production staff control the contents of the preapproved list in the first place.

Moreover, the current position of defendants' counsel – that federal rules of appraiser independence were "fully satisfied" here (Defs.' Mem. of Law at 17) – is contradicted by the statements of defendants' own executives in internal communications before this investigation was commenced.  Previously, eAppraiseIT's executives acknowledged, among other things, that their

use of the Proven Appraiser List was "way over the line" (Compl. ¶ 45); a "violation of the OCC,

OTS, FDIC, and USPAP influencing regulation" (Compl. ¶ 48); and "directly in contradiction to the

[federal] interagency guidelines" (Compl. ¶ 50). Counsel's present arguments ring particularly

hollow in light of these admissions.

Finally, even if it were true that state law on appraiser independence went beyond what

federal law required, that would not mean that state law is preempted. Defendants assume that any

state law on appraisal standards must accord precisely with federal law or else fall into conflict with

federal law. But that is not true. FIRREA was enacted in response to widespread problems with

"poor quality and fraudulent appraisals," and was directed toward improving appraisal standards

through effective regulation and enforcement. While Congress imposed USPAP as a minimum floor

for appraisal standards, 21 U.S.C. § 3339, Congress did not purport to establish any federal <u>ceiling</u>

on such standards.

Along these lines, the Appraisal Subcommittee has explicitly recognized that States may

choose to impose additional appraisals standards if they wish to do so:

> [T]he ASC urges all States to incorporate USPAP as the minimum appraisal standard
> by general reference into their laws and regulations. . . .
>
> Any State . . . agency . . . may impose additional appraisal standards if they consider
> such standards necessary to carry out their responsibilities.  Additional State imposed
> standards, however, must be consistent with USPAP and must not unduly restrict the
> ability of persons to become State certified or licensed appraisers.  Moreover, those
> additional standards must not reduce the level of appraisal standards or practices
> below those established by the [Appraisal Standards Board] or unduly burden
> temporary practice.  They also should not hamper the creation of State reciprocity
> agreements.

Appraisal Subcomm., <u>Policy Statements</u> at 12. Accordingly, there is no merit to defendants'

suggestion that New York law can survive only if it tracks federal law in all particulars.

## II.    THE COMPLAINT STATES A VALID CLAIM
## UNDER GENERAL BUSINESS LAW § 349

Defendants argue that independent of any issue of preemption, the Attorney General's claims under General Business Law § 349 must be dismissed under the Second Circuit's decisions in Conboy v. AT&T Corp., 241 F.3d 242 (2d Cir. 2001), and Broder v. Cablevision Systems Corp., 418 F.3d 187 (2d Cir. 2005). In those cases, the Second Circuit held that a private plaintiff could not bring a claim under § 349 that was predicated solely on the violation of a state or federal statute that itself provided no private right of action. As explained below, this case bears no resemblance to Conboy or Broder.

In Conboy, the private plaintiff sought to bring a § 349 claim based on defendants' violation of a New York statute prohibiting a creditor from communicating with a debtor in a harassing manner. See 241 F.3d at 257-58. The New York Court of Appeals had squarely held that the statute did not supply a private right of action, and the Second Circuit ruled that the private plaintiff could not circumvent that holding by pleading the claim under § 349. The Court also noted that the plaintiff had not alleged that defendants' conduct was "deceptive" within the meaning of § 349. Broder involved similar facts. The private plaintiff there sued under § 349 based on defendants' alleged violation of a federal statute requiring cable rates to be uniform within the State. Citing Conboy, the Second Circuit rejected the claim on the ground that the federal statute did not provide for a private right of action and did not address deceptive or misleading conduct at all.

This case differs from Conboy and Broder in at least two critical respects. First, the Attorney General is not a private plaintiff; therefore, analysis of whether federal law accords a private right of action has no place here. Compare General Business Law § 349(b) (setting forth the Attorney General's authority to sue for violations of the section), with § 349(h) (providing for a private right

22

of action for individual plaintiffs). Moreover, contrary to defendants' claims, the Attorney General's General Business Law § 349 claim is not simply a device for asserting a cause of action for defendants' violation of federal law. Defs.' Mem. of Law at 20.  Rather, the Attorney General's complaint alleges deceptive conduct lying at the heart of § 349's protections – namely, that defendants publicly touted their compliance with USPAP standards of appraiser independence, while in fact repeatedly violating those standards. This practice was "likely to mislead a reasonable consumer," Oswego, 85 N.Y.2d at 26, which is the test under § 349. The fact that the same conduct also violated federal law does not preclude the Attorney General's § 349 claim.  Cf. Walts v. First Union Mortgage Corp., 259 A.D.2d 322, 322 (1st Dep't 1999).

Defendants themselves have recognized that consumers reasonably depend upon real estate appraisals being accurate and unbiased and are victimized when appraisals fail to meet those standards.  First American's 2006 annual report observed that "inaccurate or fraudulent appraisals damage the entire market and have negative economic effects that are far reaching," and stressed that "[h]omeowners, who place a large investment in their property, can be particularly victimized by appraisal fraud."   The First American Corp., 2006 Annual Report 13, available at http://thomson.mobular.net/thomson/7/2346/2577 (last visited Feb. 6, 2008); see also Compl. ¶ 7. The annual report assured readers that "First American's third-party, unbiased valuations . . . benefit[] not only the homeowner and lender, but our nation's economy," and that "First American's warranted valuations, which are supported by our third-party perspective and backed by more than a century of integrity, virtually eliminate [the] risk" fraudulent and inaccurate appraisals pose to homeowners. Id. The Attorney General's complaint alleges that defendants failed to live up to these

promises and fell far short of the appraisal standards that consumers can reasonably expect to be

satisfied. Section 349 is designed precisely to protect consumers from such deceptive practices.


**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss should be denied.

Dated: New York, New York
   February 6, 2008

         Respectfully submitted,

         ANDREW M. CUOMO
         Attorney General of the State of New York
         Attorney for Plaintiff

    By:   /s/ Nicole Gueron
         NICOLE GUERON (NG-7682)
         Deputy Chief Trial Counsel
         120 Broadway, 25th Floor
         New York, New York  10271
         Tel: (212) 416-6053
         Nicole.Gueron@oag.state.ny.us

Of Counsel:
Richard Dearing
Assistant Solicitor General

Christopher Mulvihill
Assistant Attorney General

24